UNITED STATES DISTRICT COURT
EASTERN DISTRICT NEW YORK

---------------------------------------------------------------------- x

ERNEST JETER,

Plaintiff,

-against-

NEW YORK CITY DEPARTMENT OF EDUCATION OF THE CITY OF NEW YORK, NEW YORK CITY DEPARTMENT OF INVESTIGATION OF THE CITY OF NEW YORK, and THE OFFICE OF SPECIAL COMMISSIONER OF INVESTIGATION FOR NEW YORK CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK, *et al.*,

Defendants.

---------------------------------------------------------------------- x

**DECLARATION IN SUPPORT OF MOTION TO DISMISS**

Docket No. 06 Civ. 3687 (DGT)(LB)

I, DANIEL CHIU, hereby declare that:

1. I am an Assistant Corporation Counsel with the office of Michael A. Cardozo, Corporation Counsel of the City of New York, attorney for defendants New York City Department of Education ("DOE") (incorrectly sued herein as New York City Department of Education of the City of New York, New York City Department of Investigation ("DOI") (incorrectly sued herein as New York City Department of Investigation of the City of New York, and the Special Commissioner of Investigation for the New York City School District ("SCI") (incorrectly sued herein as the Office of Special Commissioner of Investigation for New York City School District of the City of New York) (collectively, "Defendants"). I am familiar with the matters set forth below.

2. This declaration is submitted in support of Defendants' motion to dismiss.

3. Annexed hereto as Exhibit "A" is a true copy of Plaintiff's Amended Complaint

in the action titled *Ernest Jeter v. Board of Education of the City of New York*, Docket No. 99 CV 2537 (DGT)(CLP).

4. Annexed hereto as Exhibit "B" is a true copy of the Memorandum and Order, dated March 25, 2004 in *Ernest Jeter v. Board of Education of the City of New York*, Docket No. 99 CV 2537 (DGT)(CLP).

5. Annexed hereto as Exhibit "C" is a true copy of the Complaint filed in the action titled *Ernest Jeter v. New York City Department of Education of the City of New York, New York City Department of Investigation of the City of New York, and the Office of Special Commissioner of Investigation for the New York City School District of the City of New York, et al.*, docket no. 06 CV 3687 (DGT)(LB).

6. Annexed hereto as Exhibit "D" is a true copy of a letter, dated May 11, 2003, from Plaintiff to Mayor Michael Bloomberg.

7. Annexed hereto as Exhibit "E" is a true copy of Plaintiff's Complaint of Alleged Discrimination, dated March 9, 2004, filed with DOE's Office of Equal Opportunity.

8. Annexed hereto as Exhibit "F" is a true copy of a Complaint of Discrimination sworn to by Plaintiff on July 6, 2004.

9. Annexed hereto as Exhibit "G" is a true copy of a Determination and Order After Investigation, dated October 6, 2005.

10. Annexed hereto as Exhibit "H" is a true copy of an EEOC right-to-sue letter, dated January 11, 2006.

11. Annexed hereto as Exhibit "I" is a true copy of a Complaint of Discrimination sworn to by Plaintiff on August 11, 2005.

12. Annexed hereto as Exhibit "J" is a true copy of a Determination and Order After

Investigation, dated March 16, 2006.

13. Annexed hereto as Exhibit "K" is a true copy of an EEOC right-to-sue letter, dated May 4, 2006.

14. Annexed hereto as Exhibit "L" is a true copy of a Final Investigation Report and Basis of Determination, dated September 30, 2005, from the New York State Division of Human Rights.

15. Annexed hereto as Exhibit "M" is a true copy of a Final Investigation Report and Basis of Determination, dated March 13, 2006, from the New York State Division of Human Rights.

16. Annexed hereto as Exhibit "N" is a true copy of a 39 page narrative with accompanying exhibits, dated November 25, 2005, from Plaintiff to the New York State Division of Human Rights.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
January 26, 2007

Daniel Chiu

# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK




ERNEST JETER,

Plaintiff,

-against-

BOARD OF EDUCATION OF THE CITY OF NEW YORK,

Defendant.

Amended
**COMPLAINT**
**PLAINTIFF DEMANDS TRIAL BY JURY**

99-CV-2537 (DGT)

1. At all times hereafter mentioned, plaintiff was and still is a resident of 124-21 Flatlands Avenue, Apartment 1-J, Brooklyn, New York, 11208.

2. Defendant, Board of Education of the City of New York, is a corporation incorporated under the laws of New York State and having a main office at 110 Livingston Street, Brooklyn, New York, 11201, and is licensed to do business in Education.

3. The Jurisdiction of this court is invoked pursuant to:

a) 42 U.S.C. section 2000e, et seq.: Title VII of the Civil Rights Act of 1964, as amended.

b) 42 U.S.C. section (12111) 12101, et seq.: Title I of the Americans with Disabilities Act of 1990.

4. Statement of facts:

(4A) As for the first cause of action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., I am a member of a protected class: that is, I am an African-American Male, and I am being treated different by the above named defendant. That is, plaintiff has been harassed and discriminated against by the defendant because of his race: African-American/black. The Board of Education has also treated plaintiff different, discriminated and harassed plaintiff by allowing its medical bureau, and others who are empowered to

99 MAY -7 PM 1:42 CITY OF N.Y. LAW DEPT. OFFICE OF CORP. COUNSEL CORRESPONDENCE SECTION
99 MAY 13 PM 1:01 CITY OF N.Y. LAW DEPT. OFFICE OF CORP. COUNSEL

grant line of duty injuries, to grant line of duty absences for injuries received in the line of duty in an arbitrary manner to plaintiff.

4B) Plaintiff further pleads/alleges that plaintiff has exhausted administration prerequisites to filing the complaint/suit. That is, plaintiff pleads 'exhaustion' of administration prerequisires to suit. Plaintiff is aleging that the filing of the charges with Equal Employment Opportunity Commission has been filed in a timely manner, and plaintiff has a receipt of a notice of right to sue ( see attached) from the United States Attorney General Office of United States Department of Justice: Civil Rights Division.

4C) Plaintiff also pleads and alleges that the discrimination by the defendant is continuing.

4D) My name is Ernest Jeter and I am a Guidance Counselor with the New York City Board Of Education. I have worked as a Guidance Counselor with the Board of Education for five years. I have a New York City License in Guidance Counselor and a Permanent Certificate in School Counseling from the State of New York. During the five years I have worked for the Board of Education, I have been either excessed or re-deployed to work in other schools three times. Each time I was excessed or re-deployed I was working in a vacant position.

4E) Excess means that the Board of Education can assigned counselors or other staff to positions in other schools in times of budget crisis or when a senior counselor wishes to transfer to a position announced as being vacant in a particular school even when

there is a qualified or certified counselor working in that position. The different is that the counselor tranferring is an appointed counselor and the counselor working in the position has not been appointed.

(4F) The Board of Education has negotiated with the United Federation of Teachers, the union that represents Guidance Counselors, about how this process should occur. But, however, there are problems. The has not followed the process.

(4G) First, there is the problem as to why a counselor who has worked in a counseling position from any where from one to three years and has not been appointed. While in other cases, some counselors with less than one full year experience are appointed. The key word here is appointment. Appointment is the key word because when a counselor is appointed, s/he gains seniority over all counselors who have not been appointed. It does not matter if the counselor who was not appointed was working more than five years or more.

(4H) In the school I was working, Walter Reed Junior High/P9 Queens,in Maspeth, New York, I thought that there was at least one counselor that was not appointed and I had more seniority, but it will be extremely difficult for me to find out, and that will be explained a little further on in this complaint.

(4I) The second area that is of major concern is that most of the positions for hiring of mono-lingual Guidance Counselors is not advertised atleast on a regular basis. Most individuals have achieved their position by knowing someone in the system. This put individuals in my racial group in a precarious position.

This put individuals of my racial group in this position because we do not know the decision makers. This also happen to me because I have had my provisional certificate from the State of New York and it took me twelve years to get a Guidance Counselor's position with the Board of Education. This is a very preposterous situation. Even as of the 1995/96 school year, the statistical imbalance is horrid.

(4J) There is even a more compelling question: that is, why is the Board of Education hoarding or warehousing positions in Guidance Counseling by refusing to appoint certified licensed counselors to those position they are working in.

(4K) The third concern, and perhaps the most serious concern, is that even when a counselor pass the oral examination given by the Board of Education in order to earn the New York City License and completed all the requirements for a New York State provisional or permanent certificate in School Counseling, they are placed on a computer list.

(4L) From this computer list all counselor are suppose to be chosen for assignment or appointment. The future appointed Guidance Counselors are to be chosen at random by this computer, but a formal computer list is not distributed in order for a prospective guidance counselor can determine where there position is on the list.

(4M) This makes it very difficult to be placed in a more desirable school.

(4N) The fourth concern is that when I have asked to see this computer list in order ascertain my position on the list, I

was told that I could not see the list. At this juncture we must remember that there are many from my racial group who are not working in the Board of Education that are also on this list waiting to be called for an assignment as a Guidance Counselor.( I am making no claim to represent them, but I am intending to make the Court aware of their plight). This closed system has the serious appearance of an impropriety since the Board of Education is Public Corporation. This closed system has the appearance of an impropriety simply because there is never an announcement as to when someone is appointed, where they were on the list when they were appointed, i.e., what order they were selected: was it every third, fourth, or fifth person etc., or the names of the individuals who were appointed. The whole system of selection is completely anonymous.

(40) The fifth and final concern of the first cause of action is that at each school that plaintiff worked at some one would make a wrongful accusation. Accusing plaintiff of any thing from wrongful insubordination to some form of abuse. The whole campaign of discrimination and harassment was due to an attempt by the Board of Education representative to fire plaintiff or make plaintiff quit. Plaintiff went to the Mayor of the City of New York to complain about his treatment by the Board of Education.

(41) Finally, in addition, the Board of Education representatives knew that before they transferred plaintiff out of East Brooklyn Congregation High School of East New York and of Bushwick at 1495 Herkimer Street Brooklyn, New York that there was a vacancy

for a guidance counselor position available in the Bushwick component of East Brooklyn Congregation High School. They knew because the previous guidance counselor for Bushwich was fired.

(4Q) This first cause action is all inclusive: the first cause of action includes all of the second cause action, et. seq.

As for the second cause of action: Title I of the Americans with Disability Act of 1990, 42 U.S.C. 12101, et. seq., The above named defendant has knowingly refused to provide the above named plaintiff with reasonable accommondation.The above named defendant had reasonable written and verbal knowledge that in the fashion in which defendant sent plaintiff back to work that plaintiff was not able to constantly walk up and down stairs in order to perform his duties. The defendant, after it medical bureau gave its written approval for plaintiff to return to work, deliberately transferred plaintiff out of a building that could have reasonably accomondated the plaintiff to a building that required that plaintiff to walk up and down in order for him to perform his duties. When plaintiff was reassigned to another school, the principal threaten to fire plaintiff because he did not think plaintiff could do the od. This principal had prior knowledge that plaintiff was in injured on the job and it was explained to him that the medical bureau had medical documents on file that I was not able to work because of the injury to my left leg. Yet, the medical bureau of the Board of Education refused to accept the medical opinion of plaintiff's medical doctors. The Board had plenty

(4R)

of previous Knowledge that plaintiff was not able to walk much and not able to walk up and down stairs, in particularly.

45) Furthermore, the Board of Education continue to transfer Plaintiff to other schools that required plaintiff to walk for a considerable distance and to visit atleast two site a day to do counseling. The Board of Education on hiring process for counselors will clearly demonstrate the manner in which plaintiff was not reasonably accommondated and how the constant harassing plaintiff by giving plaintiff assignment that caused plaintiff considerable difficulties and further in uries to his legs that now will includes surgery. That is, the whole process was a campaign of harassment that had a twofold purpose: 1) to cause plaintiff to quit or 2) to cause plaintiff to not be able to perform his duties, and thereby, terminate him.

(47) This second cause of action is all inclusive: that is, it includes all of the first cause action written above.

5) WHEREFORE, plaintiff demands: 1)(a) For the first cause of action money damages in the amount of $25,000,000 for personal injuries;(b) $25,000,000 for punitive damages and (c) $25,000,000 for pain and suffering, (d) $25,000,000 for mental anguish.

2) For the second cause of action, money damages in the amount of $25,000,000 personal injury, and $25,000,000 for pain and suffering, $25,000,000 for punitive damages and $25,000,000 mental anguish.

Any further relief which the court may deem appropriate.

Ernest Jeter

ERNEST JETER
PRO SE
124-21 Flatlands Ave./1
Brooklyn, New York 11208
(718)498-6437

Date: May 6 1999

Exhibit B

D+F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

[illegible] LICATION

-----------------------------------------------------x

ERNEST JETER,

Plaintiff,

- against -

BOARD OF EDUCATION OF THE CITY OF NEW YORK,

Defendant.

-----------------------------------------------------x

MEMORANDUM AND ORDER
Civil Action No.
CV-99-2537 (DGT)

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.
★ MAR 3 0 2004 ★
BROOKLYN OFFICE

Trager, J.

Plaintiff, Ernest Jeter, brings this action pro se against his employer, the New York City Department of Education[1] ("DOE"). He alleges that the defendants discriminated against him in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000(e), et seq., 42 U.S.C. §§ 1981 or 1983, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, et seq., on the basis of his race, disability, and in retaliation for grievances. Jeter describes himself as African-American and describes his disabilities as the inability to walk up and down stairs, back pain, Post Traumatic Stress Disorder, and the inability to sleep and to lift. (Pl. Opp. at 29-30.)

DOE moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing the complaint in its entirety. Jeter makes a cross-motion for summary judgment and requests further discovery. (Pl. Opp. at 34.)

---

[1]The full name of the defendant is the Board of Education of the City School District of the City of New York.

c/m

**Background**

On February 20, 1998, Jeter filed a charge of discrimination with the United States' Equal Employment Opportunity Commission ("EEOC"). (D. Ex. C.) On February 13, 1999, he received a Right-to-Sue letter from the EEOC. (Pl. Ex. C.) Jeter commenced the instant action on May 4, 1999.

Jeter has been employed by the DOE as a guidance counselor since September 8, 1994. He completed his probationary period on October 17, 1998. (Pl. Ex. A ¶ 4D, D. Ex. B.) Jeter began working for the DOE with the in-house title of Dean at East Brooklyn Congregation ("EBC"), East New York. He was working under a full-time substitute guidance counselor license. (D. Ex. B, Ex. F at 33, Ex. O at 10-11.) On March 1, 1995, Jeter was injured when a student at EBC, East New York kicked him. (D. Ex. F at 63-68.) He was granted injury in the line of duty ("ILOD") status from March 1 until June 12, 1995. His request to continue ILOD status from June 13 through June 28, 1995, the end of the school year, was denied. (D. Ex. P, Ex. Q, Ex. F at 80-81.) Jeter filed a lawsuit against the DOE on May 30, 1995 with the Supreme Court of the State of New York, for Kings County, claiming a right to an extension of ILOD status for the two week period and to receive payments pursuant to ILOD. (D. Ex. F at 62-63, 89-91, D. Ex. R.) Jeter's claim was for personal injury, and alleged "intentional tort, imputed, and gross; willful; wanton and reckless negligence," but made no mention of discrimination. (D. Ex. R.)

On June 12, 1995 Jeter was examined by Dr. Ronald Walker, a DOE orthopedic surgeon, who reported that Jeter walked with a "bizarre gait" and that the examination was unable to be

completed when Jeter became "hostile," but that Jeter was, nevertheless, fit to return to work. (Pl. Ex. J at 6.) Jeter claims that Walker did not review his medical records in making the fitness determination. (Pl. Opp. at 20.) Although MRI and x-ray reports from the Brooklyn Veteran's Administration ("VA") Hospital were available, it appears that Walker did not review them. (Pl. Ex. 22, 28.) Jeter apparently believes a review of the MRI and x-ray reports would have led to a determination that he was not fit to return to work. (Id.)

The Medical Bureau of the DOE has the initial power to grant or deny ILOD status to a pedagogue employee. While on ILOD leave salary continues to be paid without regard to the number of sick leave days accumulated by the employee. An employee seeking a medical leave files an "Application for Excuse of Absence for Personal Illness" (form OP 198). The application is forwarded to the principal of the school and then the superintendent of the district for review. The principal and superintendent review the application to assure the accuracy of the facts set forth on the form. They do not review the application for medical accuracy or to provide a medical opinion. If they approve the application it is forwarded to DOE's Medical Bureau for their review. (D. Ex. I, Ex. J at 26-27, 50-52.) When reviewing an employee's ILOD status, Walker stated it is "beneficial" for the physician to review all relevant medical records. (Pl. Ex. J at 22, 28.)

The parties contest whether medical arbitration is only available to regularly appointed, as opposed to substitute, guidance counselors. (D. Rule 56.1 Stmt. at 4, ¶ 17, D. Ex. K at 20-21. But see Pl. Ex. G at 54.) In the event that an employee is granted medical arbitration, the medical arbitrator's decision is final and binding. (D. Ex. J at 99-101.) Even if unable to seek medical arbitration, substitute guidance counselors can grieve a decision of the Medical Bureau

through ordinary grievance and arbitration procedures pursuant to the United Federation of Teachers ("UFT") contract. (D. Ex. G at 55.)

In September 1995, either Genevieve Richards-Wright, then principal of EBC, East New York, Stephen Phillips, superintendent for alternative high schools, or Bob Galli, in charge of budgeting for alternative superintendency, decided to excess[2] Jeter out of EBC, East New York. (D. Ex. O at 31-32, 47-48.) Wright testified that Jeter's excessing was due to budget constraints, and in accordance with DOE's excessing policy. (D. Ex. O at 25-28.) The Dean's position at EBC, East New York, was filled four years later, in 1999, by an unnamed African-American male. (D. Ex. O at 46-47.) Jeter never filed a grievance with the UFT with respect to this excessing. (D. Ex. F at 38-43.) At the same time that Jeter was excessed from EBC, East New York, a teacher, Ms. Reilly, was performing guidance counselor functions at EBC, Bushwick, then located in the same building as EBC, East New York. (Pl. Ex. Y.) The building that housed EBC, East New York and Bushwick was barrier free and equipped with ramps. (Pl. Ex. Y.) Jeter never requested any accommodation for his injury while at EBC, East New York. (D. Ex. F.)

Medical Bureau Personnel Memorandum No. 51 outlines procedures for an employee to request a reasonable accommodation pursuant to the ADA.[3] (D. Ex. L.) The procedures require

---

[2]Excessing involves removal from an assigned position and generally includes a re-assignment within the same district of the DOE. A guidance counselor can volunteer to be excessed to a vacancy within the same district. If no senior guidance counselor volunteers, the involuntary rules apply, and guidance counselors, either regularly appointed or full-time substitutes, may be subject to excessing according to seniority rules. (D. Ex. G. at Art. 11.) A transfer, pursuant to a Transfer Plan, on the other hand, involves a request for a new assignment within the DOE by a generally appointed teacher. (D. Ex. G at Art. 12.) Although the parties place emphasis on the characterization of each move, the substantive differences do not affect the determination of the cross-motions.

[3]Personnel Memorandum No. 51 reads in part:

> ...determinations regarding reasonable accommodations will be made on an individual basis after a review of the following : (1) the disabled individual's functional limitations; (2) the supporting

initially discussing a request for accommodation with the school, district, or office administrator. The Medical Bureau will only review a request after this discussion has occurred. (D. Ex. L.)

Guidance counselors are represented in collective bargaining by the UFT, which has a collective bargaining agreement with the DOE covering guidance counselors. The collective bargaining agreement has provisions on the subjects of appointment, excessing, seniority, transfer plans, and medical arbitration. (D. Ex. G.) For these subjects the same rules apply to appointed guidance counselors (those on tenure track) and full-time substitute guidance counselors. For appointed guidance counselors, in determining layoffs and seniority, "time in system, not time in license" is controlling. (D. Ex. H at 99-102.) This means that the date a guidance counselor was hired by the DOE is controlling for seniority and layoffs rather than the date the employee began service in a particular title. All full-time substitute guidance counselors are excessed or transferred pursuant to the seniority system applied to appointed guidance counselors. The full-time substitute guidance counselor with the least DOE service has the least seniority and will be excessed first, in the event that excessing is necessary. (D. Ex. H at 44-47, Ex. F at 38-43.)

DOE Chancellor's Regulation A-820 provides an internal complaint procedure for any guidance counselor complaining of discrimination based on several grounds, including race, color, and disability. (D. Ex. N.) Jeter never filed a complaint of discrimination with the DOE Office of Equal Opportunity. (D. Ex. F at 223.)

---

medical documentation; (3) the essential functions of the job; and (4) whether the granting of the accommodation would impose an undue hardship upon the Board of Education.

Examples of accommodations are "limited stair climbing ... Elevator accessibility" (D. Ex. L.)

From September 5 through December 17, 1995 Jeter was "temporarily reassigned," serving as a guidance counselor in the Queens Outreach Program, a part of Citywide School District 79, under principal Anthony Embriano. (Pl. Ex. AA, D. Ex. F at 36-43.) While at Queens Outreach Jeter walked with a cane, but did not request any accommodation from Embriano or the Medical Bureau. (D. Ex. F at 94-95.) Jeter claims that he would have requested an accommodation but feared reprisal. (D. Ex. F at 94-95.) During the course of Jeter's tenure at Queens Outreach, Embriano allegedly commented to Jeter "Oh, you are the lawyer," which Jeter construed as a signal that Embriano was aware of his pending claim. (D. Ex. F at 91.)

On December 18, 1995, Jeter began working at Walter Reed School, P9 ("P9") a special education school with grades K through nine, in District 75. Jeter's position was full-time substitute guidance counselor. Jeter worked at P9 from December 1995 through August 1997. During the 1995-96 school year Ms. Bloomberg was the principal of P9. In September 1996, Jeanette Fricault became principal of P9. (D. Ex. B, D Ex. F at 91-92, 96-98, D. Ex. S at 4-6.) The P9 building has four floors and does not have an elevator. (D. Ex. F at 99-100, D. Ex. S at 42-45.) Jeter did not request any accommodation for his injury from Bloomberg or Fricault. (D. Ex. F at 100-01.)

On November 16, 1996, Jeter was told by Fricault to lower certain percentage levels regarding goals he set for students. In her opinion they were unattainable. (D. Ex. T.) On August 27, 1997, Jeter was notified that he was to be excessed from P9, which is in Queens, to the Manhattan Center for Career Development, P751M ("P751M") in Manhattan, also in District 75. According to DOE the excess was necessary because a guidance counselor was coming into P9 under the UFT transfer plan on September 5, 1997. The UFT transfer plan is a contractual

provision allowing senior employees to transfer from one school to another. (D. Ex. U.) In addition to Jeter, the other guidance counselors at P9 at the time of the transfer were Talia Intrator, Mary Digman, Doris Braunstein, and Rochelle Lebovic. Intrator, who is white, started working for the DOE on September 18, 1990. (D. Ex. V, D. Ex. H at 68-70, Pl. Ex. DD.) Digman, who is white, started working for the DOE on April 3, 1995. (D. Ex. W, D. Ex. H at 74-75, Pl. Ex. DD.) Lebovic, who is white, started working for the DOE on September 7, 1977. (D. Ex. X, D. Ex. H at 75-76, Pl. Ex. DD.) Braunstein, who is black, started working for the DOE on October 14, 1985. (Pl. Ex. DD, Pl. Ex. YY, D. Ex. Y, D. Ex. H at 73-74.) Jeter did not file a grievance regarding this excessing. (D. Ex. U., D. Ex. F at 149-49.) Lewis Eisenberg, who is white, was transferred into P9 on September 2, 1997. He had been appointed a secondary guidance counselor on March 5, 1984. (D. Ex. Z, D. Ex. H at 70-72, D. Ex. S at 35, Pl. Ex. DD.)

On the day Eisenberg was transferred to P9 Jeter was excessed to P751M. There he remained a full-time substitute guidance counselor. Jeter was supervised by Carlyne Turner, the Supervisor for Guidance Counselors for District 75 for Manhattan and the Bronx. (D. Ex. B, D. Ex. F at 114, 139-41, D. Ex. AA at 83-92.) Jeter continued to walk with a cane at P751M. (D. Ex. F. at 142-43.) Manhattan Transition Center ("MTC") is an off-site location for P751M. (D. Ex. F at 139-41.) Jeter worked at several placement centers through MTC, including Columbia University, VA Hospital, Baruch College, the Restaurant School, Metropolitan Hospital, Fashion Institute of Technology, State University and Central Park. Jeter often worked at two different sites each day, five days a week. (D. Ex. F at 139-41.) On October 17, 1997, after a month of being a full-time substitute at P751M, Jeter was regularly appointed as a secondary guidance counselor in P751M and received tenure one year later, on October 18, 1998. (D. Ex. B, D. Ex. F

at 196-201.) While at P751M Jeter did not request any accommodation for his disability. (D. Ex. F at 142-43.) The buildings in which Jeter worked at Columbia University, State University, the Restaurant School, Metropolitan Hospital and Central Park had elevators. (D. Ex. F at 142-43, D. Ex AA at 83-92.)

While Jeter was assigned to the Restaurant School the school moved into another facility, formerly an elementary school, with stairs and no elevator. Turner arranged for Jeter to be relocated to Metropolitan Hospital. Turner stated that she believed it would be easier for Jeter if he could avoid the stairs at the new Restaurant School location. (D. Ex. AA at 95-98.) Jeter did not request any accommodation during the 1998-99 school year. (D. Ex. AA 66-68, 83-92.)

While at several of the P751M off-site locations, including Metropolitan Hospital, VA Hospital and Columbia University, Jeter did not have private offices or a telephone. DOE claims it did not have resources to provide such amenities at every off-site location. Each off-site location was responsible for providing space for the DOE employee to work. (D. Ex. AA at 58-61.)

In 1998, Jeter again attempted to grieve the denial of ILOD status for the two week period from June 13 through June 28, 1995. (D. Ex. F at 168-71.) The UFT informed Jeter that because he was a full-time substitute guidance counselor at the time of his injury, he was not entitled under the UFT contract to appeal the Medical Bureau's decision to a medical arbitrator. However, the UFT advised Jeter that he would have been entitled to file a regular contract grievance had he done so at the time. (D. Ex. BB, D. Ex. F at 135, 168-71.)

On February 9, 1999 Jeter was injured while breaking up a fight between two students at Metropolitan Hospital. The DOE's Medical Bureau approved Jeter's ILOD status from February

9 through March 18, 1999. (D. Ex. DD.) Jeter's case was referred to Dr. Jean Jeudy on February 24, 1999. Jeudy cleared Jeter to return to work immediately, but scheduled another appointment for March 18, 1999 and requested that Jeter bring additional documentation, including psychiatric and orthopedic reports from the Brooklyn VA Hospital, where Jeter was being treated. (Pl. Ex. P.) On March 18, 1999 Jeter was examined by Dr. Anne Garner, a DOE psychiatrist, who reported that Jeter's complaints of back pain "were not born out objectively" and that Jeter became "very angry, defensive and hostile." (Pl. Ex. V at 27.) Jeter then filed for medical arbitration. Pending arbitration, Jeter borrowed days from his Cumulative Absence Reserve. Thereafter, Jeter sought leave without pay. The Medical Arbitrator found Jeter fit to return to work. (D. Ex. GG, D. Ex. FF.) The Arbitrator also found that Jeter suffered from Post Traumatic Stress Disorder and that he feared being attacked by students. Jeter's ILOD status was extended through June 30, 1999, pursuant to the Medical Arbitrator's decision. (D. Ex. FF.) Jeter filed a Notice of Claim in May 1999 based on the injuries he had sustained in February. (D. Ex. IIII.) On October 28, 1999 Jeter was examined by Dr. Jeudy who noted that Jeter was fit for service, but added "how competent he'll be remains to be seen." (Pl. Ex. U.)

On October 26, 1999, Jeter returned from leave without pay, motivated by financial difficulties and fear of being evicted. (D. Ex. F 185-86.) Upon return he was initially assigned to P811K in Brooklyn, a special education school in District 75. (D. Ex. B, D. Ex. AA at 123-24, D. Ex. F at 185-87.) According to Turner, Jeter was transferred out of P751M, Metropolitan Hospital, because she did not want him to return to work in the environment where he was assaulted. (D. Ex. Aa at 123-24.) Jeter's position was filled by Ed Mainzer, who is white. (Pl. Ex. JJ. At 13-14.)

During 2002 and early 2003 Jeter attended physical therapy sessions at the Brooklyn VA Hospital every Tuesday and Thursday, and only worked three days per week. (Pl. Opp. at 32.) Dr. Susan Erber, superintendent of District 75, and Jeter's superior, met with Jeter on February 24, 2003 to discuss his attendance record and possible disciplinary action against him. (Pl. Ex. SS, Letter from Dr. Susan Erber dated Feb. 11, 2003.) After the meeting, at which Jeter was represented by Mr. Mancuso from the UFT, Dr. Erber required Jeter to come to work at P811K on Tuesdays and Thursdays. (Pl. Ex. SS, Letter from Dr. Susan Erber dated Feb. 24, 2003.) Jeter continues to be an appointed secondary guidance counselor at P811K. (D. Ex. B.)

**Discussion**

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548 (1986); Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994 (1962)); see also Gallo, 22 F.3d at 1223. If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The nonmoving party must produce evidence in the record and "may not rely simply on

conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993). In employment discrimination actions summary judgment must be granted with caution, but "remains available to reject discrimination in cases lacking genuine issues of material fact." Alston v. New York City Transit Auth., No. 02 Civ. 2400, 2003 WL 22871917, at *2 (S.D.N.Y. Dec. 3, 2003) (quoting Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 40 (2d Cir. 1994)).

Although the same standards for summary judgment apply when a pro se litigant is involved, the pro se litigant should be given "special latitude" in responding to a summary judgment motion. See McPherson v. Coombe, 174 F.3d 276, 279 (2d Cir. 1999) (courts "read the pleadings of a pro se plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest'") (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)); see also Alston, 2003 WL 22871917, at *2.

**(1)**

**Timeliness**

DOE argues that Jeter's claims under Title VII and the ADA for events which occurred prior to April 26, 1997 are time barred, and that Jeter's §§ 1981 or 1983 claim is barred for acts occurring prior to May 4, 1996. Claims arising under Title VII and the ADA must be commenced within 300 days.[4] Claims arising under §§ 1981 or 1983 must be commenced within

---

[4]Title VII, 42 U.S.C. § 2000e-5(e)(1)(1994) states in relevant part: "A charge ... in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice ... shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred."

The ADA, 42 U.S.C. § 12117(a)(1994) states in relevant part: "The powers, remedies, and procedures set forth in section[ ] ... 2000e-5 ... of this title shall be the powers, remedies and procedures this subchapter provides to

three years. Owens v. Okure, 488 U.S. 235, 250, 109 S.Ct. 573, 582 (1998). Jeter apparently concedes this point with regard to the §§ 1981 or 1983 claim as he completely failed to respond to it in any of his motion papers. See Hawana v. City of New York, 230 F. Supp. 2d 518, 525 (S.D.N.Y. 2002).

With regard to the timeliness of his Title VII and ADA claims, Jeter invokes the doctrines of equitable "tolling, estoppel and waiver." (Pl. Opp. at 9, ¶ 2.) Jeter claims that he lacked sufficient knowledge of the circumstances surrounding his excessings and the denials of ILOD status extensions to bring his claims until depositions were taken. This lack of information was allegedly due to misrepresentations made by various DOE personnel. (Pl. Opp. 27-28.) Jeter, however, has failed to present facts to support his invocation of the doctrines. See Zerri-Edelglass v. New York City Transit Auth., 333 F.3d 74 (2d Cir. 2003) ("Equitable tolling is an extraordinary remedy and requires showing that plaintiff acted with reasonable diligence to uncover facts."). DOE points out the incongruity that Jeter did in fact file his claim prior to taking depositions, which belies any assertion that he was unaware of the circumstances that formed the basis of the claim. Accordingly, Jeter's claims based on his 1995 excessing from EBC, East New York, and the denial of 1995 ILOD status extension are time barred.

... any person alleging discrimination on the basis of disability in violation of any provision of this chapter ... concerning employment."

If the alleged discrimination took place in a state or locality that has its own antidiscrimination laws and an agency to enforce those laws, then the time period for filing claims with the EEOC is extended to 300 days. 42 U.S.C. § 2000e-5(e)(1). In this case, the discrimination alleged took place in New York, which has both antidiscrimination laws and an antidiscrimination agency. The 300-day limit therefore applies. Ford v. Bernard Fineson Dev. Ctr., 81 F.3d 304 (2d Cir. 1996).

**(2)**

**Title VII**

**a. Excessing**

Jeter claims that his excessings from Queens Outreach to P9, from P9 to P751M, and from P751M to 811K were unlawful employment practices prohibited under Title VII because they were based on his race. Title VII makes it unlawful "for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. §§ 2000(e)-2(a)(1), (2). In order to establish a prima facie case of race discrimination Jeter must establish: (1) that he is a member of a protected class; (2) he satisfactorily performed his job duties; (3) adverse employment action was taken against him; and (4) the adverse employment action gives rise to an inference of unlawful discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973); Kerzer v. Kingly Mfg., 156 F.3d 396, 401 (2d Cir. 1998); see also Hudson v. IBM Corp., 620 F.2d 351, 354 (2d Cir. 1980) (same framework applies to § 1981 claims); Surlocco v. New York Police Dep't, 888 F.2d 4, 7 (2d Cir. 1989) (same framework applies to § 1983 claims). The parties agree that the first two requirements are met.

**1. Adverse Employment Actions**

Jeter claims that his excessing from P9 to P751M was improper because he had seniority over two of the other guidance counselors, Intrator and Digman, both of whom were white. It appears that he is correct that this excessing did not conform with DOE guidelines because both Intrator and Digman were less senior that him. Jeter also claims that his excessings from Queens

Outreach to P9, and from P751M to P811K were improper, without specifying the grounds for this belief. Moreover, Jeter does not point to any career detriment suffered due to any of the excessings. Rather, his pleadings can be construed to assert that the frequency[5] and alleged impropriety of the excessings were detrimental per se, and amounted to adverse employment actions. DOE contends that Jeter's excessings, without more, are not adverse employment actions.

In order for Jeter to show that he suffered an adverse employment action he must have "endure[d] a 'materially adverse change' in the terms and conditions of employment." Pimentel v. City of New York, No. 00 Civ. 326, 2002 WL 977535, at *3 (S.D.N.Y. May 14, 2002) (quoting Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 446 (2d Cir. 1999)). In order for an action to be "materially adverse," there must be a change in working conditions that is "more disruptive than a mere inconvenience or an alteration of job responsibilities." Galabaya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2001) (quoting Crady v. Liberty Nat'l Bank and Trust Co. of Indiana, 993 F.2d 132, 136 (7th Cir. 1993)). A materially adverse change is one that "has an attendant negative result, a deprivation of a position or an opportunity." Pimentel, 2002 WL 977535, at *3; Campbell v. Grayline Air Shuttle, Inc., 930 F. Supp. 794, 802 (E.D.N.Y. 1996). Adverse employment actions are not limited to "readily quantifiable losses," but an employee's unhappiness does not engender an actionable adverse action. Pimentel, 2002 WL 977535, at *3 (quoting Phillips v. Bowen, 278 F.3d 103, 117 (2d Cir. 2002)); see also Bennett v. Watson Wyatt & Co., 136 F. Supp. 2d 236 (S.D.N.Y. 2001).

[5]The "continuing violation" doctrine does not apply. It was not included in Jeter's original or amended complaint, which could be fatal to its application. Miller v. ITT, 755 F.2d 20, 25 (2d Cir. 1985). Even under the more liberal reading of a pro se plaintiff's motion papers, Jeter would have to raise a hostile work environment claim, which it cannot be inferred he is attempting to do. AMTRAK v. Morgan, 536 U.S. 101 (2002).

Determination of which employment actions are "adverse" must be made on a case-by-case basis. Lumhoo v. Home Depot USA, Inc., 229 F. Supp. 2d 121, 138 (E.D.N.Y. 2002) (citing Richardson, 180 F.3d at 446). Examples of adverse employment actions are "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." Pimentel, 2002 WL 977535, at *3 (quoting Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999)). If an employee "earns the same salary, has the same benefits, works the same hours ... and has the same opportunities for promotion" following a transfer then there is no adverse employment action, even if the employee is "extremely unhappy about it." Pimentel, 2002 WL 977535, at *3; see also Galabaya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (plaintiff's transfer from one special education school to another was not an adverse employment action); Garber v. New York City Police Dep't, No. 95 Civ. 2516, 1997 WL 525396, at *4 (S.D.N.Y. Aug. 22, 1997) (holding that "purely subjective feelings about a transfer which, by objective standards, did not negatively alter the terms and conditions of his employment in any respect" have no bearing on the adverse employment action inquiry). Jeter does not allege, nor is there any evidence in the record, that the excessings negatively altered the terms and conditions of his employment beyond mere inconvenience. It cannot be inferred that his excessings were anything more pernicious than lateral transfers. A "pure lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action." Pimentel, 2002 WL 977535, at *4; Adeniji v. Admin. for Children Servs., NYC, 43 F. Supp. 2d 407, 426 (S.D.N.Y. 1999); Cooper v. New York State Dep't of Human Rights, 986 F. Supp. 825, 828 (S.D.N.Y. 1997) (mere fact of transfer insufficient to show a materially adverse change in working condition). Jeter's allegations that there were more

convenient schools where he could have worked do not transform his excessings into adverse employment actions.

Jeter's working conditions while at P751M, however, including not having an office or telephone at off-site locations, may have negatively altered the terms and conditions of his employment. Nevertheless, these conditions are not shown to have affected Jeter's salary, benefits, hours or opportunities for promotion.

While Jeter was at P9, the principal, Fricault, requested that he lower his student performance goals. Jeter alleges this was one of the adverse employment actions taken against him. Being advised and counseled, however, does not, as a matter of law, constitute an adverse employment action. See Weeks v. New York State, 273 F.3d 76, 86 (2d Cir. 2001) ("criticism of an employee... is not an adverse employment action"). Even if Fricault's request is considered a negative evaluation, such an evaluation is not actionable under Title VII unless followed by an adverse employment action. See Valentine v. Standard & Poor's, 50 F. Supp. 2d 262, 284 (S.D.N.Y. 1999), aff'd, 205 F.3d 1327 (2d Cir. 2000) ("Given that plaintiff's negative reviews did not lead to any immediate tangible harm or consequences, they do not constitute adverse actions materially altering the conditions of his employment."); see also Pellei v. Int'l Planned Parenthood Fed'n, Inc., No. 96 Civ. 7014, 1999 WL 787753, at *12 (S.D.N.Y. Sept. 30, 1999) (evaluations must cause "a materially adverse change" in conditions of employment, such as "demotion, suspension, or loss of wages"); Castro v. New York City Bd. of Educ. Personnel, No. 96 Civ. 6314, 1998 WL 108004, at *7 (S.D.N.Y. Mar. 12, 1998) (negative evaluations "unattended by a demotion, diminution of wages, or other tangible loss do not materially alter employment conditions"). It can be inferred that Jeter considered his excessing from P9 a

negative consequence of his negative evaluation. However, the excessing was a lateral transfer, not a materially adverse change in the conditions of employment, and therefore cannot be considered an adverse employment action caused by the negative evaluation for purposes of Title VII analysis.

Jeter does not allege, nor does the record indicate, that the negative evaluation adversely affected his opportunity for promotion. See Manessis v. New York City Dep't of Transp., No. 02 Civ. 359, 2003 WL 289969, at *13 (S.D.N.Y. Feb. 10, 2003) ("no evidence indicating that this evaluation in any way affected plaintiff's promotional opportunities"). In fact, Jeter was appointed as a secondary guidance counselor in 1997 and received tenure on October 18, 1998.

**b. ILOD**

Jeter claims that the denial of his application to extend his 1999 ILOD status was unlawfully racially motivated. DOE concedes that a denial of an ILOD extension constitutes an adverse employment action, but they argue that Jeter fails to present evidence to support an inference that the reason for the denial was his race, and thus fails to make out a prima facie discrimination case. The burden of alleging a prima facie case "is a minimal one." Booker v. Fed. Reserve Bank of New York, Nos. 01 Civ. 2290, 01 Civ. 2291, 2003 WL 1213148, at *8 (S.D.N.Y. Mar. 17, 2003) (quoting Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000)). A victim of discrimination is "seldom able" to prove his claim by direct evidence and is usually "constrained to rely on the cumulative weight of circumstantial evidence." Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991); see also Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 464-65 (2d Cir. 1989). In raising an inference of discrimination, Jeter must show that race "had a

determinative influence" on the decision to deny the extension of ILOD status. Johnson v. Eastchester Union Free School Dist., 211 F. Supp. 2d 514, 519 (S.D.N.Y. 2002) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141, 120 S.Ct. 2097, 2105 (2000)). An inference of discrimination may be drawn from evidence tending to show preferential treatment given to employees outside the protected class, or upon the timing or sequence of events leading to the adverse employment action. Tout v. County of Erie, 2 F. Supp. 2d 320, 326 (W.D.N.Y. 1998); see also Stratton v. Dep't for the Aging, 132 F.3d 869, 878-79 (2d Cir. 1997); Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir. 1996). One "common and especially effective method" for a plaintiff to discharge his burden of showing circumstances giving rise to an inference of discrimination is to show "that the employer treated a similarly situated employee differently." Arqueta v. N. Shore Long Island Jewish Med. Health Sys., Inc., No. 01 Civ. 4031, 2003 WL 22670915, at *6 (E.D.N.Y. Nov. 6, 2003) (quoting McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001)). Jeter has not alleged that he was subjected to racially derogatory comments, nor has he presented any direct evidence of racial animus. Gordon v. New York City Bd. of Educ., No. 01 Civ. 9265, 2003 WL 169800, at *6 (S.D.N.Y. Jan. 23, 2003) (granting summary judgment where plaintiff failed to produce any evidence of racial motivation for transfer). Although Jeter asserts that the determinations made by DOE Medical Bureau staff were medically unfounded, he has not produced evidence or alleged that other similarly situated employees were granted ILOD extensions; nor does the record reveal any other evidence that might give rise to an inference of discrimination. Without such an inference Jeter fails to make out a prima facie case for discrimination based on the denial of the ILOD status extension.

(3)

**ADA**

Jeter claims that his injury in 1995 rendered him disabled under the ADA because he was unable to walk and climb stairs. Subsequent to his 1999 injury Jeter was unable "to sleep and to lift," suffered back pain and was diagnosed with Post Traumatic Stress Disorder. He further claims that he was denied reasonable accommodations for these injuries, in violation of the ADA. It can be inferred that the accommodation Jeter sought was extension of ILOD status.

To establish a prima facie case of discrimination for failure to provide reasonable accommodation under the ADA, Jeter must demonstrate that: (1) he has a disability within the meaning of the statute; (2) DOE had notice of the disability; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) DOE refused to make such reasonable accommodations. Felix v. New York City Transit Auth., 154 F. Supp. 2d 640, 653 (S.D.N.Y. 2001), aff'd, 324 F.3d 102 (2nd Cir. 2003).

DOE argues that Jeter fails to make a prima facie case because he does not have a "disability" as defined by the statute. Although he has an impairment that affects major life activities, DOE argues the impairment does not substantially limit those activities. They also claim that Jeter is not "otherwise qualified" because the accommodation he sought was to not work. They argue in the alternative that Jeter fails to establish that he was denied reasonable accommodation.

**a. Disability under the ADA**

An individual is considered disabled within the meaning of the ADA if he: (1) has a physical or mental impairment that substantially limits one or more of the major life activities; (2) has a record of such an impairment; or (3) has been regarded as having such an impairment. 42 U.S.C. § 12102(2)(A)-(C). The first factor has three discrete elements, such that the plaintiff must (1) have a mental or physical impairment that (2) substantially limits (3) a major life activity. Bragdon v. Abbott, 524 U.S. 624, 631, 118 S.Ct. 2196, 2202 (1998); Burgos v. City of Rochester, No. 99 Civ. 6480, 2003 WL 22956907, at *2 (W.D.N.Y. Mar. 31, 2003). DOE concedes that Jeter has an impairment, however, a physical impairment, standing alone, does not necessarily constitute a disability under the ADA. Hazeldine v. Beverage Media, Ltd., 954 F. Supp. 697 (S.D.N.Y. 1997).

To be "substantially limited" under the ADA, an individual must be "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity" as compared to the average person in the general population. 29 C.F.R. § 1630.2(j)(1)(i)-(ii). The three factors to be considered when determining whether an impairment substantially limits a major life activity are: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2)(i)-(iii). This list is "illustrative and not exhaustive." Bragdon, 524 U.S. at 625. If the major life activity is employment "the impairment

must substantially limit employment generally." Byrne v. Bd. of Educ., 979 F.2d 560, 565 (7th Cir. 1992); Castro v. Local 1199, 964 F. Supp. 719 (S.D.N.Y. 1997).

Several courts have held that an inability to walk or climb stairs is insufficient to meet the substantial limitation requirement. See Brower v. Continental Airlines, Inc., 62 F. Supp. 2d 896 (E.D.N.Y. 1999); Zuppardo v. Suffolk County Vanderbuilt Museum, 19 F. Supp. 2d 52 (E.D.N.Y. 1998) (holding plaintiff was not substantially limited where unable to walk more than one eighth of a mile without suffering severe pain and needing to rest); see also Kelly v. Drexel Univ., 94 F.3d 102, 106-08 (3d Cir. 1996) (plaintiff who did not require crutches or cane not "disabled" as a matter of law); Banks v. Hit or Miss, Inc., 996 F. Supp. 802, 807 (N.D.Ill. 1998) (plaintiff not "disabled" as a matter of law where she could only walk short distances and could not stand for extended periods); Horth v. Gen. Dynamics Land Sys., Inc., 960 F. Supp. 873, 878 (M.D.Pa. 1997) (plaintiff who could not sit or stand for more than two hours without difficulty and had trouble walking could not show limitations were more than moderate restrictions and thus, was not disabled). Although Jeter walked with a cane while at several schools he was clearly able to continue his work as a guidance counselor, even where he was required to travel between schools. There is no evidence to support a finding that Jeter was substantially limited in his working, walking, or any other major life activity. Accordingly, Jeter fails to establish that he was disabled within the meaning of the ADA.

**b. Reasonable Accommodation**

Even if Jeter is substantially limited in his ability to work, or in another major life activity, it is his burden to identify a reasonable accommodation that would have allowed him to

continue to work. Mitchell v. Washingtonville Cent. School Dist., 992 F. Supp. 395 (S.D.N.Y. 1998), aff'd, 190 F.3d 1 (2d Cir. 1999); see Borkowski v. Valley Cent. School Dist., 63 F.3d 131, 138 (2d Cir. 1995). This burden is a minimal one. Jeter need only "suggest the existence of a plausible accommodation," which passes a facial cost/benefit analysis. Borkowski, 63 F.3d at 138; see also Gilbert v. Frank, 949 F.2d 637, 642 (2d Cir.1991). Under the ADA, "reasonable accommodation" may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position." 42 U.S.C. § 12111(9)(B).

The accommodation Jeter sought was extension of ILOD status. A reasonable accommodation, however, does not require the employer to eliminate any of a job's essential functions. Mitchell v. Washingtonville Cent. School Dist.,190 F.3d 1, 5 (2d Cir. 1999) (employer has no obligation to provide employee with an indefinite leave of absence). Attendance is an essential job function. Mescall v. Marra, 49 F. Supp. 2d 365, 374 (S.D.N.Y. 1999). Jeter's only requested accommodation, therefore, would have required DOE to eliminate an essential job function.

Jeter also claims that he was denied a reasonable accommodation when he was not allowed to schedule his physical therapy on Tuesdays and Thursdays in 2003. This issue, however, is not properly before the court as it was raised for the first time in Plaintiff's Memorandum of Law in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment. See Beckman v. United States Postal Serv., 79 F. Supp. 2d 394, 407-08 (S.D.N.Y. 2000) (Plaintiff cannot raise a new cause of action for the first time in a motion for summary judgment or motion in opposition to an opponent's summary judgment motion).

Even if the claim was properly before this court, requesting two days off each week does not allow Jeter to perform the essential functions of his job. See Adams v. Rochester Gen. Hosp., 977 F.Supp. 226, 235 (W.D.N.Y. 1997) (holding that employer did not fail to provide reasonable accommodation where plaintiff failed to show how time off would allow him to perform an essential job function). Jeter claims that taking Tuesdays and Thursdays off to go to physical therapy is a reasonable "restructuring" of his work schedule. (Pl. Opp. at 32.) However, his superintendent found that his frequent absences created a "hardship" for students who needed counseling, and for teachers and parents who needed to speak to him. (Pl. Ex. SS, letter from Dr. Erber dated Feb. 26, 2003.) Accessibility to students, teachers, and parents is unquestionably an essential aspect of a guidance counselor's job, and Jeter's request was, therefore, unreasonable. Cf. Franklin v. Consol. Edison Co. of New York, Inc., No. 98 Civ. 2286, 1999 WL 796170, at *13 (S.D.N.Y. Sept. 30, 1999) (finding request for accommodation reasonable where plaintiff sought to arrive at work one hour later).

**(4)**

**§§ 1981 or 1983 Claims**

Jeter claims that his civil rights were violated as a result of a municipal policy or custom, in violation of 18 U.S.C. §§ 1981 or 1983. He bases this claim on the above violations of his civil rights, alleging that the individual acts of discrimination were endorsed by the lack of a coherent employment policy throughout the DOE. DOE argues that Jeter failed to establish a claim under §§ 1981 or 1983 because he cannot prove that his civil rights were violated, and that

even if Jeter proves that his civil rights were violated, he cannot point to any evidence showing that the DOE had a policy or custom of discriminating against African-Americans.

Municipal liability under §§ 1981 and 1983 requires a plaintiff to show either that he suffered the alleged harm (1) as a result of an officially promulgated policy, formally adopted by the municipal agency's governing board, or (2) because of an act undertaken by an employee who, as a matter of state law, has final policymaking authority in that area. Davis v. City of New York, 228 F. Supp. 2d 327, 337 (S.D.N.Y. 2002), aff'd, 75 Fed. Appx. 827 (2nd Cir. 2003) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690, 98 S.Ct. 2018, 2035-36 (1978) and Pembar v. City of Cincinnati, 475 U.S. 469, 480-81, 106 S.Ct. 1292, 1298-99 (1986)). To support municipal liability on the basis of an alleged custom, a plaintiff must show that the alleged custom that led to his constitutional deprivation is permanent in the agency and is so widespread as to have force of law. Davis, 288 F. Supp. at 336-37. From 1995 to 1999 final policymaking authority at the DOE was vested in the Chancellor or the seven member Board. See N.Y. EDUC. LAW § 2590-g (McKinney 2003). Jeter has presented no evidence that there was an official policy of discrimination with regard to guidance counselor excessing or ILOD extensions, or that any of the acts alleged were undertaken by the Board or the Chancellor.

**(5)**

**Retaliation**

Jeter claims that his excessings and the denial of the 1999 ILOD extension were retaliations for his filing of a Notice of Claim for the first denial of ILOD extension. To establish a prima facie case of retaliation a plaintiff must demonstrate that: (1) the employee was engaged in protected activity; ... (3) the employee suffered an adverse employment action; and (4) there

was a causal connection between the protected activity and the adverse employment action. Booker, 2003 WL 1213148, at *9 (quoting Distasio v. Perkin Elmer Corp., 157 F.3d 55, 66 (2d Cir. 1998)). "[P]rotected activity" refers to action taken to protest or oppose statutorily prohibited discrimination. See 42 U.S.C. § 2000e; see also Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1178 (2d Cir. 1996) (stating that plaintiff must act in "opposition to an unlawful employment practice" to engage in protected activity). Here, Jeter has not alleged that he engaged in any protected activity. Jeter's Notice of Claim does not allege that the denial of his ILOD status was racially motivated, or evidence that he was in any way protesting statutorily prohibited discrimination. Even if Jeter had believed at the time of the 1995 denial of ILOD status extension that the denial was racially motivated, and his filing the Notice of Claim is considered a protected activity, he has not suffered any adverse employment action as a result. See Section III(A)(1), supra. Accordingly, Jeter fails to make out a prima facie retaliation case.

**(6)**

**Request for Additional Discovery**

Jeter's request for additional discovery, raised in Plaintiff's Memorandum of Law in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, is denied. A party opposing summary judgment on the ground that it needs more discovery under Rule 56(f) must present his contention by affidavit. United States v. Evseroff, No. 00 Civ. 6029, 2001 WL 1571881, at *5 (E.D.N.Y. Nov. 6, 2001); see also Paddington Partners v. Bouchard, 34 F.3d 1132, 1137 (2d Cir. 1994). "A reference to Rule 56(f) and to the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate

substitute for a Rule 56(f) affidavit." Evseroff, 2001 WL 1571881, at *5. Jeter does not reference rule 56(f) in his Memorandum.[6]

Even if Jeter's Memorandum is liberally construed to allow it to be treated as a Rule 56(f) affidavit, the Second Circuit requires such an affidavit to include: "(1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." Meloff v. New York Life Ins. Co., 51 F.3d 372, 375 (2d Cir. 1995). Jeter request is a bare assertion that he needs additional discovery time "to offer the court more details to support" his 1981 and 1893 claims. Jeter does not mention what details will be obtained or how they will be obtained. Further, Jeter essentially admits that he has made no efforts to discover the information.

As the party opposing the motion for summary judgment, Jeter is usually entitled to "the opportunity to discover information that is essential to his opposition." Berger v. United States, 87 F.3d 60, 65 (2d Cir. 1996). "But the trial court may properly deny further discovery if the non-moving party has had a fully adequate opportunity for discovery." Trebor Sportswear Co. v. The Limited Stores, Inc., 865 F.2d 506, 511 (2d Cir. 1989). Discovery in this case was extensive. Moreover, a court may deny a request for further discovery "if it deems the request to be based on speculation as to what potentially could be discovered." Paddington Partners, 34 F.3d at 1138. Jeter's lack of specificity suggests that his request is probably speculative. The

[6] The rule states:

> Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f).

"bare assertion" that the evidence supporting a party's allegation is in the hands of his opponent is "insufficient to justify a denial of a motion for summary judgment under Rule 56(f)." Id. (quoting Contemporary Mission, Inc. v. United States Postal Serv., 648 F.2d 97, 107 (2d Cir. 1981)).

## Conclusion

Jeter's claims based on his 1995 excessing from EBC, East New York, and the denial of 1995 ILOD status extension are time barred. The remaining excessings are not adverse employment actions and, therefore, preclude Jeter from establishing a prima facie case of employment discrimination. Jeter fails to establish a prima facie case based on the denial of the 1999 ILOD status extension because he has not produced any evidence to support an inference of discriminatory motive. Similarly, Jeter failed to establish prima facie cases as to the §§ 1981 and 1983 and retaliation claims.

Accordingly, DOE's motion for summary judgment is granted, and Jeter's cross-motion for summary judgment is denied. The Clerk of the Court is directed to close the case.

Dated: Brooklyn, NY
March 25 2004

SO ORDERED:

David G. Trager
United States District Judge