# Exhibit I

# The Special Commissioner of Investigation

**For the New York City School District**

CASE FORM

| Date: | 6/6/2003 | Received by | 17 |
|---|---|---|---|
| Response Date to the Complainant | | | |
| Referred From: | | | |
| Number: | | | |

| Intake | 20031602 |
|---|---|
| School | 811K |
| District | 75 |
| Division | DSE |
| Region | |

*Complainant wishes to remain confidential?* (Y/N) N

*If yes, does complainant agree to the release of complainant data to the appropriate office if complaint is referred?* (Y/N) Y

Allegation:

Carbon copied correspondence addressed to Mayor Bloomberg from Ernest Jeter, Guidance Counselor assigned to P811K, relates that he is being unfairly harassed about his time by Dr. Susan Erber, Citywide Programs Superintendent and Ms. Bonnie Brown, Director of Operations for CSD # 75 (see attached). Mr. Jeter claims that said parties are well aware of his medical condition, via medical documentation which he has provided, which necessitates medical treatment at the Veteran's Hospital on Tuesdays and Thursdays (due to two line of duty injuries which he sustained at the hands of students). Mr. Jeter writes that although he is absent on these two days, his workload has never suffered as a result.

List of Names:

| Last | First | Role | Title | Position | School | Dist | Div |
|---|---|---|---|---|---|---|---|
| BROWN | BONNIE | SU | AD | DIRECTOR OF OPERA | | 75 | DSE |
| ERBER | SUSAN | SU | SU | SUPERINTENDENT | | 75 | DSE |
| JETER | ERNEST | CO | GC | GUIDANCE COUNSEL | 811K | 75 | DSE |

Allegation Information:

| Complainant | Type | Subject |
|---|---|---|
| JETER ERNEST | EMPLOYEE MISCONDUCT | BROWN, BONNIE |
| JETER ERNEST | EMPLOYEE MISCONDUCT | ERBER, SUSAN |

Findings

Substantiation Information

| Subject | Type | Victim |
|---|---|---|

Case Results

| Subject | Result |
|---|---|

Administrative Recommendations

| Subject | Report Date | Followup Date | Final Date |
|---|---|---|---|

~~02-3065 R (OSI)~~ BROWN

~~01-0516 R (OSI)~~ BROWN

99-2449 R (OSI) } ASK DAVE

96-1843 R (OSI) }

# Exhibit J

DeMarco - Cross - Glass

A. Some O.T.s and P.T.s.

Q. Do you remember their names?

A. No.

MS. PEPE-SOUVENIR: I just needed a time frame --

THE HEARING OFFICER: Object?

MS. PEPE-SOUVENIR: -- as to what period he's referring to. Is he referring to this time --

MR. GLASS: Yes.

MS. PEPE-SOUVENIR: -- that Mr. -- Mr. Jeter's things were being reviewed or --

THE HEARING OFFICER: Foundation?

MS. PEPE-SOUVENIR: -- another time frame?

THE HEARING OFFICER: Foundation.

BY MR. GLASS: (Cont'g.)

Q. Well, what -- what school year did you review these other people's related-service books?

DeMarco - Cross - Glass

A. It was during the same school year that I was reviewing Mr. Jeter's book.

Q. All right. I'm going to show you what -- D-B-Twenty -- or D-Twenty-seven-A, which I believe is one of the forms you filled out for October, that's in your handwriting. Checking the books?

A. Uh-huh.

Q. What -- just going back, the O.T.s and P.T.s, were there any other names you recall that -- when you reviewed?

A. No, there were many, many of them and I don't recall their names.

THE HEARING OFFICER: I'm sorry, is that -- you said DB-Twenty-eight?

MR. GLASS: This was part of that big exhibit -- it's marked as --

THE HEARING OFFICER: Oh, Twenty-seven-A?

MR. GLASS: -- Twenty-seven.

THE HEARING OFFICER: Okay. All right.

MR. GLASS: Okay.

DeMarco - Cross - Glass

BY MR. GLASS: (Cont'g.)

Q. Now, you have here, written on the side, that -- for example, no mandate listed or no effective language. Were you familiar with that book when you recorded those -- missing pieces -- we're -- we're doing --

A. Yes.

Q. -- R-Fifteen?

A. Yes.

Q. Okay. And are you familiar with the provision of the book that says that -- that as a pilot attendance-keeping program, providers only need to fill out the top of those forms as of the first month and then it carries over to subsequent months?

A. It should go through on the carbon copies. It wasn't filled out on any of them.

Q. Isn't it --?

A. It all comes down -- well, it's like this. This the carbonized page, you write on this page and it goes through, and it

DeMarco - Cross - Glass

should all be on this page then.

So if, on the first page, the first time you do the book, you fill out all of the information, it's documented on this page, which is why you don't have to repeat it, because then the next month the only piece that you do is the attendance, because all of that information is already permanently recorded on this -- that page.

Q. You're saying as of October, did the -- did you have the September -- there's been a concession in this case that the books -- are you aware -- was every one of Mr. Jeter's books correctly submitted to Source Corporation?

A. I'm sorry. I don't understand the question.

MS. PEPE-SOUVENIR: I don't understand it.

THE HEARING OFFICER: Well, the -- Ms -- Ms. Pepe-Souvenir, if the witness doesn't understand, that's -- she'll say so. Otherwise, unless there's some other objection,

800.523.7887 06/23/2006, NY, NY, In the Matter of NYC Dept. of Ed. v Ernest Jeter, Associated Reporters Int'l., Inc.

Page 2612

DeMarco - Cross - Glass

that class had science, so that's where they would be.

Q. Okay. And they -- but they may have been with three or four different teachers during a school day; correct?

A. During a day, absolutely. It's a reflected high school setting.

Q. In the class that the E. boys were in, did they also have like a -- was there also classroom para in that class?

A. Yes.

Q. Do you remember who that was in the --?

A. No, it changes. M. was in a six-one-one class, and G. was in twelve-one-one class.

Q. So those classrooms would have a teacher, a classroom para and perhaps a one-to-one para?

A. Perhaps a one-to-one.

Q. And both of those boys required one-to-one, do you recall?

A. I'm pretty sure M. had a

Page 2613

DeMarco - Cross - Glass

one-to-one. I don't remember if G. did.

Q. Okay. And when you got the sign-in -- sign-in/sign-out sheets, did you look for other irregularities among providers -- as to whether they were properly filling them out?

A. Not specifically. At one point during the school year we collected everyone's books and crosschecked. We picked a starting day, and Ms. Henderson and Mr. Bennet crosschecked those -- the documents for all the related-service providers.

Q. Are the related-service providers mandated to take the students out of the classroom for one -- you know, one-to-one counseling?

A. Counseling was usually out of the classroom. It's not usually pushing.

Q. And that would --

A. It's in the privacy --.

Q. -- would that have been the speech therapist as well?

A. Just on speech, the model for

Page 2614

DeMarco - Cross - Glass

district seventy-five really encourages push-in for the students to use language appropriately in an appropriate setting.

Q. Do you recall -- Ms. Santa Antonio as one of the providers?

A. Sounds familiar.

Q. Did you notice any irregularity in the way she was filling out the sign-in/sign-out sheet?

A. I --.

MS. PEPE-SOUVENIR: Objection. That isn't irrelevant to the charges.

THE HEARING OFFICER: Well, let's -- let's start with -- she said it sounds familiar, which -- and I'm not sure what that means. I'm not sure whether it's a basis for asking questions about the person.

MR. GLASS: It would be in -- it's in the paperwork.

BY MR. GLASS: (Cont'g.)

Q. Take a look at the October 25th, 29th, 2004 sign-in sheet for Mrs.

Page 2615

DeMarco - Cross - Glass

DeMartino's (phonetic spelling) class. It would probably be part of -- it's in that -- it's in that -- it's in that packet of documents for that week.

THE HEARING OFFICER: Okay. Okay. It's in -- so, it's in D-Twenty-seven?

MR. GLASS: Yes.

THE HEARING OFFICER: Okay.

MR. GLASS: But I'm showing her one of the pages --

THE WITNESS: Uh-huh.

MR. GLASS: -- from that packet.

BY MR. GLASS: (Cont'g.)

Q. Is that a typical sign-in sheet?

MS. PEPE-SOUVENIR: I missed the -- I -- was there --

A. Yes, it is.

MS. PEPE-SOUVENIR: -- I'm sorry. Was there a ruling on my objection --

THE HEARING OFFICER: Okay. That's --

DeMarco - Cross - Glass

MS. PEPE-SOUVENIR: -- as to relevance.

THE HEARING OFFICER: -- well, let's -- let -- let's see if she -- if she first can establish that she knows -- that he can establish that he -- that she knows the person --

THE WITNESS: Yes.

THE HEARING OFFICER: -- which would be a basis for asking questions, and then we'll get to the relevance of the question.

MS. PEPE-SOUVENIR: Okay.

BY MR. GLASS: (Cont'g.)

Q. Okay. So, do you -- do you recognize that sheet?

**A. Yes.**

Q. And does that refresh your recollection of who Santa Antonio is?

**A. Yes.**

Q. Who -- who is she?

**A. She's -- I believe, a speech therapist, and I think her first name is**



DeMarco - Cross - Glass

**Melissa. I'm not -- I'm not entirely sure.**

Q. Okay. Would she have services -- would she have a mandate to service individual students?

**A. Yes.**

Q. I notice it says on that sheet, class. Is that an appropriate use of a sign-in sheet?

**A. She most likely was push-in. Speech was push-in. Speech Therapists did not have a private office, only our guidance counselors did. Speech provider worked in the classroom with the students.**

Q. But would she have a mandate to service individual students?

**A. Yes.**

Q. Did you ever question her as to how she -- why she was filling out "class" on this?

MS. PEPE-SOUVENIR: Objection, relevance.

THE HEARING OFFICER: Okay. Mr. Glass?



DeMarco - Cross - Glass

MR. GLASS: Well, part of the theory is that he is being scrutinized differently than other people and so this goes to you know -- the question of sign-in sheets, there's been some testimony that she reviewed that, her concerns, and we're trying to show that it wasn't always consistent, whether she --.

THE HEARING OFFICER: I -- I think it's relevant, at least as background evidence.

MR. GLASS: And it -- this document is in evidence.

THE HEARING OFFICER: Okay.

BY MR. GLASS: (Cont'g.)

Q. Okay. Did you ever question Ms. Santa Antonio about her filling out the sign-in sheets?

**A. No.**

Q. Do you know if anyone else ever questioned her about that?

**A. I wouldn't know. I was only directed to monitor Mr. Jeter's sheets.**



DeMarco - Cross - Glass

Q. Do you know someone named Rochelle?

**A. Yes.**

Q. Okay. Was she -- was she a mandated one-to-one provider?

**A. I don't know what exactly her -- whether she was listed as a one-to-one -- I believe she may have been listed on the organization under that. She was in the main office.**

Q. Who made the decision to assign her to the main office as opposed to as a one-to-one service --?

MS. PEPE-SOUVENIR: Objection, relevancy to the charges.

MR. GLASS: Well, it's particularly relevant to Ms. Copenny's charge that was charged in here about Mr. Jeter raising a concern about what Ms. Kirshbaim was doing.

MS. PEPE-SOUVENIR: That was never -- as far as direct. That was not --

THE HEARING OFFICER: Go

DeMarco - Cross - Glass

even though you think it's vague, then your responsibility on redirect examination is to clear up the ambiguity.

MS. PEPE-SOUVENIR: Here's the thing though, when I say that a question -- I don't understand the question, I'm not saying it in the position of the witness, answering for the witness.

THE HEARING OFFICER: Right.

MS. PEPE-SOUVENIR: I'm saying that I don't understand the question because either I need to make an objection to the question, or if the question is not objectionable at all, if it's just made clearer then we can just move on.

THE HEARING OFFICER: Yeah.

MS. PEPE-SOUVENIR: So, my thing is not that -- I don't want the -- the -- the witness to go ahead and answer.

THE HEARING OFFICER: Right.

MS. PEPE-SOUVENIR: She may very well understand what it is.

THE HEARING OFFICER: Right.

DeMarco - Cross - Glass

MS. PEPE-SOUVENIR: And she may very well just go ahead and answer.

THE HEARING OFFICER: Right.

MS. PEPE-SOUVENIR: But if I'm not given the chance to say I don't understand the question, if you could make it clearer before I can make my objection --

THE HEARING OFFICER: Right.

MS. PEPE-SOUVENIR: -- that's my concern.

THE HEARING OFFICER: I think -- I think that's a redirect examination issue. I mean, foundation is another kind of objection you can make.

MS. PEPE-SOUVENIR: Uh-huh.

THE HEARING OFFICER: But, I think that, other than the -- the sort of conventional objections to the form of the question, or to the content of the question even, then you're left, on redirect to clear up any ambiguity. You know, that's -- that's -- that's the -- the order of the process.

But it's certainly

DeMarco - Cross - Glass

inappropriate to -- to interfere with an examination. And -- and -- and lawyers do it, but -- but just to say I don't understand the question, I mean, that's really between the witness and the examiner.

MS. PEPE-SOUVENIR: Okay.

THE HEARING OFFICER: And -- but -- and but -- I mean, you have tools that will allow you to clear all that up. It's just in the interest of order, using those tools, rather than interrupting the questioning.

MS. PEPE-SOUVENIR: And just note my objection for the last --

THE HEARING OFFICER: Yes, okay.

MS. PEPE-SOUVENIR: -- decision.

THE HEARING OFFICER: Duly noted.

BY MR. GLASS: (Cont'g.)

Q. You know, I was asking a question about, did you have any role in Ms. Kirshbalm assignment to the office?

DeMarco - Cross - Glass

**A. No.**

Q. Do you know who made that assignment?

**A. Ms. Henderson.**

Q. Okay. Do you know if that was in violation of the -- what Ms. -- Ms. Kirshbalm's job was? To assign her to do paperwork when she was to be a one-to-one?

**A. That was Ms. Henderson's, decision not mine.**

Q. So, I believe your previous testimony was as far as the -- the -- the logs, and the creation of these logs, that the -- that you were doing for October, you were really only doing it for Mr. Jeter; you weren't doing that regularly for any other provider?

**A. Correct.**

Q. Okay. So, you don't know if other providers were leaving the top form empty or --?

**A. I was not reading any of them.**

Q. Okay. You said you had some

DeMarco - Cross - Glass

familiarity with the counselor and clinician's daily log. Let me just show you what's -- already in as R-Sixty-nine through Seventy-two. If you could just look at the comments on the top of those forms.

**A. Uh-huh.**

Q. Do you recall seeing those logs from Jeter?

**A. No.**

Q. Okay.

**A. I don't think at this point I was monitoring them anymore.**

Q. Does it appear that someone else may have been monitoring them at that point?

**A. I wouldn't know.**

Q. Were you aware that at some point you were relieved of that duty and someone else was assigned to --

**A. I was not --**

Q. -- look at logs?

**A. -- I was not informed.**

Q. Okay. I'm going to show you

DeMarco - Cross - Glass

R-Seventy-three. This is an e-mail. Have you seen that e-mail before?

**A. It wasn't sent to me.**

Q. Did you ever see that e-mail?

**A. I -- I really don't know.**

Q. So that -- so, as of December and January, you were still involved in --?

**A. Absolutely.**

Q. And this was at Ms. -- Ms. Dreyfus' request?

**A. Yes. And Ms. Henderson.**

Q. Show you R-Seventy-five. Wondering if you've seen this?

**A. No, I've never seen it.**

Q. Were you ever called to any kind of grievance meeting with --

**A. Yes.**

Q. -- regarding Mr. Jeter?

**A. No.**

Q. Were you ever told that a grievance had been filed against you?

**A. No.**

Q. On the

DeMarco - Cross - Glass

related-service-attendance cards in that book, did you ever any make any marks on Mr. Jeter's cards yourself? You have to yes or no for the record.

**A. No.**

THE HEARING OFFICER: In that book, you're referring to --?

MR. GLASS: The yellow book for -- for a particular student.

THE HEARING OFFICER: What's the number on the yellow book?

MR. GLASS: R-Fifteen.

THE HEARING OFFICER: R-Fifteen, okay.

**A. (Cont'g.) I don't believe so. I -- it wouldn't have been appropriate.**

BY MR. GLASS: (Cont'g.)

Q. That was for Mr. Jeter to correct?

**A. Correct.**

Q. Okay. Now, these -- these long log sheets that we were looking at, that are part of D-Twenty-seven, did you provide

DeMarco - Cross - Glass

those to Mr. Jeter at anytime?

**A. At times I gave him copies.**

Q. The complete log sheet?

**A. My cover sheets.**

Q. What? Showing which teachers were missing?

**A. Uh-huh.**

Q. Do you have anything in writing to show that you gave them to Mr. Jeter?

**A. No, I don't.**

Q. And how -- how often did you do that?

**A. Often when I returned the books. I did not do it consistently. My goal was to have them correct, and to make sure students were served. That was my only function.**

Q. And you recall specifically giving Mr. Jeter those -- the long forms or those forms comparing the -- his logs to the related-service-attendance book?

**A. At times I would put them in**

DeMarco - Cross - Glass

of service.

Q. Okay. So, it could be even like a -- it may take a few weeks for the school to -- allocate when the service will start?

A. It -- it -- there may be some time. I don't think there would be a few weeks, but there might be a few days lag from when we -- we're notified that a student is unserved, or receiving counseling, to the actual assignment.

Q. Okay. And is there -- do you -- do you know -- so these students may have different start dates --

A. Yes.

Q. -- correct?

Did you start to fill in start dates later in these forms?

A. I did not.

Q. Did you know what start dates were at the time that you were doing these for him? I mean, did you understand --

A. When I --.

DeMarco - Cross - Glass

Q. -- the concept of start date?

A. Yes. When I created the schedule no student had been picked up yet.

Q. You were -- you were first creating it, but --?

A. When I created it in September no student had been picked up yet.

Q. Okay. So, would -- wouldn't you need to give Mr. Jeter a start date to start his pick-ups?

A. No, Mr. Jeter's start date is the first date he picks up the student. So, he generates the start date.

Q. But you were creating these schedules for him to see the students, so you -- were you creating the start -- start dates based on their I.E.P.s?

A. The start date is the first day the student attends in school and is picked up by the provider.

Q. And Mr. Jeter was assigned to these particular students as of the date you gave him the first schedule; correct?

DeMarco - Cross - Glass

A. Correct.

Q. Okay. And Mr. Lent would have had a similar schedule for his students?

A. Correct.

Q. Okay. Did you look at any of Mr. Lent's sign-out logs in September 2004, to see if he was servicing the E. boys?

A. I know he was assigned the E. boys. I had seen that; I had seen his schedule. I looked at his schedule, yes.

Q. Did you review his sign-out -- the sign-out logs?

A. No, I was not directed to.

Q. Okay. And you're not certain whether he was signing in or signing out those boys early in September of 2004?

A. No, but I did collect all the sign-in/sign-out logs.

MR. GLASS: I'm not sure we have this in at some -- at this point. Mr. Jeter just gave me this document. I'm going to show her -- let me just mark it, to be safe, as my next.

DeMarco - Cross - Glass

THE HEARING OFFICER: Certainly. You haven't introduced anything today; right?

MR. GLASS: No, I haven't.

MS. PEPE-SOUVENIR: No.

THE HEARING OFFICER: Okay. So, I think it's Seventy-nine.

MR. GLASS: I'm going to show her two documents that Mr. Jeter handed me during the break, so I don't have copies yet, but R-Seventy-nine and R-Eighty, I'll mark them.

THE HEARING OFFICER: Okay.

MS. PEPE-SOUVENIR: Okay.

MR. GLASS: Do you want to -- I'm going to give this to the witness, but --.

THE HEARING OFFICER: Okay. Go ahead.

BY MR. GLASS: (Cont'g.)

Q. So, R-Seventy-nine, is that another schedule that you created for Mr. Jeter?

A. Yes.

DeMarco - Cross - Glass

Q. That's your handwriting?

A. Yes.

Q. Okay. And this is as of 3/21/05, I believe, on the top?

A. Uh-huh.

Q. Okay. At that point you still were not putting start dates in his schedules?

A. No, I was just adding two more students to his caseload.

Q. Okay. And --?

A. It wasn't my job to put in the start dates. That's the guidance counselor's responsibility.

Q. Was he directed to fill out the start dates?

A. I assume that the director of counseling would direct any related-service provider.

Q. This is for your identification to fill-out these sheets; correct?

A. No, I wasn't. I was

DeMarco - Cross - Glass

designated to give him a schedule. I did this part, where -- all the names and OSIS (phonetic spelling) numbers, that was a courtesy I did for him. I was designated to give him a schedule.

Q. Okay.

A. And I gave him all the information with the student's mandates and their I.D. numbers.

Q. Is everything on R-Seventy-nine your handwriting?

A. Yeah.

Q. So, you -- so, you wrote down all the names of the students and you -- then you actually created the schedule on the left-hand side; correct?

A. Yes, I did.

Q. And you just didn't fill out the start dates because you thought that was his --?

A. I know it's his responsibility.

Q. Okay. But everything else on

DeMarco - Cross - Glass

the form was your responsibility at this time?

A. Just the schedule, but I gave him all the additional information, to be proactive so I wouldn't be told that he doesn't have their information, like their mandate or their I.D. number.

Q. But you didn't think the start date was something that was within your purview?

A. It's not. I'm not --

MS. PEPE-SOUVENIR: Objection.

A. (Cont'g.) -- the person who --.

MS. PEPE-SOUVENIR: Asked and answered.

THE HEARING OFFICER: Sustained. Sustained. Asked and answered several times.

MS. PEPE-SOUVENIR: You're like, badgering now.

MR. GLASS: I'd like to -- I'd like to move that into evidence.

DeMarco - Cross - Glass

THE HEARING OFFICER: Any objection?

MS. PEPE-SOUVENIR: No.

THE HEARING OFFICER: Okay. Received.

THE REPORTER: I apologize. Just so I'm clear, and the record's clear, you said this is R-Seventy-nine?

MR. GLASS: I believe so. I was trying to get the next consecutive one.

THE REPORTER: My -- my belief was that Seventy-nine was the e-mail from Ms. DeMarco.

MR. GLASS: Okay.

THE HEARING OFFICER: Okay. Thank you, Mr. Streu. You may --

MS. PEPE-SOUVENIR: Thank you.

THE HEARING OFFICER: -- be right.

MR. GLASS: And we'll call that R-Eighty, then.

THE HEARING OFFICER: Is that

800.523.7887 06/23/2006, NY, NY, In the Matter of NYC Dept. of Ed. v Ernest Jeter, Associated Reporters Int'l., Inc.

Page 2684

DeMarco - Cross - Glass

the last one you have, Mr. Streu?

THE REPORTER: I'm sorry?

THE HEARING OFFICER: Is -- is R-Seventy-nine, the e-mail, the last one that you have?

THE REPORTER: Yes.

THE HEARING OFFICER: Okay.

(Off-the-record discussion)

THE HEARING OFFICER: Thank you very much. So, that's Eighty and Eighty-one.

MR. GLASS: Okay. Now I'm going to show you R-Eighty-one.

MS. PEPE-SOUVENIR: For identification?

MR. GLASS: For identification.

BY MR. GLASS: (Cont'g.)

Q. Can you -- do you -- first of all, do you know a student named Ar.Se., she was a student there?

**A. Yes.**

Q. Okay. Do you recognize what

Page 2685

DeMarco - Cross - Glass

this form is?

**A. Yes, it's the page that designates what their counseling, what their related-service mandate was.**

Q. Did this student have speech --?

**A. Apparently. It's listed on the related-service page, that she has a mandate of two sessions per week for thirty minutes in a group of three.**

Q. And that would be a pull-out session?

**A. Speech at Eight Eleven was push-in.**

MR. GLASS: Now, first of all I'd like to move this is into evidence, then I'll ask her questions about it --.

THE HEARING OFFICER: Any objection?

MS. PEPE-SOUVENIR: Objection, relevancy.

THE HEARING OFFICER: Mr. Glass.

Page 2686

DeMarco - Cross - Glass

MR. GLASS: She said push-in and I have some questions about this form about, you know, what is appropriate. You know, it has to do with the sign-out-logs issue as to -- when I asked briefly what class meant, you know, and -- so, it's following up on that.

MS. PEPE-SOUVENIR: Well --.

THE HEARING OFFICER: May I just take a look at it?

THE WITNESS: Can I ask how much longer --

THE HEARING OFFICER: Sure.

THE WITNESS: -- we're going to be --?

MR. GLASS: Well --.

THE WITNESS: I'm missing my school's graduation as it is, and I would like to at -- get back to see the kids at least.

THE HEARING OFFICER: Okay. I'm not sure how long we have, but let's go off-the-record for the moment, Mr. Streu.

(Off-the-record discussion)

THE HEARING OFFICER:

Page 2687

DeMarco - Cross - Glass

Overrule the objection on that, go ahead.

MS. PEPE-SOUVENIR: Well, if the questions are going to be as to the whole speech-therapy push-in -- push-in, it's been questioned -- asked about that and -- and answered about that. I don't know if you need that document to ask those very questions. I don't see the relevancy of this document at all.

If the questions are simply about what the speech teacher does and if she pushes-in, pushes-out, that was already discussed and I don't think this document is going to add anything to it. I don't see the relevance of the document and I -- I would object to it coming in.

THE HEARING OFFICER: Okay. I'm -- I'm going to overrule the objection as to relevancy. I don't think it's cumulative. If it becomes so we'll revisit that.

Go ahead.

MR. GLASS: All right.

BY MR. GLASS: (Cont'g.)

32 (Pages 2684 to 2687)

DeMarco - Cross - Glass

Q. I'm showing you R-Eighty-one, which is now in evidence. I notice on the first line it does say separate, for speech provider, does that signify that the student should be removed from the class?

**A. As per the school policy for speech in district seventy-five they adhere to a more push-in model. We have speech teachers who are in the classroom.**

Q. And that was in every case, or that's only because of the space limitations?

**A. I -- I've seen it in many schools. It was not only in Eight Eleven.**

Q. So, speech provider focus is inside the classes?

**A. Some do, some don't, but at Eight Eleven it was push-in.**

**MS. PEPE-SOUVENIR: Okay. I'm going to object to the relevance. To this whole --**

THE HEARING OFFICER: Over --

MS. PEPE-SOUVENIR: -- line

DeMarco - Cross - Glass

about the push-in, push --

THE HEARING OFFICER: -- over --

MS. PEPE-SOUVENIR: -- of the speech teacher. What does it have to do with the charges?

THE HEARING OFFICER: Overruled.

BY MR. GLASS: (Cont'g.)

Q. And that was -- and that was their policy to explain how you came by saying that there should be provided separate services?

**A. That was -- it's -- that was speech services in district seventy-five policy -- and well, I don't know district seventy-five. It was speech policy at Eight Eleven that our speech therapists did push-in.**

MR. GLASS: One more minute, there may be a final question.

THE HEARING OFFICER: How long?

MR. GLASS: Just two minutes,

DeMarco - Redirect - Pepe-Souvenir

that's all.

THE HEARING OFFICER: Okay. But let's limit it to two minutes, if we can.

THE WITNESS: This is so unfair. I missed my school's graduation. You know.

MS. PEPE-SOUVENIR: I'm so sorry, Ms. DeMarco.

THE HEARING OFFICER: Off -- off the record, Mr. Streu.

(Off-the-record discussion)

REDIRECT EXAMINATION

BY MS. PEPE-SOUVENIR:

Q. Ms. DeMarco, looking at what has been marked Respondent's-Seventy-nine, dated May 28th of 2004, was Mr. Jeter assigned to Eight Eleven K during May 20th -- sorry September 28th of 2005?

**A. I don't -- I'm not quite sure when he was removed, but I believe it was before that.**

Q. Do you have any idea how -- was this a -- a public e-mail that was sent to

DeMarco - Redirect - Pepe-Souvenir

everyone?

**A. I have no idea how Mr. Jeter came into possession of my private, personal, secure Board of Ed e-mail, which I have never given anyone my password, my PIN, any of my confidential information.**

Q. Is any of the information within the e-mail related to Mr. Jeter?

**A. No.**

Q. And is there anything in the e-mail that would be considered -- withdrawn.

Now you asked during cross-examination about issues that you have with Mr. Jeter. Could you just explain to us exactly what the issues are that -- were that you had with Mr. Jeter, during this period of time when you had to collect his data?

**A. It very quickly became very adversarial. He was resistant to give me the documents in a timely manner, which is why Ms. Henderson stepped in. I would pass him in the hall, say hello and he would ignore me. He wouldn't talk to me. If I asked him to add a**

DeMarco - Redirect - Pepe-Souvenir

student to his caseload, he would not take any direction except in writing. If I had to meet with him to discuss anything, he would refuse and tell me he needed union representation and would not speak to me. Everything was a very big deal.

Q. Okay. Do you recall one instance where you attempted to get documents from Mr. -- Mr. Jeter, and he had a conversation with you, in November of 2004?

A. Was it the -- I -- I don't know if you're referring to the Nazi comment, about Nazi Germany, there was a --.

Q. Well, tell us about that conversation.

A. We were in the stairwell and it was -- I don't know what it was directly after, but I had interacted with him in the stairwell and I said something to the effect of look, you know, don't shoot me. I'm just the messenger. My role here is -- is following directions from my supervisor and -- an collecting this information.

DeMarco - Redirect - Pepe-Souvenir

And he made some kind of comment about that's what they said in -- in Nazi Germany, that they were only following directions. And -- and you're a smart girl, you know what that means, kind of thing. I don't remember specifically, but I was really uncomfortable and I wrote it up. I was -- I was uncomfortable.

MS. PEPE-SOUVENIR: I unfortunately don't remember our last document number but I'd like to have this marked, Department of Education's --?

THE HEARING OFFICER: Let me see.

A thought, before you go.

On that last exchange that you referred to, what's the date of that, do you recall?

THE WITNESS: I don't recall.

THE HEARING OFFICER: Okay.

THE WITNESS: And I wrote it up, I don't know if the date's on it, but I wrote an anecdotal and I shared it with Ms.

DeMarco - Redirect - Pepe-Souvenir

Henderson and Dr. Dreyfus.

THE HEARING OFFICER: Okay.

MR. GLASS: Actually, you know, this -- I have to lodge an objection at this point. I mean, this is sort of what we've been through here in the past. This is -- the first thing is -- is coming back with new documents that have not been provided in Discovery, trying to establish a tendency to behave in a certain way --

THE HEARING OFFICER: I'm sorry.

MR. GLASS: -- not to provide --

THE HEARING OFFICER: What -- but what are you objecting to?

MR. GLASS: Well, the -- the introduction of this very vivid --.

THE HEARING OFFICER: Oh. Oh, well, let's -- we'll -- we'll get to that. You'll have a chance at the appropriate time. The -- the number is Thirty-six.

MS. PEPE-SOUVENIR: Thank

DeMarco - Redirect - Pepe-Souvenir

you. Thirty-six for identification.

BY MS. PEPE-SOUVENIR: (Cont'g.)

Q. Can you identify that document that has been marked Department of Education's Thirty-six for identification?

A. Yes.

Q. What is that document?

A. I wrote an anecdotal of what exactly -- you know, what Mr. Jeter had said to me that afternoon, because I was pretty uncomfortable. And when I shared it with Dr. Dreyfus she asked for copies.

Q. And you wrote this yourself?

A. Yes, I did.

Q. And this is your recollection of what took place on that day?

A. I wrote it that day.

MS. PEPE-SOUVENIR: Okay. I'd like to have this moved into evidence as Department of Education's Thirty-six, please?

THE HEARING OFFICER: Any objection?

MR. GLASS: I think I do.

DeMarco - Redirect - Pepe-Souvenir

Let me speak to Mr. Jeter about it. It's the first time I've seen it.

THE HEARING OFFICER: Okay.

MR. GLASS: It was not provided at the beginning of the day --.

MS. PEPE-SOUVENIR: I believe it was in all the documents that you received.

MR. GLASS: I can absolutely assure you it was not in -- in the documents --.

THE HEARING OFFICER: Well, okay. Let's --

MS. PEPE-SOUVENIR: Well --

THE HEARING OFFICER: -- let's just --

MS. PEPE-SOUVENIR: What?

THE HEARING OFFICER: -- focus on --

MR. GLASS: Well, I think --

THE HEARING OFFICER: -- whether he has --

MR. GLASS: -- it should be on the --

DeMarco - Redirect - Pepe-Souvenir

THE HEARING OFFICER: -- an objection.

MR. GLASS: -- record, though, that --.

THE HEARING OFFICER: Yeah, I'm sure -- it's on the record.

MR. GLASS: This is about the third time it's happened.

THE HEARING OFFICER: Mr. Streu?

THE REPORTER: Yes, sir.

THE HEARING OFFICER: We're off the record just, probably, for a minute.

(Off-the-record discussion)

THE HEARING OFFICER: Any objection, Mr. Glass?

MR. GLASS: I mean, I have to lodge an objection. I mean, I'm not sure the -- what the point of bringing this in.

Number one, it could have come up on direct testimony. There's nothing in cross that makes her all of a sudden start to talk about why she has to bring this in now.

DeMarco - Redirect - Pepe-Souvenir

Number two, it was never provided to us.

Number three, it's not charged in this case.

Number four, it -- it's consistent with, you know, late -- late provision of documents that don't surface.

Never -- number five, never provided to Mr. Jeter at any -- any -- any time. And you know, it's -- it's -- it could have been created yesterday for all I know.

So, it's -- you know, it's not particularly relevant to the charges, it doesn't even -- it -- it's not even saying anything of misconduct. You know, now they'll say that this person feels threatened, because he made a comment. It's consistent with what happened at our last meeting, when Ms. Brown brings in something and says, "Oh, by the way he had another threatening incident."

I mean, these are not charged things. They happened well before this case was -- to provide it. They extend the case,

DeMarco - Redirect - Pepe-Souvenir

and you know, it's just prejudicial. Just come in, you know, after the fact. I mean, why was it not on the direct case? Why was it not provided to me? Why -- why is it an issue now?

THE HEARING OFFICER: Okay. Wait -- but the objection is as to the relevancy of it? I mean, the other discovery issues may be, obviously, a matter of concern between you, but --

MR. GLASS: Well, that is a --.

THE HEARING OFFICER: -- but -- excuse me, let me finish.

But the question here is whether this is relevant and the other legitimate objection is whether it's within the scope of -- of cross.

So, those are the ones I'd like to have Ms. -- Ms. Pepe-Souvenir answer -- respond to.

MS. PEPE-SOUVENIR: Absolutely. The beginning of the cross-examination there were several questions

DeMarco - Redirect - Pepe-Souvenir

asked of Ms. DeMarco where she clearly intimated to the arbitrator during the hearing that she had a problem with Mr. Jeter, getting documents from Mr. Jeter, that the relationship was very -- there was a lot of tension in the relationship. It was hard for her to get documents, and these were questions that were brought out -- responses that were brought out by the questions Mr. Glass asked.

If -- he's correct. During my direct examination I didn't ask her about the relationship with Mr. Jeter, the difficulties that she had. She made one comment, actually, during her direct examination, that there was a point in time when her relationship with Mr. Jeter got very tension-filled.

But Mr. Glass, in his cross, asked several -- at least five questions, and I've noted them, as to issues, as to tensions she had, as to the difficulties she had with getting documents with him, as to the reason why she stopped being the one actually getting

DeMarco - Redirect - Pepe-Souvenir

the documents, that they were going to Ms. Henderson. And she was the one, Ms. Henderson would then give to her, or there would be another person in the loop, she wouldn't have to directly deal with Mr. Jeter.

So, Mr. Glass opened the door, and this was an issue that came up during his cross, and I feel I have a perfect right to explore it further on redirect.

THE HEARING OFFICER: I understand.

MS. PEPE-SOUVENIR: And that's exactly what I'm doing.

THE HEARING OFFICER: I'll overrule the objection. Go ahead.

MS. PEPE-SOUVENIR: Thank you.

THE HEARING OFFICER: Go ahead.

MR. GLASS: Okay. I just would ask, though, I mean, if -- regardless as to whether what they're going to say may have an element of relevance -- I'm mean, as long as

DeMarco - Redirect - Pepe-Souvenir

they're -- they're relevant. But also, you know, there is -- there's the Discovery issue that's being glossed over again and again, and I think that should be under consideration --.

THE HEARING OFFICER: Okay. Mr. -- Mr. Glass. I heard you on that. I don't want to take it up at this point. We can take that up at another point. That's fine.

MR. GLASS: Just note for the record this is --

THE HEARING OFFICER: Yeah.

MR. GLASS: -- the third violation and it's an ongoing concern in this matter and --.

THE HEARING OFFICER: All right. Fine. Let's -- let's not discuss it any further. That's duly noted.

Go ahead, Ms. Pepe-Souvenir.

BY MS. PEPE-SOUVENIR: (Cont'g.)

Q. After having that conversation with Mr. Jeter in November of 2004, did you have any subsequent conversation with Mr. Jeter in reference to documents that

DeMarco - Redirect - Pepe-Souvenir

he needed to give you?

**A. I tried not to really have conversations alone, and at that point anything I gave him was usually in writing, with either his union rep or somebody there.**

Q. Uh-huh. Okay. Now, was this the standard procedure when you would talk to a -- whether it be a teacher, whether it be a service provider, that they would have to have the union rep if you wanted to give them instructions as to what they needed to do procedurally within the school setting?

**A. I assume that it's their right to have -- my understanding is that they only need -- they're -- they're entitled to union representation if it's disciplinary. But my experience prior to this was that I -- I had never had to have a staff member have union representation just to get direction.**

Q. Okay. And as a result of Mr. Jeter always requiring to have union representation present when you had to give him instructions, did that delay having to give him

DeMarco - Redirect - Pepe-Souvenir

the stipulation that we have on that point.

BY MS. PEPE-SOUVENIR: (Cont'g.)

Q. Prior to Ms. Dreyfus having a conversation with Mr. Jeter in September -- you recall that --

**A. Yes.**

Q. -- correct?

And you were with Ms. Dreyfus that morning?

**A. I believe it was more like lunchtime.**

Q. Okay. Lunchtime. Prior to her having the conversation with Mr. Jeter, had she, at any point, instructed you to follow-up on Mr. Jeter's documentation?

**A. No.**

Q. Okay. And her request for you to follow-up on Mr. Jeter's documentation only came after she had the conversation with Mr. Jeter; correct?

**A. Yes.**

Q. Okay. And you were present when she spoke to Mr. Jeter about the questions

DeMarco - Redirect - Pepe-Souvenir

she had?

**A. With his schedule?**

Q. Uh-huh.

**A. Yes.**

Q. Okay. At any point in time did Mr. Jeter ever say to you that he could not provide the proper information in his related-service -- related-service forms or his counseling log or this -- the -- these sign-in/sign-out sheet, because you were holding onto his materials?

**A. Not that I recall.**

Q. And based on the -- the -- the data, on average how long did it take you to go through Mr. Jeter's documentation in the comparison of the three documents?

**A. Maybe four hours, five hours.**

Q. All right.

**A. It was a lot of time.**

Q. And you did that on a weekly basis?

**A. Every week. It usually took up either all day Monday or all day Tuesday,**

**DeMarco - Redirect - Pepe-Souvenir**

**depending on when we got the book.**

Q. All right. And then you would turn around and then give it -- give the book back to Mr. Jeter?

**A. Yes.**

Q. Okay. Would you say that during the period of time when you were looking over Mr. Jeter's documentation, that he was singularly scrutinized more than any other service -- related-service provider?

**A. At the time, yes, but my understanding was that it was based on a reason.**

Q. Okay. Did you know what the reasons were? Were you at least aware of what the reasons were?

**A. There were concerns about him servicing students.**

Q. Whether or not Ms. Henderson -- well, withdrawn.

You indicated that at one point in time there were some concerns about your time and attendance?

Scrutinized singularly

DeMarco - Redirect - Pepe-Souvenir

**A. Yes.**

Q. Okay. And that eventually those were unfounded?

**A. Yes.**

Q. Okay. Did your time and attendance at -- at all affect Mr. Jeter's -- or your findings of Mr. Jeter's entries in his related-service card or his counseling log or his time -- sign-in/sign-out sheets.

**A. Not affected at all, no.**

Q. Okay. Did that affect your -- the errors that you would find, or the omissions that you would find, would that be related to you being on time or late at any point in time in your career?

**A. In my -- my recollection is it happened long after he was gone.**

Q. The attendance issue?

**A. Yes.**

Q. Okay. Was Mr. Jeter involved with you -- with your attendance issues? Did he make a complaint?

**A. I don't know.**

**DeMarco - Redirect - Pepe-Souvenir**

Q. All right.

**A. The only person I know made a complaint was Mr. Adolphe.**

Q. Okay. At any point in time, when you checked over Mr. Jeter's documentation -- withdrawn.

Now, you also indicated that Ms. Henderson did not leave the school voluntarily?

**A. Correct.**

Q. And that there was some complaints related to Ms. Henderson?

**A. Correct.**

Q. Okay. Did that -- those complaints relate at all to Mr. Jeter's -- to your reviewing Mr. Jeter's related-service cards, his sign-ins -- his sign-in/sign-out cards, or his counseling log? Were they related at all to that?

**A. No, and I -- I 'm not sure if Mr. Jeter was even still in the building at the time.**

Q. At any point in time did you,

DeMarco - Redirect - Pepe-Souvenir

Ms. Dreyfus, Ms. Henderson get together and decide that you were going to go after Mr. Jeter specifically?

**A. No. Just to monitor students not being served.**

Q. Okay. At any point in time was there a discussion to go after Mr. Jeter because he's black?

**A. No.**

Q. And that -- I'm relates -- referring to any conversations between you, Ms. Henderson, and Ms. Dreyfus?

**A. No. Ms. Henderson is black as well.**

Q. Prior to coming to Eight Eleven K did you know Mr. Jeter?

**A. No.**

Q. Okay. And prior to you having to review Mr. Jeter's documentation, could you describe what kind of relationship you had with Mr. Jeter?

**A. I really only interacted with him when students were in crisis, because he**

**DeMarco - Redirect - Pepe-Souvenir**

**was one of -- as a guidance counselor he worked with students in crisis, in conjunction with the -- the crisis teacher.**

Q. Okay. At any point in time when you did work with Mr. Jeter, in conjunction with students having crisis, did he at all exhibit any kind of behavior that made you feel uncomfortable?

**A. Not at that time.**

Q. Okay. And is it your testimony that the only time that he did make you feel uncomfortable, or -- or exhibited behaviors that you described, was after you started reviewing his documentation and making -- pointing out to him the things that he needed to fix in his documentation?

**A. Absolutely.**

Q. And I know you've already testified about what has been moved into evidence as R-Seventy-nine, and you indicated that this was a private e-mail sent from your e-mail to this person. How does it make you feel, as you sit here today, this document

DeMarco - Redirect - Pepe-Souvenir

being used during these 3020-a hearings?

**A. Well, I'm concerned about someone having access to my Board of Ed e-mail. I really am feeling very violated, and personally I think I have some rights, but apparently I don't.**

**And I'm concerned how someone got ahold of this e-mail. I -- I -- it's just -- I don't understand how someone could have access to e-mails that are password-protected when I certainly have never given anyone access to my e-mail account.**

Q. Okay. Then you were also -- also asked some questions about Ms. Kirshbalm being assigned to do something else. What exactly is Ms. Kirshbalm's title, if you could tell me?

**A. Well, right now she's retired.**

Q. But can --.

**A. But when she was there I believe she was listed as a paraprofessional.**

Q. She was a paraprofessional.

DeMarco - Redirect - Pepe-Souvenir

Were you aware of this incident that took place in April, involving Mr. Jeter and Ms. Kirshbalm and Ms. Copenny?

**A. Only through Ms. Copenny.**

Henderson

Q. And you testified that Ms. Kirshbalm's assignment that particular day was given to her by Ms. Henderson?

**A. She had been in and out of classroom positions from the time I'd gotten there and I -- I don't know how long before, but that was -- that was Henderson, and how she had her school organized.**

Q. Okay. At that point in time did Mr. Jeter -- was -- was it appropriate for Mr. Jeter, who was assigned to be someplace else, to make this complaint to Ms. Copenny at that point in time?

**A. No.**

Q. Okay. And why was it not appropriate?

**A. The person who does staff assignments and staff designations is an administrator, not -- not anyone else.**

**DeMarco - Redirect - Pepe-Souvenir**

Q. Had there any -- been -- been any complaints before, prior to Mr. Jeter's complaint, about Ms. Kirshbalm's position?

**A. I don't know.**

**MS. PEPE-SOUVENIR: Okay. Just give me a few minutes.**

THE HEARING OFFICER: Okay.

MS. PEPE-SOUVENIR: Oh, can I please show her what you have marked as Exhibit Eighty?

BY MS. PEPE-SOUVENIR: (Cont'g.)

Q. You were -- were you given a specific assignment to make Mr. Jeter's schedule?

**A. Yes.**

Q. How often would you have to do his schedule?

**A. I -- you know, it got amended any time a new student needed to be added to his caseload. But I did the first one in September, and then added a student or made a correction, I'm not sure which in -- in the -- the October one. And for the most part it**

**DeMarco - Redirect - Pepe-Souvenir**

**stayed pretty constant, unless a new student came or we received notification from the District about a student unserved counseling. And based on who had space in their schedule I would assign them to either Mr. Lent or Mr. Jeter.**

Q. Okay. So, ordinarily, the -- the schedule itself was made up by an administrator and then given to the related-service providers?

**A. No. Normally they're made up by the provider, but Dr. Dreyfus had seen his initial schedule and -- and was very unhappy with it, and asked to me write it.**

Q. Do you know why she was unhappy with his initial schedule?

**A. He was assigned two sites, and she was concerned about him being out of the building.**

Q. Okay. And you indicated that your only responsibility, then, would have been to just do this part -- this portion of the schedule?

DeMarco - Redirect - Pepe-Souvenir

**A. Correct.**

Q. Okay. But you proceeded to do the other portion of the schedule?

**A. Correct.**

Q. And why is it that you did the other portions of the schedule?

**A. Because it gave all the pertinent information that he would need to fill out his related-service cards, and I -- this way he wouldn't have to look them up.**

Q. Okay. So, you were trying to help Mr. Jeter out?

**A. Yes, I was.**

Q. Okay. And you indicated that you didn't put a start date. Was that your responsibility to put the start date?

**A. No, it's the related-service provider.**

**MS. PEPE-SOUVENIR: I have no further questions for this witness.**

THE HEARING OFFICER: You may go ahead.

MR. GLASS: Well, yeah -- a

DeMarco - Recross - Glass

few questions.

RECROSS EXAMINATION

BY MR. GLASS:

Q. First regarding this. Did Dr. Dreyfus ever direct Mr. Jeter to fill out the start date on this form?

**A. Not that I know of.**

Q. Did you ever instruct him to do it?

**A. No, I did not.**

Q. Okay. Then regarding the Kirshbalm incident we just discussed, do you think it was wrong for Mr. Jeter to complain if he thought Ms. Kirshbalm was being improperly assigned by the school?

**A. From my understanding of the incident I think there was a more appropriate way to make that complaint.**

Q. But it's not improper for a teacher to do or a guidance counselor, to raise a concern if staff was being misallocated, in violation of I.E.P.s?

**A. It's not their role, but**

DeMarco - Recross - Glass

**I'm -- I would certainly have a conversation if I was a principal. I'm not, but I would assume that that's something that he could bring to -- speak to the principal about.**

Q. And if it's legitimately raising a concern, would you feel it would be improper to retaliate against someone for raising that concern?

**A. I don't believe in retaliation.**

Q. Okay. Now, you expressed, in this letter, that Mr. Jeter was someone who said that he was closely scrutinized?

**A. Yes, it does.**

Q. You understood -- you understood that he was -- why he might feel upset, that this --?

**A. I did understand it, but I didn't feel like it -- I should be the target of his anger.**

MR. GLASS: Okay.

THE HEARING OFFICER: I'm sorry. And when you referred to this letter

DeMarco - Recross - Glass

you're referring to --

MR. GLASS: D-Thirty-six.

THE HEARING OFFICER: -- D-Thirty-six. Okay.

BY MR. GLASS: (Cont'g.)

Q. Okay. And but you understood that he might be upset, because he felt that he was being wrong -- wrongly watched?

**A. Right.**

Q. And you were likewise upset when someone made a complaint about your time in attendance, you felt it was unjustified; correct?

**A. I -- I -- yes.**

Q. You were pretty upset at Mr. Martiste (sic) for raising that concern?

**A. I wouldn't say pretty upset because I wasn't doing anything wrong, but it was not a pleasant experience.**

Q. Okay. And those comments he made about Nazi Germany, wasn't he just trying to convey that he felt that -- that people were acting in such a way that that -- that he

DeMarco - Recross - Glass

feared the, you know, loss his job because he -- he -- he was not acting -- felt like he was being scrutinized over -- well, strike the question. I'll try to rephrase.

First let me just ask you about the statement in general. When did you write the statement?

**A. Soon after it happened.**

Q. And who -- was this a -- and where did you write it?

**A. I went up and -- on my computer, I wrote it.**

Q. And who did you give it to?

**A. Well, at first I -- I just filed it, and then when I shared it with Dr. Dreyfus she wanted a copy of it.**

Q. And when did you share it with Dr. Dreyfus?

**A. Well, I don't know the exact date. I -- I didn't put the 11/03 on the top, so it's possible that that's when Dr. Dreyfus put it, when I gave it to her, but --.**

Q. All right. And did you type

# Exhibit K

Case 1:06-cv-03687-NGG-LB Document 15-2 Filed 03/19/07 Page 22 of 31 PageID #: 509

800.523.7887 06/08/2006, New York, NY, In the matter of Ernest Jeter Associated Reporters In'tl., Inc.

Page 2200

THE STATE EDUCATION DEPARTMENT
THE UNIVERSITY OF THE STATE OF NEW YORK

---

In the Matter of

NEW YORK CITY DEPARTMENT OF EDUCATION - DISTRICT 75

v.

ERNEST JETER

Section 3020-a Education Law Proceeding (File #5,285)

---

DATE: June 8, 2006

TIME: 10:30 a.m. to 2:28 p.m.

LOCATION: NYC Department of Education
Office of Legal Services
49-51 Chambers Street
New York, New York 10004

BEFORE: CALVIN W. SHARPE, ESQ.
Hearing Officer
27 Undercliff Road
Montclair, New Jersey 07042

COPY

Flynn - Cross - Glass

is being charged with. He's not being charged with whether he had line-of-duty injury or not. It -- it's a specific charge that he is out for several days. There's no question as to his CAR balance or -- or what he had. So I don't see the relevancy of the line of questioning. That's -- that's the basis.

THE HEARING OFFICER: Okay. I -- I get it. Mr. -- Mr. Glass?

MR. GLASS: Well, he's charged with excessive absence for these missed periods of time, and whether it's unauthorized absence or authorized absences, line-of-duty may very well have an impact on explaining why he was absent. A CAR balance is a -- is a defense that they had a -- if they had a viable CAR balance, which the administration changed on him -- could be a defense as to whether these are excused absences, and you know, this is barely the -- the -- the heart of the charges -- excessive absence. I want --.

THE HEARING OFFICER: I think it could -- could be related, so I'll overrule

Flynn - Cross - Glass

the objection.

BY MR. GLASS: (Cont'g.)

Q. Okay. So didn't you say something about Ms. Henderson also talked to you about this?

**A. Yeah.**

Q. What -- what did she say about it?

**A. The same thing Dr. Erber.**

Q. After -- did she speak to you after Dr. Erber?

**A. Dr. Erber probably spoke to her first, and then they both told me.**

Q. And she told you to change --

**A. Yeah.**

Q. -- remove his CAR balance? Is that -- that's a "yes"?

**A. Well, not -- oh. Yes.**

Q. At some point, was that in -- I believe our -- well, who is -- who is Danette, by the way?

**A. She worked at our district office. She helped the --.**

**Flynn - Cross - Glass**

Q. At 400 Main Street?

**A. Yeah -- 400 for -- she helped with the -- with the school -- the teachers -- their payroll.**

Q. I want to --.

MS. PEPE-SOUVENIR: I'm trying to look at my copy.

BY MR. GLASS: (Cont'g.)

Q. And that date -- you see how the -- for the top, there's a date -- last usage date of 6/15/03.

THE HEARING OFFICER: Looking at Fifty?

MR. GLASS: Yeah.

THE HEARING OFFICER: Is this Respondent's Fifty?

BY MR. GLASS: (Cont'g.)

Q. Respondent's Fifty -- you see that date of 6/15/03?

**A. Right.**

Q. Does that reflect that there was still a CAR balance of thirty-seven days, as of that date?

Flynn - Cross - Glass

**A. Yes.**

MR. GLASS: I'm marking another document. I just want to make sure. Is 'R' Fifty -- the last document -- is that in evidence -- 'R' Fifty?

THE HEARING OFFICER: 'R' Fifty?

MR. GLASS: I'd like to move it in. She wrote the note on it.

THE HEARING OFFICER: 'R' Fifty -- I don't have it in this --.

MS. PEPE-SOUVENIR: Did you try to put that in through -- on the 7th?

MR. GLASS: I think I tried. Yeah. I probably --.

THE HEARING OFFICER: I don't have a notation of -- of it being received.

MR. GLASS: I'd like to move it into evidence at this point.

THE HEARING OFFICER: Any objection, Ms. Pepe-Souvenir?

MS. PEPE-SOUVENIR: I have no objection. Do you have an extra copy of this?

# Exhibit L

To: Office of Equal Opportunity
    Complaint Unit
    65 Court Street,  Roo m 923
    Brooklyn, New York 11201

From: Ernest Jeter
    Guidance Counselor/
    Related Service Provider
    124-21 Flatlands Avenue
    Brooklyn, New York   11208

Date: June 1, 2005

Re: Complaint of Allege Discrimination and Retaliation for filing complaint

Dear Sir/Madame:

The individuals mentioned above in this complaint have retaliated against me for filing a complaint for discrimination to your office. That is, I have re-assigned and assigned to the District 75 main office at 400 First Avenue, New York, New York. In addition, I have been placed at the district office for some unknown investigation in which the reason for the investigation has not been explained to me.

The actions of re-assigning or assigning me happened on April 12, 2005 to the present. In my opinion,  By Fran Dryfus, etc., re-assigning, assigning, investigating, and re-investigating me for some unknown reasons, they are punishing and taking disciplinary action, and harassing me for filing a complaint to your office. Furthermore your office did not honor my April 6, 2005 rquest to your office for a formal investigation.

I am demanding to be immediately placed back at the school I am entitled to work in.

Thank you

Ernest Jeter

**CHANCELLOR'S REGULATION A-830**
**NEW YORK CITY DEPARTMENT OF EDUCATION**
**COMPLAINT OF ALLEGED DISCRIMINATION**

*Complainant:*

*Please complete every appropriate item and submit it* ***as soon as possible*** *after the incident of alleged discrimination or harassment to:*

***Office of Equal Opportunity***
***Complaint Unit***
***65 Court Street, Room 923***
***Brooklyn, NY 11201***
***Fax #718-935-2531***

*(Please print clearly all requested information. Also attach additional pages and supporting documentation if necessary.)*

*Check (✔) One:* ● *Employee* ○ *Student* ○ *Parent* ○ *Other*

*Name:* Ernest Jeter

*Student's Name:* ______________________
*(If complaint is being filed by parent.)*

*Home Address:* 124-21 Flatlands Ave., / 1-J- B'Klyn, N

*Phone #:* Home 718 498-6437 /Work 357-596-7357 cell

***Complaint Request:*** *(Please circle A or B)*

A. ***Investigation Request:*** *This is a request for a formal investigation of a complaint of alleged discrimination.*

B. ***Conciliation Request:*** *This is a request for OEO and/or the Local Equal Opportunity Coordinator (LEOC) to conciliate/resolve a complaint of alleged discrimination.*

Name of LEOC or Principal: ______________________

School/Office/Region: ______________________

School/Office Phone #: ( ) ______________________

**Nature of Complaint**:

1. **Check below why you believe you were discriminated against.**

- ○ Age
- ○ Arrest/Conviction
- ○ Color
- ○ Creed
- ○ Disability
- ○ Ethnicity/National Origin
- ○ Gender/Sex
- ○ Alienage/Citizenship Status
- ○ Marital Status
- ● Race
- ○ Religion
- ● Retaliation (for complaint)
- ○ Sexual Harassment
- ○ Sexual Orientation
- ○ Other ____________

2. **Name(s)/Title(s) of person(s) you believe discriminated against you.**

Francine Dryfus, Local Instructional Superintendent D. 75 and Bonnie Brown, Deputy Superintendent District 75

3. **Where did it take place?**

____________

4. **Date (s) on which alleged act(s) of discrimination occurred.**

Month: April Day 12 Year 2005, Month: ~~May~~ June Day ~~31~~ 1 Year 2005 (present)

5. **Explain what happened. (Attach extra pages if needed.)**

(See attached) Retaliated against me for filing a complaint to your office.

6. **What relief or corrective action are you seeking?**

Return to my previous school, etc.

Signature Ernest Jeter /Date June 1, 2005



THE NEW YORK CITY DEPARTMENT OF EDUCATION
JOEL I. KLEIN, *Chancellor*

Office of Equal Opportunity

April 21, 2005

Mr. Ernest Jeter
124-21 Flatlands Avenue, Apt. 1-J
Brooklyn, NY 11208

Dear Mr. Jeter:

The Office of Equal Opportunity (OEO) is in receipt of your complaints. Our preliminary investigation, made pursuant to Chancellor's Regulation A-830, indicates that there is no credible evidence presented which would support your allegations of discrimination and retaliation. Additionally, you have not presented credible evidence that the actions of school administrators regarding the assessment of your job performance and their involvement in a Special Commissioner of Investigations ("SCI") investigation of you regarding "falsified records and not providing mandated services to students" were pretexts for illegal discrimination. The issues raised in your complaints regarding your job performance and the SCI investigation are best addressed by your union. Based on the foregoing, OEO has declined to assert further jurisdiction over this matter and has closed your case file.

If you have any questions, you may contact Michael J. Valente, Esq., Equal Opportunity Complaint Officer at (718) 935-3319.

Sincerely,

Connie A. Shulman
Acting Director

CAS:mjv

# Exhibit M

THE NEW YORK CITY DEPARTMENT OF EDUCATION
JOEL I. KLEIN, *Chancellor*
OFFICE OF THE CHANCELLOR
52 Chambers Street, Rm. 308, New York, NY 10007

October 12, 2005

RECEIVED

BY FAX – (718) 722-2869

Kathleen Fitzharris
Investigator
State Division of Human Rights
55 Hanson Place
Brooklyn, New York 12217

BROOKLYN OFFICE

Re: Ernest Jeter v. NYC DOE and Norma Barinas
SDHR No.: 1017254

Dear Ms. Fitzharris:

Allegation

Complainant, who filed a previous case with the Division, now claims that the actions taken by the New York City Department of Education ("the Department") constitute retaliation. He claims that his assignment to the District Office in April 2005 constitutes disparate treatment and that he has been "falsely accused of excessive absenteeism… and brought up on unwarranted disciplinary charges."

Statement of Facts

The Department emphatically denies discriminating against complainant in retaliation for his having filed a prior complaint with the Division, or for any other unlawful reason.

District 75 Local Instructional Superintendent ("LIS") Francine Dreyfus advises that complainant has been assigned to the District Office since April 2005 as a result of substantiated findings based on an investigation by the Department's Office of Special Investigations ("OSI"). He was removed from his assignment at 811K as per the directive from the Department's Office of Legal Services. The OSI investigation and the substantiated findings were based on a parent's complaint that her two children who attended 811K were not seen for counseling by complainant during the 2003-04 school year.

As of late September 2004, complainant's related service attendance logs, sign in/sign out sheets and the students' daily attendance, ATS report, were checked to ascertain if complainant actually followed his schedule and adhered to the students' mandates for counseling.

This was as a result of letters complainant received in June 2004 from his supervisor, Margo Levy, Supervisor of Guidance Counselors/Social Workers and a letter dated in October 2004 (following a conference in late September 2004) from Superintendent Dreyfus in which it was documented that complainant did not maintain his official Related Service Attendance cards and/or did not perform his duties (i.e., see mandated students on his schedule for counseling).

Complainant's related service attendance cards as well as the sign in/sign out sheets were collected every Monday. These documents were compared to individual students' mandates and their daily attendance in school. The Assistant Principal also periodically reviewed the other related service providers' attendance cards and sign in/sign out sheets.

In May 2004, a meeting was held with Principal Henderson concerning complainant's failure to follow his counseling schedule, failure to see students for their mandated service, and failure to fill out the Related Service Attendance Cards. Principal Henderson brought complainant's failing to perform his responsibilities as a counselor to Margo Levy's attention.

Conclusion

Complainant has failed to make a *prima facie* case of discrimination based on retaliation. Establishing a *prima facie* case of discrimination requires a showing that (1) complainant belongs to a protected class; (2) he performed his duties satisfactorily; (3) he was subjected to an adverse employment action; and (4) such adverse employment action occurred in circumstances giving rise to an inference of discrimination on the basis of her membership in a protected class. McLee v. Chrysler Corp., 109 F 3d 130 (2d Cir. 1997).

Complainant failed to perform his duties satisfactorily. The complaint does not allege any information that would lead anyone to conclude that discrimination based on retaliation occurred. Thus, I respectfully request that the Division issue a finding of no probable cause and dismiss this complaint in its entirety. If you have any questions on this matter, please do not hesitate to contact me.

Sincerely,

Mary McKenna Rodríguez
Senior Counsel

MMR/tg