UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

ERNEST JETER,

                                 Plaintiff,

                - against -

NEW YORK CITY DEPARTMENT OF EDUCATION
OF THE CITY OF NEW YORK, NEW YORK CITY
DEPARTMENT OF INVESTIGATION OF THE CITY OF
NEW YORK, and THE OFFICE OF SPECIAL
COMMISSIONER OF INVESTIGATION FOR NEW
YORK CITY SCHOOL DISTRICT OF THE CITY OF
NEW YORK,

                                Defendants.

------------------------------------------------------------------------ x

**DECLARATION IN SUPPORT
OF MOTION FOR SUMMARY
JUDGMENT**

Docket No. 06 Civ. 3687
(NGG)(LB)

I, DANIEL CHIU, hereby declare pursuant to 28 U.S.C. § 1746 that:

1.       I am an Assistant Corporation Counsel with the office of Michael A. Cardozo, Corporation Counsel of the City of New York, attorney for defendants. I am familiar with the matters set forth below based on a review of the case file maintained by this office and conversations with employees of the defendants.

2.       This declaration is submitted in support of defendants' motion for summary judgment.

3.       Annexed hereto as Exhibit "A" is a true copy of the Complaint.

4.       Annexed hereto as Exhibit "B" is a true copy of a Memorandum and Order, dated March 22, 2004, in Jeter v. Board of Education of the City of New York, Docket No. 99 CV 2537 (DGT).

5.       Annexed hereto as Exhibit "C" is a true copy of excerpts from the deposition transcript of plaintiff Ernest Jeter.

6.     Annexed hereto as Exhibit "D" is a true copy of excerpts from the deposition transcript of Bonnie Brown.

7.     Annexed hereto as Exhibit "E" is a true copy of excerpts from the deposition transcript of Francine Dreyfus.

8.     Annexed hereto as Exhibit "F" is a true copy of excerpts from the deposition transcript of Susan Erber.

9.     Annexed hereto as Exhibit "G" is a true copy of excerpts from the deposition transcript of Sylvia Serra

10.    Annexed hereto as Exhibit "H" is a true copy of the answers of Thomas Fennell to plaintiff's deposition upon written questions.

11.    Annexed hereto as Exhibit "I" is a true copy of SCI Memorandum, dated December 16, 2004, and plaintiff's Related Service Attendance Cards.

12.    Annexed hereto as Exhibit "J" is a true copy of SCI Intake Complaint Forms, dated October 8, 2004.

13.    Annexed hereto as Exhibit "K" is a true copy of SCI Investigator's Final Report and Interview Notes, dated January 10, 2005.

14.    Annexed hereto as Exhibit "L" is a true copy of a letter from Regina Loughran to Joel Klein, dated February 18, 2005.

15.    Annexed hereto as Exhibit "M" is a true copy of a disciplinary charges, dated June 6, 2005.

16.    Annexed hereto as Exhibit "N" is a true copy of disciplinary charges, dated June 29, 2006.

17.    Annexed hereto as Exhibit "O" is a true copy of excerpts from transcript

2

of the 3020-a disciplinary hearing.

18.    Annexed hereto as Exhibit "P" is a true copy of the Hearing Hofficer's Decision in <u>New York City Department of Education-Region 5 v. Jeter</u>, dated July 12, 2007.

19.    Annexed hereto as Exhibit "Q" is a true copy of a Step 2 Grievance Decision, dated October 19, 2007.

20.    Annexed hereto as Exhibit "R" is a true copy of an NYPD Complaint, dated February 13, 2004.

21.    Annexed hereto as Exhibit "S" is a true copy of a letter from Steve Lent to Rachel Henderson, dated March 1, 2004.

22.    Annexed hereto as Exhibit "T" is a true copy of a letter from Penny Leblang, dated March 1, 2004.

23.    Annexed hereto as Exhibit "U" is a true copy of an SCI Report and Case Form, dated June 9, 2005.

24.    Annexed hereto as Exhibit "V" is a true copy of a letter from Bonnie Brown to Ernest Jeter, dated May 9, 2003.

25.    Annexed hereto as Exhibit "W" is a true copy of a letter from Margo Levy to Ernest Jeter, dated June 4, 2004.

26.    Annexed hereto as Exhibit "X" is a true copy of a letter from Fran Dreyfus to Ernest Jeter, dated October 18, 2004.

27.    Annexed hereto as Exhibit "Y" is a true copy of a letter from Fran Dreyfus to Ernest Jeter, dated November 30, 2004.

28.    Annexed hereto as Exhibit "Z" is a true copy of a letter from Fran Dreyfus to Ernest Jeter, dated April 7, 2005.

3

29.     Annexed hereto as Exhibit "AA" is a true copy of a letter from Judy Nathan to Ernest Jeter, dated June 23, 2005.

30.     Annexed hereto as Exhibit "BB" is a true copy of a letter from Ernest Jeter to Mayor Michael Bloomberg, dated May 11, 2003.

31.     Annexed hereto as Exhibit "CC" is a true copy of an Office of Equal Opportunity Complaint, dated March 8, 2004.

32.     Annexed hereto as Exhibit "DD" is a true copy of an e-mail from Rachel Henderson to Susan Erber, dated March 8, 2004.

33.     Annexed hereto as Exhibit "EE" is a true copy of a New York State Division of Human Rights complaint, sworn to July 6, 2004.

34.     Annexed hereto as Exhibit "FF" is a true copy of a New York State Division of Human Rights Determination and Order, dated October 6, 2005.

35.     Annexed hereto as Exhibit "GG" is a true copy of an Office of Equal Opportunity Complaint, dated January 17, 2005.

36.     Annexed hereto as Exhibit "HH" is a true copy of an Office of Equal Opportunity Complaint, dated April 4, 2005.

37.     Annexed hereto as Exhibit "II" is a true copy of an e-mail from ernest jeter to Mayor Michael Bloomberg, dated April 18, 2005.

38.     Annexed hereto as Exhibit "JJ" is a true copy of an Office of Equal Opportunity Complaint, dated June 1, 2005.

39.     Annexed hereto as Exhibit "KK" is a true copy of a New York State Division of Human Rights complaint, sworn to August 11, 2005.

40.     Annexed hereto as Exhibit "LL" is a true copy of a New York State

Division of Human Rights Determination and Order, dated March 16, 2006.

      41.    Annexed hereto as Exhibit "MM" is a true copy of the Ruling on Respondent's Motion to Dismiss All Specifications, dated July 17, 2006, in the matter of <u>New York City Department of Education-Region 5 v. Jeter</u>.

      42.    Annexed hereto as Exhibit "NN" is a true copy of a letter from Susan Erber to Ernest Jeter, dated February 24, 2003.

      43.    Annexed hereto as Exhibit "OO" is a true copy of a letter from Regina Loughran to Charles J. Hynes, dated February 18, 2005.

      44.    Annexed hereto as Exhibit "PP" is a true copy of an email from Bonnie Brown to Rachel Henderson, dated April 1, 2003.

      45.    Annexed hereto as Exhibit "QQ" is a true copy of the answers of Regina Loughran to plaintiff's deposition upon written questions.

      46.    Annexed hereto as Exhibit "RR" is a true copy of plaintiff's portion fo the proposed joint pretrial order.

      I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       November 18, 2011

                               Daniel Chiu

# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Ernest Jeter,

                Plaintiff,

    -against-

New York City Department of Education
of the City of New York,  New York City
Department of Investigation of the City of
New York, and the Office of Special
Commissioner of Investigation for New York
City School District of the City of New York,
et al.,

                Defendant(s)

Complaint



-A-

1) Plaintiff, Ernest Jeter, resides at 124-21 Flatlands Avenue, apartment 1-J, Brooklyn, New York 11208.

2)  Defendant, New York City Department of Education of the City of New York, resides at 52 Chambers Street, New York, New York 10007.

2-a). Defendant, New York City Department of Investigation, resides at 80 Maiden  Lane, New York, New York 10038.

2-b)  Defendant, Office of Special Commissioner of Investigation for New York City School District, resides at 80 Maiden Lane, New York, New York 10038.

3)  Allegations of jurisdiction: This Court has Jurisdiction under federal questions and this action arrises under:

         a-1) Fourteenth Amendment of the Constitution of the United States

         a-2) Title VII of the Civil Rights Act of 1964, as amended:

                1. Disparate treatment

1

2. Hostile work environment

3. Retaliation

4. Retaliatory hostile work environment

b) Title 42 U.S.C. section 1981 of the United States Codes

c) Title 42 U.S.C. section 1983 of the United States Codes

d) Title 42 U.S.C. section 1985 of the United States Codes

e) Title 42 U.S.C. section 1986 of the United States Codes

f) New York State Division of Human Rights, New York State Executive Law section 290 and 296, et seq.,

4) This action is commenced because the defendant(s) has/have discriminated against plaintiff because of his race. Plaintiff is an African American and is a member of the protective class, and the defendant has created an hostile work environment and a retaliatory hostile work environment for plaintiff, and the harassment and hostile work environment are continuing, and plaintiff is raising the continuing violation theory because the harassment/hostile work environment has continued over an extended period of time including to the present:

a) Plaintiff has filed complaints with the with defendant's equal opportunity office beginning in March of 2004 and with the last complaint filed with defendant in January 2006 or later concerning the race discrimination, harassment and retaliation by supervisors and other staff members, but the defendant did not reasonably investigate or address plaintiff's allegations.

b) Plaintiff has filed complaint with New York State Human Division of Rights in July of 2004 and August 2005.

c) Plaintiff has filed a dual complaint with the Equal Employment Opportunity

2

Commission when plaintiff filed a complaint with the New York State Division

of Human Rights in July 2004 and August 2005.

c) Plaintiff's complaint filed with New York State Division of Human Rights has

been reviewed by the Equal Employment Opportunity Commission (EEOC);

d) Plaintiff has previously filed a complaint with this Court against the defendant

in this Court in 1999 that ended in March 2004.

e) Plaintiff has received a "Notice of Right to Sue" from the EEOC. ( See attached

Notice of Right to Sue letter ( dated May 4, 2006) and envelope (dated: May 4,

2006).

f) The defendant began it's disparate treatment, retaliation and hostile work

environment against complainant beginning on April 1, 2003 or earlier when

Bonnie Brown, current Superintendent of District 75 of the New York City

Department of Education, wrote an email to Rachel Henderson, former principal

of 811K@286, requesting that Rachel Henderson make sure that the payroll

secretary of 811K@286k, Mary Flynn, was taken days out of plaintiff's sick

bank and deducting complainant's pay because they, i.e., the District, wanted to

charges complainant. Complainant at that particular time had thirty-seven (37)

days in complainant's sick bank and as a tenured guidance counselor,

complainant had the right to borrow an additional twenty (20) days if

complainant had used all the days in plaintiff's sick bank. Plaintiff discovered

the email from Bonnie Brown to Rachel Henderson in his personnel files on

July 19, 2005 when he copied documents from his personnel files.


f1) In addition, plaintiff discovered on July 19, 2005, when plaintiff copied

3

documents out of his personnel files, that Mary Flynn, 811K's payroll

secretary, received instructions from Susan Erber, former Superintendent of

District 75, to changed days in plaintiff's attendance history from pending line of

duty injury to unauthorized absence during the period of time from February

2003 to June 2003 with deduction of plaintiff's pay. The borrowed days which

would have covered the medical certified days was not attributed to plaintiff for

the period of February 2003 to June 2003 until after the disciplinary charges was

filed and disciplinary hearing was proceeding when plaintiff received his rating

sheet for 2005- 2006 school year which showed no negative days in plaintiff's

cumulative absence reserve, but the rating sheet did show the 20 days borrowed

days by plaintiff, and defendant brought plaintiff up on disciplinary charges for

for unauthorized absence.

f2) In October 2003, plaintiff was transferred to 811K@286K by Francine

Dreyfus, Local Instructional Superintendent of District 75, (LIS). Francine

Dreyfus, LIS, claimed to transfer complainant because the other counselor,

Steve Lent, had more seniority than complainant. But, plaintiff learned during

the disciplinary hearing proceeding through the testimony of Bonnie Brown,

current Superintendent of District 75, that plaintiff was transferred because

they, i.e., the district administrators, could not keep up with plaintiff.

f3)The defendant began with the assignment at 811K@286K main site to assigned

plaintiff multiple duties outside of plaintiff's guidance counselor's contract and

in violation of the Jose P. stipulations. Duties such as, assignment to cafeteria,

4

assignment to busing, transitional coordinator and functional behavior assessment. The extra duties interfered with the performance of his duties in that plaintiff was not given adequate time to do the necessary paperwork and responding to the constant emergencies or crisis constantly interfered with the counseling sessions in that students who were in the middle of their counseling sessions had to be taken alone with plaintiff when plaintiff responded to emergency crises in the school. This subject was brought to the attention of Rachel Henderson, former Principal of 811K@286K, that the constant request for plaintiff to respond to emergencies in the school was interfering with plaintiff performance of his duties, Nevertheless, Rachel Henderson stated that complainant had to continued to respond to the emergencies crises in the school.

f4(a) Assigning plaintiff to the transitional coordinator's position is a duty that was assigned to plaintiff in violation of plaintiff's guidance counselor's contract which states that guidance counselors should not be assigned duties that are assigned to teachers. In addition, the contract specifically states that guidance counselors should not be assigned duties such as: cafeteria, busing, hall duties, etc.

f4(b)  As for the functional behavior assessment, the defendant assigned plaintiff to this particular assignment when defendant should have known that this is a school wide responsibility. That is, the functional behavior assessment is supposed to be a team approach in which each person who comes into contact with a particular student is suppose to participate in developing a

5

behavioral management program for the student.

f5)  It was clear to plaintiff as to what the defendant's intentions were when the defendant assigned plaintiff these extra duties in violation of plaintiff's contract and the Jose P. stipulations. That is, the defendant was planning on setting up plaintiff so that the defendant could bring plaintiff up on disciplinary charges. The defendant did bring plaintiff up on disciplinary charges for duties forbidden by plaintiff's contract and Jose P. stipulations.

f6)  In February 2004, plaintiff was verbally abuse by Guidance Counselor Steve Lent who was upset because Rachel Henderson had assigned plaintiff the duties of transitional coordinator, duties that Steve Lent testified during plaintiff's disciplinary hearing that he has been performing for the past twenty (20) years in violation of the Jose P. stipulations and not providing mandated counseling while he was performing other duties such as attending Parent Teacher Association meetings. It is a know fact to the District 75 administrators knew that Steve lent was not performing his duties as related service provider for the last twenty, 20, years because it was the administrators who gave him the above duties according to his sworn testimony.

f7)  During the time Steve Lent verbally abused plaintiff, he threaten plaintiff with the fact the he was going to see to it that plaintiff was removed from 811K@286K and that plaintiff was terminated from the New York City Department of Education.

6

f8)  In March of 2004, Steve Lent filed a false police report against plaintiff

with the intent to have plaintiff arrested. When plaintiff became aware of

this false plot by Steve Lent, plaintiff filed a complaint against Steve Lent

with the Office of Equal Opportunity of the New York City Department

of Education for racial discrimination and harassment in March of 2004.

Steve Lent was removed from the 811K@286K main site for the rest of

school year  2003/2004. He returned to the main site of 811K@286K in the

fall of school year of 2004/5. He would walk down the halls of the school

and make faces at plaintiff and state that he was going to get plaintiff

fired and out of 811K..

f9)  In May of 2004, plaintiff received a surprise visit from Margo Levy,

School Based Coordinator, and Roslyn Hoff, Supervisor of School

Psychologists. Neither Margo Levy nor Roslyn Hoff had the proper New

York City Department of Education license nor New York State

Department of Education certification in guidance or school counseling

to supervise plaintiff. Yet, they proceeded as if they were plaintiff's

supervisors by demanding plaintiff's paperwork, and finally writing a

negative evaluation report threatening plaintiff with disciplinary actions.

Plaintiff perceived the actions on the part of Margo Levy and Roslyn

Hoff as retaliation against plaintiff for filing a complaint against Steve

Lent.

f10) In addition, the defendant has used a letter written by Steve Lent

supposedly during spring 2004 against plaintiff in which plaintiff

7

did not received notice or due process until the disciplinary charges were filed against plaintiff. The defendant has used other claims by Steve Lent that plaintiff would not assist him with transitional coordinator and PTA assignments, duties that violates the guidance counselor's contract and Jose P. stipulations. In essence, the defendant has by including the false allegations made by Steve Lent in order to assist him and them with assigning plaintiff out of 81 JK@286K and seeking to terminated plaintiff from the New York City Department of Education. That is, defendant received notice that Steve Lent was harassing plaintiff, yet the defendant is supporting the continuing harassment of plaintiff by including the false statements and false testimony against plaintiff by Steve Lent with the intent of getting his assistance in terminating plaintiff.

5)  The defendant, DOE, has discriminated against complainant/plaintiff by retaliating against plaintiff for filing complaints with defendant's internal Office of Equal Opportunity and for filing complaints with the Equal Employment Opportunity Commission and the New York State Human Rights Commission, and for filing a previous complaint with this Court. The defendant has also retaliated against plaintiff for filling a complaint against supervisors for harassment with the Office of Special Commissioner for Investigation for New York City School District.

6)  The defendants, DOE, DOI and SCI, have a custom and policy of abusing their administrative powers by selectively investigating employees of DOE who may have commit inappropriate acts while not investigating others who may have committed similar acts.

7)  The defendant, DOE, has a custom and policy of violating New York State Education Law

8

section 2569(a) by allowing personnel to work in positions as educators without having the proper qualifications/certifications to supervise plaintiff.

8)    The defendant, DOE, has a custom and policy of violating New York State Education Law section 2573 by allowing unqualified individuals to supervise plaintiff/others with out having proper NYS certifications.

9)    The defendant, DOE, has a custom and policy of allowing uncertified persons to write negative evaluation report concerning plaintiff's job performance outside of their professional boundaries, duties and responsibilities.

10)  The defendant, DOE, has a custom and policy of using uncertified persons to write negative reports and use the negative report in a disciplinary hearing against plaintiff in violations of New York State Education Laws sections 2569 and 2573.

11)  The defendant, DOE, has a custom and policy of allowing uncertified person person to testify in an administrative hearing as plaintiff's supervisor with complete knowledge that such person is uncertified.

12)  The defendant, DOE, has custom and policy of allowing uncertified individuals to supervisor plaintiff, i.e., Margo Levy and Roslyn Hoff.

13. The defendant, DOE, SCI, DOI, have a custom and policy of selectively choosing with employee to investigate and not to investigate.

14. The defendant, DOE, has a discriminatory custom and policy of checking for plaintiff's:

> a. signature on the sign-in/sign-out sheets in classroom,
> b. checking students attendance sheets and logs,
> c. while not checking similar situated related service providers signatures on sign-in/sign-out, students attendance sheets and related service logs;
> d. with the sole intent of pursuing disciplinary charges against

plaintiff.

15. The defendants, DOE and SCI have a custom and policy of filing charges or substantiating allegations based on incomplete investigations.

16. Plaintiff during his entire work history has received satisfactory rating for his job performance. When plaintiff was reassigned, he was supposed to receive rating of not applicable (N/A) until the charges were resolved. However, on July 19, 2005, Francine Dreyfus changed plaintiff's rating from not applicable, N/A, to an unsatisfactory rating in violation of plaintiff's guidance counselors' contract.

-B-

Title VII of the Civil Rights Acts of 1964 as amended, New York State

Division of Human rights Laws, and New York State Executive Law section 296-

1) The defendant, DOE, has disparately treated plaintiff different than similar situated related service employees by:

> a. utilizing uncertified , unlicensed and unqualified personnel and/or,
> b. incompetence individuals to supervise plaintiff,
> c. to only check plaintiff work with out cause;
> d. to write negative report.

2) The defendant, DOE, has singled out plaintiff for disciplinary actions when defendant knew that other related service providers were not performing theirs duties with the knowledge and instructions from the defendant.

3. The defendant knew that other related service providers, such as speech and counseling providers , were not performing their duties because defendant did not provide other related service providers with appropriate space for delivery of services.

10

3(a) Defendant's agent/supervisor, Francine Dreyfus, Local Instructional Superintendent (LIS), has lied under oath during plaintiff disciplinary hearing that she checked other related service providers paper work.

3(b) Defendant's agent/supervisor, Francine Dreyfus, LIS, has lied under oath that an assistant principal, Rosina DeMarco, checked other related service providers paper work.

3(c) Defendant's agent/supervisor, Rosina DeMarco, has testified under oath during plaintiff's disciplinary hearing that she did not check other related service providers' paper work, etc.

3(d) Defendant's agent/supervisor, Rosina DeMarco, has testified under oath during plaintiff's disciplinary hearing that she was only instructed by Francine Dreyfus, LIS, and the district to check complainant's paper work.

3(e) Defendant's agent/supervisor, Rosina DeMarco, has testified under oath that it was the district that told the administrative staff at 811K@286K to tell certain related service providers to go into the classrooms to provide related services in violation of federal laws, state laws and the Jose P. stipulations agreed to in this Court.

3(f) Defendant and defendant's agents/supervisors, Francine Dreyfus, LIS, and Rosina DeMarco, and legal department lied to New York State Division of Human Rights when in defendant's response to complainant's complaint to that state agency defendant stated that an assistant principal reviewed the other related service providers work periodically.

4. The defendant, DOE, has checked for plaintiff's signatures on sign-in/sign-out sheets in classrooms, but defendant did not check for signatures of other related service provider signatures in order to make sure other providers were in fact providing services according to students' Individual Education Plan (IEP) mandates. If defendant would have check classroom sign-in/sign-out sheets, defendants should have known that on approximately 120 times during

11

school year 2004-2005 students were not taken out of their classes for related services in violation of their IEPs'. In fact, defendant should have known that since there were approximately twelve (12) students in the classes in which these 120 violations occurred that there were approximately 1,400 times those students IEPs' were violated since some of the students were not mandated for services or their mandates were for groups of a specified size, such as groups in sizes of 3, 4, 5, 6, 7; 8 or for individual services. Plus some were mandated for services for more than one session per week when in fact either they did not receive services at all or not as mandated on their IEPS'.

4(a) Defendant's agent/supervisor, Rosina DeMarco, admitted under oath that she was only instructed to check for complainant signatures on the sign-in/sign-out sheets in classrooms, plaintiff's students' attendance sheets and plaintiff's counseling logs every Monday during school year 2004-2005 up until plaintiff was reassigned to the district office in April of 2005, and defendant did not check similar situated related service providers' sign-in/sign-out sheets, students' attendance sheets and logs every Monday during school year 2004-2005.

4(b) Defendant's agent/supervisor, Francine Dreyfus, LIS, during school year 2004/2005, assigned formal assistant principal of 811K, Rosina DeMarco, plaintiff's duties and responsibilities of constructing and planning his counseling schedules, of checking students' Individual Education Plans for correct biographical information and counseling mandates, etc.; submitting plaintiff's counseling schedules to the appropriate district personnel each month and denying plaintiff to independently make changes in his counseling schedules with out the express approval of the administration while allowing other related service providers to continue performing duties defendant had taken away from plaintiff.

4(c) Defendant's actions and practice of changing plaintiff work assignments and assigning the

majority of plaintiff's professional duties and responsibilities of a related service provider to an assistant principal amounted to a demotion; caused loss of professional prestige, caused professional humiliation, and caused the perception of plaintiff's peers, etc., that plaintiff was incompetent or unable to perform his duties, yet plaintiff had received satisfactory ratings for his job performance every school year prior to school year 2004/2005. .

5.    The defendant, DOE, has checked for plaintiff's signatures on sign-in/sign-out sheets, plaintiff's students' attendance sheets, plaintiff's logs every Monday during school year 2004-2005, but defendant did not check similar situated related service providers sign-in/sign-out sheets, students' attendance sheets and logs every Monday during school year 2004-2005.

5(a) Defendant's agents/supervisors' abusive and hostile acts of abuse of power toward plaintiff by continuously examining plaintiff's performance of his duties for the purpose of developing ficticious reasons to bring plaintiff up on disciplinary charges while knowing that the other related providers were not performing their duties caused plaintiff psychological and emotional trauma.

5(b) Defendant suspended plaintiff pursuant to false disciplinary charges.

6. Defendant transferred/re-assigned complainant to an assignment that caused complainant materially significant disadvantage.

7. Defendant transferred/assigned complainant to duties materially less prestigious and materially less suited to complainant's skills and expertise.

8. Defendant assigned complainant to duties such as shredding  papers, stamping mailing envelopes, taking garbages out; packaging envelopes, writing envelopes, stacking boxes, writing form letters. Duties that are typically assigned to clerical or mail room staff, and other types of meaningless assignments that significantly diminished plaintiff material responsibilities.

13

9. Defendant re-assigned complainant involuntarily and the transfer from 811K for an investigation or disciplinary actions constitutes a negative employment action tantamount to a demotion and punishment.

9(a) Defendant's stated reason for transferring plaintiff from 811K for an investigation was false.

10. Defendant's agents/supervisors have written plaintiff letters threatening plaintiff with unwarranted disciplinary actions:

1. Rachel Henderson wrote plaintiff a letter(s) threatening plaintiff with disciplinary action,

2. Doris CoPenny wrote plaintiff a letter threatening plaintiff with disciplinary action for informing administration that a staff member was falsifying documents,

3. Rosina DeMarco has written plaintiff a letter threatening plaintiff with disciplinary action,

4. Susan Erber, former Superintendent of District 75, has written plaintiff a letter threatening plaintiff with disciplinary action;

5. Bonnie Brown, current Superintendent of district 75, has written plaintiff letter(s) threatening plaintiff with disciplinary action;

5(a) Bonnie Brown wrote email to Rachel Henderson requesting that Rachel Henderson make sure that Mary Flynn, 811K's payroll secretary, deduct days from plaintiff's sick bank so that they could bring plaintiff up on disciplinary charges,

5(b) Defendant did not bring other similar situated employees up on disciplinary charges for non-performance of their duties.

6. Francine Dreyfus, LIS, has written plaintiff three or more letters threatening plaintiff with disciplinary action.

7. Defendant did take disciplinary actions against plaintiff by filing 3020a disciplinary charges with the ultimate aim of seeking to terminate plaintiff.

14

8. Alexis Tandit, former assistant principal of 811K@286K, lied under oath when she testified during plaintiff's hearing that there were no staff sign-in sheets at 811K@329K in which each staff members signed each morning when they arrived to work.

11. Defendant suspended plaintiff from his regularly assigned duties.

12. Defendant suspension of plaintiff denied plaintiff the opportunity of working percession assignments and getting paid for those assignments for school years 2004/5 and 2005/6.

13. Defendant suspension of plaintiff denied plaintiff the opportunity to work for the summer and to receive pay for summer assignments for 2004/5 and 2005/6.

14. Defendant allowed other similar situated employees to work percession during school year 2004/5 and 2005/6 even though defendant knew that similar situated employees were not performing their duties due to the instructions of the defendant.

15. Defendant allowed other similar situated employees to work for the summers of 2004/5 and 2005/6 when defendant knew that these employees were not performing their duties at the instructions of the defendant.

16. Defendant actions of bringing plaintiff up on false disciplinary charges, suspending plaintiff from his regular assignment, assigning plaintiff to material less significant duties, singling plaintiff out to deliberately bring plaintiff up on disciplinary charges and causing plaintiff to lose his rights to extra assignments amounts to an adverse employment actions.

17. All the allegations alleged in this complaint are included in this part of the plaintiff complaint.

-C-

Title VII of Civil Rights Act of !964 as amended: Retaliation

1.The defendant, DOE, has retaliated against plaintiff for filing complaints with defendant's

15

internal Office of Equal Opportunity for race discrimination, harassment, retaliation and by the defendant creating a retaliatory hostile work environment.

2. The defendant, DOE, has retaliated against plaintiff for filing a complaint with defendant's internal Office of Equal Opportunity for an employee harassing plaintiff by filing a false police report against plaintiff and  by assigning plaintiff this employee's duties.

3. The defendant, DOE, has retaliated against plaintiff for filing a complaint with defendant's internal Office of Equal Opportunity for an employee harassing plaintiff by including in defendant's administrative charges against plaintiff libelous and slanderous  statements attributed to this employee, Steve Lent, against plaintiff with out giving plaintiff due process or proper notice of such complaint made by this particular DOE employee.

4.The defendant, DOE, has retaliated against plaintiff for filing a harassment complaint against an employee, Steve Lent,  by allowing this employee to retaliate against plaintiff by testifying at plaintiff administrative hearing.

5. The defendant, DOE, has retaliated against plaintiff for filing complaints with the New York State Division of Human Rights in June 2004, and August 2005.

6. The defendant, DOE, has retaliated against plaintiff for filing complaint with the Equal Employment Opportunity Commission  in June 2004 and August 2005 by conspiring  to harass plaintiff, discriminating against plaintiff because of his race, creating a retaliatory hostile work environment with the sole intent  to create charges with the intent to terminate plaintiff and to deprive plaintiff of his property/tenured rights to employment.

7.The defendant has retaliated against plaintiff for previously filing a complaint with this Federal District Court of the Eastern District of New York that ended in 2004 by conspiring to harass plaintiff, discriminating against plaintiff because of his race, creating a hostile work

environment with the sole intent to create charges with the intent to terminate plaintiff and to deprive plaintiff of his employment rights at the DOE.

8. Plaintiff received a satisfactory rating for his job performance for school year 2003-4.

9. Since plaintiff was reassigned during early April of school year 2004-2005, plaintiff was suppose to receive "Not Applicable" for school year year 2004-2005. Plaintiff did receive a N rating at the end of school year 2004-2005, but the job performance rating was changed by Francine Dreyfus, Local Instructional Superintendent during July 2005 to a "U" rating in violation of the Guidance Counselors' contract.

10. Defendant has created a retaliatory hostile work environment by singling plaintiff out for disciplinary actions.

11. Defendant has created a retaliatory hostile work environment by threatening witnesses with disciplinary actions if they did not testify against plaintiff

12. Defendant has created a retaliatory hostile work environment by threatening a witness to to testify in a disciplinary proceeding against plaintiff when the witness did not want to testify.

13. Defendant has created a retaliatory hostile work environment by committing acts of perjury under oath during the disciplinary proceedings against plaintiff:

        a) Francine Dreyfus has committed deliberate acts of perjury during her testimony under oath,

        b) Margo Levy has committed deliberate acts of perjury during her testimony under oath,

        c) Neil Laskowitz has committed deliberate acts perjury during his testimony under oath;

        d) Michael Bisogna has committed acts of perjury during his testimony

under oath,

    e) Bonnie Brown has committed deliberate acts of perjury during her

       testimony under oath,

    f) Steve Lent has committed deliberate acts of perjury during his testimony;

    g) Rosina DeMarco has committed deliberate acts perjury under oath;

    h) Penny Lablang has committed deliberate acts of perjury under oath,

    i) Yvonne Joseph has committed deliberate acts of perjury under oath,

    j) Sylvia Serra has committed deliberate acts of perjury under oath,

    k) Alexis Tandit has committed deliberate acts of perjury under oath.

14. Defendant has created a retaliatory hostile work environment by bringing false charges

against plaintiff with the sole intent and purpose to terminate plaintiff from the DOE.

15. Defendant has created a retaliatory hostile work environment against plaintiff for filing a

complaint with the DOE's internal civil rights office against Steve Lent for harassment for filing

a false police report against plaintiff, and racial discrimination.

16. Defendant has created a retaliatory hostile work environment by assigning plaintiff duties

outside of plaintiff's contract with the intent to filed charges against plaintiff for not performing.

these duties. Defendant did filed charges.

17. Defendant has created a retaliatory hostile work environment by bringing plaintiff up on

disciplinary charges for duties that are outside the boundaries of plaintiff's contract.

18. Defendant has created a retaliatory hostile work environment by writing evaluative reports

stating as a fact that plaintiff did not perform duties that are outside plaintiff's Guidance

Counselor's contract.

18. Defendant has created a retaliatory hostile work environment by bringing plaintiff up on

charges for not performing duties that violated the Jose P. stipulations agreed to in this Court.

That is, defendant is accusing plaintiff of not performing duties such as PTA responsibilities

when performing these duties would interfere with providing services to students as required by

Jose P.

19. Defendant has created a retaliatory hostile work environment.

20. Defendant knew that complainant had filed:

      a. complaint in the United States District Court of Eastern District
         in 1999,

      b. knew that the case in the District Court ended on March 27, 2004,

      c. knew that complainant had filed a complaint against Steve Lent,
         Guidance Counselor at 811K@286k 2525 Haring Street, Brooklyn, New
         York with the Office of Equal Opportunity of the New York City
         department of Education in March of 2004 for racial discrimination and
         harassment, etc.;

      d. Defendant knew that plaintiff that plaintiff filed complaints with the New
         York Division of Human Rights and the Equal Employment Opportunity
         Commission in July 2004 and August 2005,

      e. Defendant knew that plaintiff had filed a complaints for abuse of powers
         and harassment against Susan Erber and Bonnie Brown with the Mayor
         of the City of New York and the Office of the Special Commissioner for
         Investigation for New York City School District, and the defendant did not
         address or take any actions to resolve the complaint.

21. Defendant has committed several adverse employment employment actions against

complainant for participating in protected activities, and the adverse employment actions

the defendant has committed against complainant are:

      a. Disciplinary actions against complainant

      b. Suspending and reassigning plaintiff

      c. Retaliatory hostile and abusive work environment

      d. Punish plaintiff for filing complaint with agencies mentioned
         in this complaint.

e. Assigning plaintiff duties that were materially less significant,

f. Willfully and intentionally conspiring to terminate and to bring plaintiff up on disciplinary charges,

g. Filing false disciplinary charges against plaintiff;

h. Willfully and intentionally putting forth false witnesses to testify with false testimony with out seeking to exonerate plaintiff from the false disciplinary charges,

i. Threatening witnesses to testify against plaintiff.

22. Defendant's adverse employment actions are directly and indirectly connected with

complainant protected activities:

a. R. Henderson and M. Levy started writing letters to complainant threatening complainant with disciplinary action in spring of 2004.

b. Susan Erber and Bonnie Brown wrote a letter in spring 2003 threatening plaintiff with disciplinary action, and they did bring plaintiff up on disciplinary charges for the erroneous issues cited in the 2003 letter.

c. Bonnie Brown wrote email to Rachel Henderson stating in the email dated April 1, 2003 that they wanted to bring plaintiff up on disciplinary charges; they did bring plaintiff up on disciplinary charges in relation to the email in June 2005. The conspiracy to terminate and bring plaintiff up on disciplinary charges began right after plaintiff's Federal District Court case ended in March 2003 and during plaintiff's Federal District Court case.

d. (1) Plaintiff filed a complaint against Steve Lent for racial discrimination, harassment and filing a false police report against plaintiff with the Office of Equal Opportunity of the New York City Department of Education. Margo Levy wrote letter to plaintiff threatening plaintiff with disciplinary action in May 2004. In addition, defendant assigned plaintiff all of Steve Lent's duties and responsibilities once he was removed from the main site at 286K as a form of punishment for filing complaint against Steve Lent.

(2) Defendant used letter written by Steve Lent against plaintiff during disciplinary hearing with out giving plaintiff notice of such letter when when it was supposedly written by Steve Lent.

(3) Defendant brought disciplinary charges against plaintiff based on the false allegations of Steve Lent in retaliation for plaintiff filing

complaint against Steve Lent with the Office of Equal Opportunity of the New York City Department of Education.

(d-2)  1.  Francine Dreyfus wrote three letter dated September 29, 2004, November 18, 2004, and May 19, 2005 threatening plaintiff with disciplinary action. Each letter is filled with false allegations. Francine Dreyfus actions started after plaintiff had filed complaints against Steve Lent with the office of Equal Opportunity of the New York City Department of Education and filed complaints against Margo Levy and Rachel with the New York State Division of Human Rights.

2.  In addition, Francine Dreyfus held numerous meetings with plaintiff during school year 2004/2005 in an attempt to devise reasons to bring plaintiff up on disciplinary charges.

(e)  Defendant filed disciplinary charges against plaintiff after plaintiff filed complaint with defendant's office of equal opportunity against Bonnie Brown and Francine Dreyfus for racial discrimination, harassment; retaliation and reassigning plaintiff in April 2005 to the district pursuant to an investigation, when in fact, there was no investigation.

23. All other allegations alleged in this entire complaint are included in this part of the complaint.

-D-

Title VII of the Civil Rights Act of 1964 as amended:
"Hostile Work Environment"

1.  Defendant, DOE, has created an hostile work environment that has caused plaintiff:
   a. mental anguish
   b. mental fatigue
   c. emotional pain
   d. emotional suffering
   e. professional humiliation
   f. loss of sleep
   g. constant worrying

2. Defendant has deliberately by its concerted actions to cause plaintiff's work environment to be hostile and abusive by taking actions to ensure that plaintiff will be brought up on false

disciplinary chagres.

3. Defendant's actions are continuing violations and plaintiff is raising the continuing violation theory because defendant's actions against plaintiff have occurred over an extended period of time since plaintiff began working for the defendant.

4. Defendant has continuously violated plaintiff during school year 2004-2005 by creating an hostile work environment by deliberately singling plaintiff out with false allegations of plaintiff not performing his duties while defendant knew that other similar situated employees were not performing their duties.

4-a. Defendant has a continuing discriminatory policy of discriminating against plaintiff because of his race, of creating a hostile work environment and of creating a retaliatory hostile work environment.

5.  Defendant has harass plaintiff for filing complaint complaint against defendant with outside agencies, Special Commissioner of Investigation for the New York City School District.

6.  Defendants, DOE and SCI, have used its investigatory powers as a form of harassment against plaintiff.

7.  Defendants, DOE and SCI, has used incomplete investigatory information as a form of harassment and to bring plaintiff up on disciplinary charges.

8.  Defendant, DOE, has harassed plaintiff by reassigning plaintiff in April 2005 from 811K to 400 First Avenue, New York, New York because of an investigation when there was no investigation.

8a.  Defendant lied to the New York State Division of Human Rights when defendant stated that plaintiff was reassigned because of the defendant's own Office of Special Investigation had investigated plaintiff in April 2005.

8b. Defendant lied when defendant stated in its response to New York State Division of Human

22

Rights when defendant stated that that an assistant principal had periodically reviewed the other related service providers work.

9. Defendant has reassigned plaintiff twice since plaintiff was reassigned to 400 First Avenue, New York, New York, i.e. to:

          a. Regional Operation Center in Flushing, NY
          b. 25 Chapel Street, Brooklyn, New York

10. Defendant's, DOE, representative deceived SC I's investigator into thinking that plaintiff had only twelve students on plaintiff counseling caseload during school year 2003-2004 thereby ensuring that SCI would substantiate its investigation against plaintiff.

11. Defendant, DOE, deliberately went back to a previous school year, 2003-2004 in which plaintiff received a satisfactory rating for his job performance to search plaintiff's records in order to find reasons to bring plaintiff up on disciplinary charges.

11(a) Defendant's agent/supervisor Francine Dreyfus lied when she stated that the mother of two students at 811K@286K made a complaint to her in September 2004 in reference to plaintiff not providing services to her children: That is, mother testified that she did not call Francine Dreyfus or in fact, she had never called Francine Dreyfus, and she did not know Francine Dreyfus.

11(b) Defendant SCI lied in it's letter to DOE's Chancellor when they wrote in the letter dated February 18, 2005 that: a) mother of two children told Francine Dreyfus that her two children were not being taken out of class for counseling, b) both teachers told investigators that plaintiff did not see these two students for counseling during school year 2003/2004; c) mother told the investigators when they went to interview the mother at her home that her two children told her that plaintiff did not take them out of class for counseling, and d) mother denied under oath that that she had every spoken to Francine Dreyfus or, e) that she told the investigators that her two children told her that they were not taken out of class for counseling.

23

12. Defendant, DOE, deliberately encouraged a parent to lie that plaintiff did not served her children for counseling when no teacher or administration made a complaint about plaintiff not performing his duties during 2003-2004 school year.

12(a)  Defendant offered mother of two students renumeration/money to make false claim/complaint against plaintiff.

12(b)  The mother of the two students lied under oath when she testified at plaintiff's hearing that Rosina DeMarco did not call her on her cell phone during and after school year 2003/2004.

12(c)  Mother testified that she received numerous telephone calls from staff members from the District 75 main office in reference to her false complaint against plaintiff. Plaintiff is alleging that these telephone calls were for the sole purpose of encouraging this parent to file a false complaint against plaintiff at the beginning of school year 2004/2005.

13. Defendant deliberately portrayed plaintiff as a hostile black man in it's disciplinary charged against plaintiff, i.e., overtly and subtly.

14. Defendant deliberately portrayed  plaintiff as a black man with an attitude in it's disciplinary charges against plaintiff, i.e., overtly and subtly.

15. Defendant threaten to bring plaintiff/complainant up on disciplinary charges on May 9, 2003.

16. Defendant brought disciplinary charges against plaintiff/complainant on June 6, 2005 for the threat to bring plaintiff/complainant up on disciplinary charges on May 9, 2003.

17. Defendant threaten to bring plaintiff/complainant up on disciplinary charges in the June 7, 2004 letter by Margo Levy.

18. Defendant brought plaintiff/complainant up on disciplinary charges pursuant to the letter by Margo Levy threatening to bring plaintiff up on disciplinary charges.

19. Defendant threaten to bring plaintiff/complainant up on disciplinary charges on the letter written to plaintiff/complainant by Fran Dreyfus, Local Instructional Superintendent(LIS), dated

24

October 18, 2004.

20. Defendant brought plaintiff/complainant up on disciplinary charges pursuant to the letter written by Fran Dreyfus on October 18, 2004 threatening plaintiff/complainant with disciplinary charges.

21. Defendant threaten to bring plaintiff/complaint up on disciplinary charges in the letter written by Fran Dreyfus, LIS, on November 28, 2004.

22. Defendant brought plaintiff/complainant up on disciplinary charges pursuant to the letter written by Fran Dreyfus, LIS, on November 28, 2004.

23. Defendant threaten to bring plaintiff/complainant up on disciplinary charges in the letter written to plaintiff/complaint by Fran Dreyfus, LIS, on May 19, 2005.

24. Defendant brought plaintiff/complainant up on disciplinary charges pursuant to the letter written to plaintiff/complainant by Fran Dreyfus, LIS, on May 19, 2005.

25. Rachel Henderson, Principal of 811K@286K, wrote two letters threatening plaintiff/complainant charges.

26. Defendant brought plaintiff/complaint up on disciplinary charges pursuant to the letter written to plaintiff/complainant by Rachel Henderson.

27. Doris CoPenny, Assistant Principal wrote plaintiff/complaint one letter threatening plaintiff/complainant with disciplinary actions.

28. Defendant brought plaintiff/complainant up on disciplinary charges pursuant to the letter written by Doris CoPenny when the letter demonstrates that defendant has committed theft of service and medicaid fraud by allowing an educational paraprofessional mark attendance in other related service providers  and support services attendance booklets .

28(a) The letters written by DOE agents/supervisors are all examples of the defendant

25

deliberately and intentionally creating a hostile work environment for plaintiff/complainant.

29. Defendant deliberately and intentionally assigned plaintiff/complainant cafeteria duties in violation of plaintiff/complainant's Guidance Counselor's contract.

30. Defendant deliberately and intentionally assigned plaintiff/complainant duties. i.e., Transitional Coordinator, that interfered with plaintiff/complaint performance of his duties as a related service provider.

31. Defendant assigned plaintiff/complainant duties of Transitional Coordinator that according to plaintiff/complaint's contract should have been assigned to a teacher for the purpose of bringing plaintiff up on disciplinary charges.

32. Defendant has brought plaintiff/complaint up on disciplinary charges for duties defendant should not have assigned to plaintiff/complainant, i.e., Transitional Coordinator, Functional Behavior Assessment and Parent Teachers Association (PTA).

33. Defendant has a discriminatory policy of checking plaintiff work but not the work of similar situated employees.

34. Plaintiff is alleging that defendant has a discriminatory policy and practices by continously checking plaintiff performance of his duties every week during school year 2004-2005 up until defendant transferred plaintiff while not checking the other related service providers performance of their duties.

35. Defendant suspended plaintiff for claims that plaintiff alleges that were deliberated created and devised to make plaintiff quit his employment at the New York City Department of Education.

35(a) Defendant deliberately sent Francine Dreyfus, LIS, in October 2003 to begin to set up charges so that disciplinary action could be taken against plaintiff.

35(b). Defendant's Local Instructional Superintendent, Francine Dreyfus, wrote three letters

saturated with deliberate misrepresentations threatening plaintiff with disciplinary actions.

35(c) Defendant's Local Instructional Superintendent, Francine Dreyfus, did bring charges

against plaintiff with the ultimate goal of seeking plaintiff's termination.

35(d) Defendant's Local Instructional Superintendent, Francine Dreyfus, did give false testimony

when she testified  against plaintiff at plaintiff's disciplinary hearing.

36. Defendant denied plaintiff the opportunity to work percession.

37. Defendant denied plaintiff the opportunity to work in the summer of 2004/5 and 2005/6.

38. Defendant has threaten to bring plaintiff up on disciplinary charges.

39. Defendant brought plaintiff up on disciplinary charges.

40. Defendant has created a quid pro quo hostile work environment.

41. Defendant has created a work environment that is severe, pervasive and humiliating

in defendant's attempt to develop false reasons to charge and terminate plaintiff.

42. Defendant has a discriminatory policy of singling plaintiff out for disciplinary actions.

43. Plaintiff is alleging that the frequency of the defendant checking plaintiff's students'

attendance books, of checking plaintiff's counseling logs, and of checking to see if only plaintiff

was signing the classrooms' sign-in/sign-out sheets during school year 2004/2005 created an

hostile and abusive work environment and interfered with plaintiff performing his duties.

44. Plaintiff is also alleging that the frequency of defendant collecting plaintiff's students'

attendance books and keeping the attendance books at times up to ten (10) days and accusing

plaintiff of not keeping students' attendance for such periods of time in which defendant had

possession of the attendance books interfered with plaintiff performing his duties.

45. Plaintiff is alleging that the frequency or number of meeting Francine Dreyfus, LIS, required

plaintiff to attend to discussed plaintiff's students' attendance books, counseling logs and

plaintiff's signature classrooms sign-in/sign-out sheets/logs was abusive, hostile and

professionally humiliating for the fact that Francine Dreyfus continously and wrongly accused

plaintiff at these meeting of not performing his duties.

46. Plaintiff is alleging that the frequency or number of lies and deliberate misrepresentations

included in the three letters written to plaintiff by Francine Dreyfus, LIS, on September 29, 2004,

November 18, 2004 and May 19, 2005 was written to cause plaintiff to lose his job.

47. Defendant has allowed Francine Dreyfus, Local Instructional Superintendent, to personally

supervise plaintiff in violation of the supervisory chain of command, have numerous meetings

with plaintiff as the only relative service provider in attendance, write false accusations and

misrepresentations, write negative evaluation reports without having supervising experience in

supervising related service providers with the deliberate intent in which plaintiff believed was

to cause plaintiff work environment to become pervasive, severe, abusive and hostile.

48. Defendant actions and practices of deliberately singling plaintiff out for disciplinary action

with the ultimate goal of seeking to terminate plaintiff caused plaintiff to believe and perceive

that defendant has/had deliberately caused plaintiff's work environment to become pervasive,

severe, abusive and hostile.

49. Defendant has allowed and encouraged witnesses to lie and to testify falsely at plaintiff's

3020(a) disciplinary hearing that began on March 30, 2006 with the continously intent in plaintiff

belief and perception to cause plaintiff's work environment to continue to be pervasive, severe,

abusive and hostile by the fact that the defendant is/was seeking to terminate plaintiff on

frivolous and false disciplinary charges.

50. Defendant began creating an abusive and hostile work environment for plaintiff all while

proceedings were continuing or almost immediately after a judgment was entered in this Court

before or in March of 2004.

51. Plaintiff has filed complaints with the Mayor of the City of New York in May of 2003, with the Special Commissioner of Investigation for the New York City School District in June 2003, and other complaints for harassment, etc., against defendant's supervisors without defendant doing anything to stop the harassment.

52. Defendant has re-assigned plaintiff for approximately ten (10) times in plaintiff career with the defendant while some related service providers/counselors have spent their entire working career at one school. Plaintiff perceive and believe the numerous reassignments are/were a form of harassment, and, whereby, the defendant has intentionally created a continuing abusive and hostile work environment. As stated before, plaintiff is alleging the "Continuing Violation Theory".

53. Defendant's agent/supervisor, Francine Dreyfus, LIS, has deliberately lied to SCI when she informed the SCI investigator that the mother of the two children had called her to complain about plaintiff not serving her children, when in fact, the mother testified under oath that she did not call Francine Dreyfus to complain about plaintiff serving her children.

54. The mother who testified under oath during plaintiff's disciplinary hearing lied when she stated that plaintiff told her that he was not serving her children.

55. The mother testified under oath that not one staff member at 811K@286K told her that plaintiff was not serving her children, yet the defendant proceeded with a complaint and disciplinary proceedings against plaintiff based on the encouraged lies of the mother of the two students.

56. The fact that plaintiff has been put through this abusive and hostile experience has made plaintiff life completely miserable.

57. Defendant's agent/supervisor, Francine Dreyfus, LIS, lied under oath when she testified

that the mother of the two children called her to complain about plaintiff not servicing her children.

58. Defendant's supervisors threaten to inflict tangible employment/job injury on plaintiff, i.e., quid pro quo harassment/hostile work environment.

59. Defendant's agent/supervisor, Francine Dreyfus, LIS, filed a complaint with the Office of the Special Commissioner of Investigation, SCI, that was loaded with lies, fabrications and misrepresentations.

60. Defendant's agent/supervisor, Francine Dreyfus, LIS, fabricated a connection with the parent of the two students mentioned in the SCI's report in order to harass plaintiff and to set plaintiff up so that the defendant could bring plaintiff up on disciplinary charges, reassigned plaintiff and suspend plaintiff.

61. Defendant's agent/supervisor, Francine Dreyfus, LIS, did not give plaintiff due process on all issues mentioned in the SCI's report.

62. Defendant's agents/supervisors conspired with the Office of Special School Investigation for New York City School District to ensure that plaintiff would be reassigned, suspended and brought up on ficticious/frivolous disciplinary charges.

63. Defendant's agents/supervisors, Susan Erber, Bonnie Brown, and Francine Dreyfus, etc., conspired to harass plaintiff by reassigning plaintiff, suspending plaintiff and devising false reasons to bring plaintiff up on disciplinary charges.

64. Defendant's agents/supervisors, Susan Erber, Bonnie Brown, Francine Dreyfus, etc., conspired to harass plaintiff with the New York City Department of Education's Medical Bureau to deny plaintiff a decision as to whether to grant plaintiff a continuation of line of duty status in order to bring plaintiff up on charges for unauthorized absence.

65. Defendant's Medical Bureau conspired to harass plaintiff by issuing medical decisions before reviewing medical documents, MRI reports, or X-Rays.

66. Defendant's agent, Yvonne Joseph, Medical Bureau Administrative Director, testified during plaintiff's hearing on issues related to plaintiff's injuries in the line of duty in February of 1999. In essence, the defendant has open the door to that period of time.

67. Defendant reassigned plaintiff from the district office and the regional operation center as a form of harassment.

68. Defendant reassigned plaintiff to 25 Chapel Street, Brooklyn, New York as a form of harassment.

(E)

Title 42 U.S.C. section 1981

1. Complainant/plaintiff is a member of a protected class, that is, plaintiff is an African American.

2. The defendant intentionally discriminated against plaintiff because of his race by conspiring to create disciplinary charges in order to harass and terminate plaintiff's employment rights.

3. The discrimination concerns the following activities that are enumerated in section 1981:

a. breach of the terms an conditions of the contract, such as,

    1. assigning duties outside of contract
       (a) cafeteria duties
       (b) transitional coordinator
       (c) functional behavior analyze
       (d) busing, etc,

    2. conspiring to bring plaintiff up on disciplinary charges with the intent to terminate plaintiff's employment contract;

    3. violating the clause in plaintiff's contract that

31

prohibits discrimination of employees by intentionally discriminating against plaintiff because of his race,

4. conspiring to deprive plaintiff of all the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship by concocting/creating reasons to bring plaintiff up on disciplinary charges with the sole intent to terminated plaintiff,

5. to take plaintiff's property, that is, defendant has conspired to take plaintiff's tenured rights of employment by creating actions to bring plaintiff up on disciplinary charges with the intent to terminate plaintiff;

6. defendant has deliberately single plaintiff out for disciplinary actions and charges with the intent to terminate plaintiff,

7. defendant knew other related service providers were not performing their duties because defendant had instructed them not to do their duties in violation of federal and states laws and the Jose P. Stipulation,

8. defendant agents/supervisors have lied and committed perjury under oath in their attempt to terminate plaintiff;

9. defendant legal department has threaten witnesses with termination if they did not testify against plaintiff,

10. defendant's agent/supervisor, Francine Dreyfus, LIS, has written letters to witnesses threatening them with disciplinary action if they did not testify against plaintiff. One of the witnesses has testified that she felt threaten by the conversation she had with the DOE's Legal department and the letter she received from Francine Dreyfus threatening her with disciplinary action,

4. Defendant has deprived or attempted to deprive plaintiff of equal benefits of New York State

Education Law section section 3020(a) by:

32

    a. bringing false disciplinary charges against
       plaintiff,

    b. deliberately planning to bring plaintiff up on
       disciplinary charges,

    c. supporting perjured testimony during proceedings
       against plaintiff,

    d. coercing or forcing witnesses to testify against
       plaintiff,

    e. the right that no deliberate false disciplinary
       charges or actions be brought against plaintiff,

    f. allowing an uncertified and unlicensed person
       to claim to supervise and write negative evaluation
       reports about plaintiff,

    g. allowing an uncertified and unlicensed person,
       Margo Levy, to testify in a disciplinary hearing as if
       she was plaintiff's supervisor, with the attempt to
       deprive plaintiff of plaintiff's tenured rights to
       employment

    h.

5. Defendant has deprived or attempted to deprive plaintiff of equal benefits of New York State

Education Law section 2569(a) by:

    a. by allowing an uncertified person to claim
       to supervise plaintiff without the proper
       New York State Department of Education
       certification,

    b. by allowing uncertified person(s) to write
       negative evaluations of plaintiff threatening
       plaintiff with disciplinary action and to used
       the written negative evaluation by the uncertified
       person in a disciplinary preceeding,

    c. by allowing uncertified person testify in a
       disciplinary preceeding  against plaintiff
       as plaintiff's supervisor without proper
       state certification;

    d. by allowing uncertified person(s) attend meetings
       as plaintiff's supervisor(s),

    e. by allowing Margo Levy and Roslyn Hoff claim
       to supervise plaintiff without proper state

33

certification.

6. Defendant has deprived or attempted to deprive plaintiff of equal benefits of New York State

Education Law section 2573 by:

> a. by allowing Margo Levy to work in the school
> district of New York City without the appropriate
> New York State Education Department's
> certification as a Supervisor of Guidance
> Counselors,

> b. by allowing Roslyn Hoff to work in the school
> district of New York City without the appropriate
> New York State Education Department's
> certification as a Supervisor of Guidance
> Counselors;

> c. by allowing Margo Levy and Roslyn Hoff
> to supervise and write a negative evaluation
> report against plaintiff without the appropriate
> New York State Education Department's
> certification for Supervisor of Guidance
> or School Counselors.

7. Defendant has deprived or attempted to deprive plaintiff equal benefits of New York City

Department of Education Chancellor's Regulation C-230 by:

> a. by allowing Margo Levy and Roslyn Hoff
> to supervise plaintiff without the appropriate
> New York City Department of Education
> license to supervise guidance counselors.

> b. by allowing Margo Levy to testify at plaintiff
> disciplinary hearing as plaintiff's supervisor
> of guidance counselors when in fact she does
> not have a license in guidance counseling.

34

(F)

Title 42 U.S.C. section 1983

1. Defendant has discriminated against plaintiff because of his race in violation of plaintiff's equal protection rights.

2. Defendant acted under the color of New York State Education Law section 3020(a) to bring false disciplinary charges against plaintiff for the sole purpose of terminating plaintiff from plaintiff's tenured rights to employment

2(a). Defendant acted under the color of New York State Education Laws sections 2569 and in violation 2573 of New York State Education Law in allowing uncertified persons, Margo Levy and Roslyn Hoff, to supervise plaintiff without appropriate New York State Education Department's certification for supervisor of guidance counselors and allowing these two individuals to work in the New York City School District without the appropriate state certification for supervising guidance counselors..

2(b) Defendant acted under an official policy, custom, regulation ; practice or law when its allowed Margo Levy and Roslyn Hoff to supervise guidance counselors without the appropriate New York City License in guidance counseling in violation of New York City Department of Education Chancellors' Regulation C-230. Regulation C-230 states that all supervisors in schools should have license or certification in the area in which they will supervise staff. Margo Levy is a certified social worker and Roslyn Hoff is a school psychologist.

3. Defendant has treated similar situated individuals different than plaintiff.

4. Defendant has an official policy, custom or practice of filing false charges against employees.

5. Defendant has an official policy, custom, regulations and  practice of violating its own policies and regulations.

35

6. Defendant has an official policy, custom, regulation and practice of deliberately violating the provisions of the guidance counselors' contract by assigning plaintiff duties in violation of plaintiff's guidance counselors' contract.

7. Defendant has an official policy, custom and practice of singling plaintiff out for disciplinary action and punishing plaintiff for not performing duties outside of his contract that were in violation of federal, state and municipal laws.

8. Defendant has an official policy, custom and practice of violating federal and state medicaid laws by condoning the falsification of attendance documents for students by related service providers for related service not perform according to students Individual Education Plan (IEP).

9. Defendant has an official policy, custom and practice of receiving medicaid reimbursement for services not provided to students according to their IEP.

10. Defendant has an official policy, custom and practice of deliberately coercing related service providers, i.e., speech providers, etc., to falsify attendance documents for services not provided to students according to their Individual Education Plans (IEP).

11. Defendant, according to former Assistant Principal of 811K@286K, Rosina DeMarco, testimony under oath during plaintiff's disciplinary hearing, has/had instructed other related service providers to provide service to students in their class because there was not enough space to provide services in violation of each student's IEP.

12. Defendant has an official policy, custom and practice of not bringing other related service providers up on disciplinary charges for not performing their duties and falsification of attendance documents for which the New York City Department of Education has received millions of dollars and perhaps billions of dollars in medicaid reimbursement from the federal and state government.

13. Defendant has/had an official policy, custom and policy of strictly monitoring plaintiff

36

performing his duties by checking plaintiff's students' attendance books, counseling logs,

classroom sign-in/sign-out sheets and to ensure that plaintiff was taking students out of their

classes for related services.

14. Defendant has an official policy, custom and practice of selectively investigating staff

by the Office of Special Investigation of the New York City Department of Education.

15. Defendant(s) has/have an official policy, custom and practice of not investigating complaints

filed against certain employees of the New York City Department of Education. Plaintiff and

others have filed numerous complaint with  the New York City Department of Investigation.

the Office of the Commissioner of Special Investigation for the New York City School District

and  the Office of Special Investigation of the New York City Department of Education against

certain employees of the New York City Department of Education for abuse of powers and

violating New York City Department of Education regulations, New York City Mayoral

Executive Order Number 11, New York State laws and regulations and federal laws and

regulations.

16. Defendant(s) has/have not provided plaintiff with equal protection of the laws under the

fourteenth amendment of the Constitution of the United States and under the color of New York

State Laws by not investigating plaintiff's complaints to the Chancellor of the New York City

Department of Education, to the Office of the Special Commissioner of Investigation for the New

York City School District and to New York  City Department of Investigation  against certain

employees, Susan Erber, former Superintendent of District 75, Bonnie Brown, current

Superintendent of District 75, Francine Dreyfus, Local Instructional Superintendent of District

75, Rosina DeMarco, former Assistant Principal of 811K, Steve Lent, Guidance Counselor at

811K and the whole Speech Department of District 75, etc., in violation of the New York City

Charter and Mayoral Executive Order Number 11.

17. Defendant and defendant's agents/supervisors, etc., conspired to deprive plaintiff of equal protection of the laws by discriminating against plaintiff because of his race and retaliating against plaintiff for filing complaints with Office of Equal Opportunity of the New York City Department of Education, the New York State Division of Human Rights and the Equal Employment Opportunity Commission (EEOC) in violation of New York State Human Rights Law, New York State Executive Law section 296 by filing and bringing false disciplinary charges against plaintiff.

18. Defendant has deliberately deprive plaintiff under the color of law of the right to work in an environment free from harassment and fear of losing his job.

19. Defendant has deprived plaintiff of equal treatment under the color of state law or official capacity.

20. Defendant acting under the color of state laws has abused its powers against plaintiff by the powers granted to it by state laws.

21. All allegations alleged in this complaint are included in this part of plaintiff's complaint.

22. Defendant has an official policy , custom, practice, etc. of violating New York State Education Laws sections 2569(a), 2573 and 3020.

23. Defendant has an official policy of violating the New York City Department Chancellors' Regulations: Regulation C-230, etc.

24. Defendants, New York City Department of Education, New York City Department of Investigation, and Special Commissioner of Investigation for New York City School District have an official policy, custom and practice, etc., of violating the New York City Charter section and the New York City Mayoral Executive Order number 11.

25. Defendant, New York City Department of Education, failed to provide plaintiff equal

38

protection of New York State Education Laws sections 2569(a) and 2573 by permitting uncertified persons, Margo Levy and Roslyn Hoff, to supervise complainant without proper or appropriate New York State Education Department certification as Supervisor of Guidance/School Counselors.

25. Defendant, New York City Department of Education, failed to provide plaintiff of equal protection or equal treatment of Chancellors' regulation C-230, etc., when defendant allowed unlicensed persons to supervise plaintiff, participate in meetings, testify in disciplinary hearing, and write negative evaluation report without the proper or appropriate New York City Department of Education license as Supervisor of Guidance Counselors.

26. Defendant, New York City Department of Education has/had an official discriminatory policy, custom and practice, etc., of checking plaintiff performance of his duties while not checking other related service providers performance of their duties.

27. All other parts of this complaint is included in this part of the complaint.

### (G)

### Title 42 of the U.S.C. section 1985

1. The defendant's agents/supervisors, etc., i.e., all agents and supervisors mentioned in this complaint and the legal department of the defendant in a concerted effort and a meeting of the minds or an agreement conspired as a group to single plaintiff out for disciplinary action, to deny plaintiff of due process, to reassigned plaintiff, to demote and harass because of his race.

2. Defendant and defendant's agents/supervisors have deliberately taken unfair actions such as creating reasons to scrutinized and check the performance of plaintiff's duties, as mentioned above in this complaint, while similar situated employees performance of their duties were not scrutinized or checked at all.

39

3. Defendant allowed unlicensed and uncertified individuals to supervise, write a negative evaluation report, participated in meeting and testify in a disciplinary hearing as a supervisor of plaintiff.

4. Defendant conspired to allowed witnesses to give false testimony against plaintiff.

5. Defendant knowingly conspired to allowed false witnesses to testify against plaintiff.

6. Defendant knowingly conspired to tampered with evidence.

7. Defendant conspired to investigate plaintiff.

8. Defendant conspired with other employees to bring plaintiff up on false disciplinary charges.

9. Defendant conspired with the Special Commissioner of Investigation for the New York City School District to bring plaintiff up on disciplinary charges.

10. Defendant's agents/supervisors have conspired to deny plaintiff medical leave of absence.

11. Defendant's agents/supervisors have conspired to suppress or destroy documents that would exonerate plaintiff during disciplinary hearing.

12. Defendant's agents/supervisors have conspired to fabricate and/or lie in order to deprive plaintiff of his tenured rights of employment with defendant.

13. Defendant actions deprive plaintiff of his employment rights, terms and conditions of employment and equal privileges and immunities of employment.

14. Defendant has deprived plaintiff of equal protection under the New York State Education Laws sections 3020(a), 2569(a) and 2573 by:

        a. Bringing false disciplinary charges under section 3020(a)

        b. Allowing uncertified persons to claim to be plaintiff's supervisor and write negative evaluation report in violation N.Y.S. Ed. law section 2569(a)

        c. Allowing uncertified persons to work in the New York City School District

40

      d. Allowing unlicensed person to work as plaintiff's supervisor and write negative evaluation report in violation of New York City Department of Education Chancellor's regulation C-230.

15. In furtherance of the conspiracy against plaintiff, defendant has:

      a. single plaintiff out for disciplinary actions,

      b. brought plaintiff up on disciplinary charges with the intent to terminate plaintiff,

      c. abused its powers by intentionally violating state laws;

      d. provided false witnesses to give false testimony against plaintiff,

      e. tampered with evidence

      f. threaten witnesses to testify against plaintiff

16. Defendant has caused injury to plaintiff by agreeing to singling plaintiff out for disparate treatment while knowing other similar situated employees were not performing their duties.

17 Defendant has cause plaintiff injury by depriving plaintiff equal protection of New York States Education Laws, sections 3020(a), 2569(a) and 2973, etc.

18. Defendant has caused plaintiff injury by depriving plaintiff equal protection of the New York City Department of Education Chancellor's regulation C-230.

(H)

Title 42 of the U.S.C. section 1986

Plaintiff is alleging that a group of individuals conspired to violate plaintiff's civil rights as alleged in this complaint.

(I)

New York State Executive Law Section 296

Plaintiff is hereby alleging that all facts relevant to New York State Human Rights Laws,

New York State Executive Laws, section 296, alleged in this complaint are complained of as

if alleged under New York State Human Rights Laws, New York Executive Laws, section 296.

(J)

Request for an Injunction

Plaintiff is also petitioning the Court for an injunction from this Court for an order for the

defendant to cease and desist from harassing plaintiff in any manner.

(K)

Demand for Jury Trial

Plaintiff hereby gives the Court plaintiff's notice for a Jury Trial.

(L)

Plaintiff is alleging that each sections of this complaint is alleged as if alleged in each separate

section of this complaint.

(M)

Wherefore plaintiff demands judgment against the defendant(s) (1) in the sum of $10 million

dollars for disparately treating plaintiff and retaliating against plaintiff for filing complaints for

racial discrimination, retaliation, harassment, creating an abusive hostile work environment, and

previously filing a complaint against defendant in this Court that ended in March of 2004 in

violation of Title VII of the Civil Rights Act of 1964 as amended, Title VII, section 2000 of the

U.S.C. , (2) in the sum of $10 million dollars for creating a retaliatory hostile work environment

and an hostile work environment in violation of Title VII of the Civil Rights Acts of 1964 as

42

amended, etc.; (3) in the sum of $25 million dollars for violating Title 42 section 1981 of the United States Codes, (4) in the sum of $25 million dollars for violating Title 42 section 1983 of the United States Codes, and (5) in the sum of $10 million dollars for discriminating and disparately treating plaintiff because of his race, and retaliating against plaintiff for previously filing complaints against defendant, defendant's agents/supervisors or other employees of defendant in violation of New York State Human Rights Law, New York State Executive Laws section 296, etc.; (6) in the sum of $200,000 for conspiring to violate plaintiff's civil rights in violation of Title 42 sections 1985 and 1986, and (7) in the sum of $25 million dollars for deliberately conspiring to caused plaintiff mental pain, mental anguish, emotional pain, emotional stress, psychological stress and loss of sleep, loss of reputation, interfering with family relationship by causing plaintiff to spend huge amounts of his time thinking and preparing to defend the frivolous and false charges leveled against plaintiff, and for cost and other relief as may be lawful and proper.

Date: July 27, 2006
Brooklyn, New York

Respectfully submitted,

Ernest Jeter
Plaintiff Pro Se
124-21 Flatlands Avenue/1J
Brooklyn, New York  11208
(H) 718-498-6437
(C) 347-596-7357

EEOC Form 161 (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

# DISMISSAL AND NOTICE OF RIGHTS

| | |
|---|---|
| To: **Ernest Jeter**<br>**124-21 Flatlands Avenue  Apt. 1J**<br>**Brooklyn, NY 11208** | From:   **New York District Office - 520**<br>**33 Whitehall Street**<br>**5th Floor**<br>**New York, NY 10004** |

|   | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR § 1601.7(a)) |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **16G-2005-04643** | **Holly M. Woodyard,**<br>**Investigator** | **(212) 336-3643** |

## THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

|   | |
|---|---|
| [ ] | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
| [ ] | Your allegations did not involve a disability as defined by the Americans with Disabilities Act. |
| [ ] | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| [ ] | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge. |
| [ ] | Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge. |
| [ ] | While reasonable efforts were made to locate you, we were not able to do so. |
| [ ] | You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged. |
| [ ] | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
| [X] | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| [ ] | Other (briefly state) |

## - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this Notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

MAY 16 2006

Enclosure(s)

**Spencer H. Lewis, Jr.,**
**Director**

(Date Mailed)

cc:  **NEW YORK CITY DEPARTMENT OF EDUCATION**
**52 Chambers Street, Room  308**
**New York, NY 10007**
**Attn: Human Resources Director**

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
New York District Office
33 Whitehall Street, 5th Fl
New York, N.Y. 10004

OFFICIAL BUSINESS
PENALTY FOR PRIVATE USE, $300





UNITED STATES POSTAGE
PITNEY BOWES

02 1A
0004601382           $ 00.39⁰
MAY 04 2006
MAILED FROM ZIP CODE 10004

112Q8+5B22-33 CO14

# Exhibit B

D+F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x

ERNEST JETER,

          Plaintiff,

- against -

BOARD OF EDUCATION OF THE CITY
OF NEW YORK,

          Defendant.

-------------------------------------------------------x

Trager, J.

MEMORANDUM AND ORDER
Civil Action No.
CV-99-2537 (DGT)

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.
★ MAR 3 0 2004 ★

**BROOKLYN OFFICE**

    Plaintiff, Ernest Jeter, brings this action pro se against his employer, the New York City

Department of Education[1] ("DOE"). He alleges that the defendants discriminated against him in

violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000(e), et seq.,

42 U.S.C. §§ 1981 or 1983, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §

12112, et seq., on the basis of his race, disability, and in retaliation for grievances. Jeter

describes himself as African-American and describes his disabilities as the inability to walk up

and down stairs, back pain, Post Traumatic Stress Disorder, and the inability to sleep and to lift.

(Pl. Opp. at 29-30.)

    DOE moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary

judgment dismissing the complaint in its entirety. Jeter makes a cross-motion for summary

judgment and requests further discovery. (Pl. Opp. at 34.)

---

[1]The full name of the defendant is the Board of Education of the City School District of the City of New
York.

c/m

## Background

On February 20, 1998, Jeter filed a charge of discrimination with the United States' Equal Employment Opportunity Commission ("EEOC"). (D. Ex. C.) On February 13, 1999, he received a Right-to-Sue letter from the EEOC. (Pl. Ex. C.) Jeter commenced the instant action on May 4, 1999.

Jeter has been employed by the DOE as a guidance counselor since September 8, 1994. He completed his probationary period on October 17, 1998. (Pl. Ex. A ¶ 4D, D. Ex. B.) Jeter began working for the DOE with the in-house title of Dean at East Brooklyn Congregation ("EBC"), East New York. He was working under a full-time substitute guidance counselor license. (D. Ex. B, Ex. F at 33, Ex. O at 10-11.) On March 1, 1995, Jeter was injured when a student at EBC, East New York kicked him. (D. Ex. F at 63-68.) He was granted injury in the line of duty ("ILOD") status from March 1 until June 12, 1995. His request to continue ILOD status from June 13 through June 28, 1995, the end of the school year, was denied. (D. Ex. P, Ex. Q, Ex. F at 80-81.) Jeter filed a lawsuit against the DOE on May 30, 1995 with the Supreme Court of the State of New York, for Kings County, claiming a right to an extension of ILOD status for the two week period and to receive payments pursuant to ILOD. (D. Ex. F at 62-63, 89-91, D. Ex. R.) Jeter's claim was for personal injury, and alleged "intentional tort, imputed, and gross; willful; wanton and reckless negligence," but made no mention of discrimination. (D. Ex. R.)

On June 12, 1995 Jeter was examined by Dr. Ronald Walker, a DOE orthopedic surgeon, who reported that Jeter walked with a "bizarre gait" and that the examination was unable to be

completed when Jeter became "hostile," but that Jeter was, nevertheless, fit to return to work. (Pl. Ex. J at 6.) Jeter claims that Walker did not review his medical records in making the fitness determination. (Pl. Opp. at 20.) Although MRI and x-ray reports from the Brooklyn Veteran's Administration ("VA") Hospital were available, it appears that Walker did not review them. (Pl. Ex. 22, 28.) Jeter apparently believes a review of the MRI and x-ray reports would have led to a determination that he was not fit to return to work. (Id.)

The Medical Bureau of the DOE has the initial power to grant or deny ILOD status to a pedagogue employee. While on ILOD leave salary continues to be paid without regard to the number of sick leave days accumulated by the employee. An employee seeking a medical leave files an "Application for Excuse of Absence for Personal Illness" (form OP 198). The application is forwarded to the principal of the school and then the superintendent of the district for review. The principal and superintendent review the application to assure the accuracy of the facts set forth on the form. They do not review the application for medical accuracy or to provide a medical opinion. If they approve the application it is forwarded to DOE's Medical Bureau for their review. (D. Ex. I, Ex. J at 26-27, 50-52.) When reviewing an employee's ILOD status, Walker stated it is "beneficial" for the physician to review all relevant medical records. (Pl. Ex. J at 22, 28.)

The parties contest whether medical arbitration is only available to regularly appointed, as opposed to substitute, guidance counselors. (D. Rule 56.1 Stmt. at 4, ¶ 17, D. Ex. K at 20-21. But see Pl. Ex. G at 54.) In the event that an employee is granted medical arbitration, the medical arbitrator's decision is final and binding. (D. Ex. J at 99-101.) Even if unable to seek medical arbitration, substitute guidance counselors can grieve a decision of the Medical Bureau

through ordinary grievance and arbitration procedures pursuant to the United Federation of

Teachers ("UFT") contract.  (D. Ex. G at 55.)

In September 1995, either Genevieve Richards-Wright, then principal of EBC, East New

York, Stephen Phillips, superintendent for alternative high schools, or Bob Galli, in charge of

budgeting for alternative superintendency, decided to excess[2] Jeter out of EBC, East New York.

(D. Ex. O at 31-32, 47-48.)  Wright testified that Jeter's excessing was due to budget constraints,

and in accordance with DOE's excessing policy.  (D. Ex. O at 25-28.)  The Dean's position at

EBC, East New York, was filled four years later, in 1999, by an unnamed African-American

male.  (D. Ex. O at 46-47.)  Jeter never filed a grievance with the UFT with respect to this

excessing.  (D. Ex. F at 38-43.)  At the same time that Jeter was excessed from EBC, East New

York, a teacher, Ms. Reilly, was performing guidance counselor functions at EBC, Bushwick,

then located in the same building as EBC, East New York.  (Pl. Ex. Y.)  The building that housed

EBC, East New York and Bushwick was barrier free and equipped with ramps.  (Pl. Ex. Y.)

Jeter never requested any accommodation for his injury while at EBC, East New York.  (D. Ex.

F.)

Medical Bureau Personnel Memorandum No. 51 outlines procedures for an employee to

request a reasonable accommodation pursuant to the ADA.[3]  (D. Ex. L.)  The procedures require

---

[2]Excessing involves removal from an assigned position and generally includes a re-assignment within the same district of the DOE.  A guidance counselor can volunteer to be excessed to a vacancy within the same district. If no senior guidance counselor volunteers, the involuntary rules apply, and guidance counselors, either regularly appointed or full-time substitutes, may be subject to excessing according to seniority rules.  (D. Ex. G, at Art. 11.) A transfer, pursuant to a Transfer Plan, on the other hand, involves a request for a new assignment within the DOE by a generally appointed teacher.  (D. Ex. G at Art. 12.)  Although the parties place emphasis on the characterization of each move, the substantive differences do not affect the determination of the cross-motions.

[3]Personnel Memorandum No. 51 reads in part:
    ...determinations regarding reasonable accommodations will be made on an individual basis after a
    review of the following : (1) the disabled individual's functional limitations; (2) the supporting

-4-

initially discussing a request for accommodation with the school, district, or office administrator. The Medical Bureau will only review a request after this discussion has occurred. (D. Ex. L.)

Guidance counselors are represented in collective bargaining by the UFT, which has a collective bargaining agreement with the DOE covering guidance counselors. The collective bargaining agreement has provisions on the subjects of appointment, excessing, seniority, transfer plans, and medical arbitration. (D. Ex. G.) For these subjects the same rules apply to appointed guidance counselors (those on tenure track) and full-time substitute guidance counselors. For appointed guidance counselors, in determining layoffs and seniority, "time in system, not time in license" is controlling. (D. Ex. H at 99-102.) This means that the date a guidance counselor was hired by the DOE is controlling for seniority and layoffs rather than the date the employee began service in a particular title. All full-time substitute guidance counselors are excessed or transferred pursuant to the seniority system applied to appointed guidance counselors. The full-time substitute guidance counselor with the least DOE service has the least seniority and will be excessed first, in the event that excessing is necessary. (D. Ex. H at 44-47, Ex. F at 38-43.)

DOE Chancellor's Regulation A-820 provides an internal complaint procedure for any guidance counselor complaining of discrimination based on several grounds, including race, color, and disability. (D. Ex. N.) Jeter never filed a complaint of discrimination with the DOE Office of Equal Opportunity. (D. Ex. F at 223.)

---

medical documentation; (3) the essential functions of the job; and (4) whether the granting of the accommodation would impose an undue hardship upon the Board of Education. Examples of accommodations are "limited stair climbing ... Elevator accessibility" (D. Ex. I.)

From September 5 through December 17, 1995 Jeter was "temporarily reassigned," serving as a guidance counselor in the Queens Outreach Program, a part of Citywide School District 79, under principal Anthony Embriano. (Pl. Ex. AA, D. Ex. F at 36-43.)  While at Queens Outreach Jeter walked with a cane, but did not request any accommodation from Embriano or the Medical Bureau. (D. Ex. F at 94-95.)  Jeter claims that he would have requested an accommodation but feared reprisal. (D. Ex. F at 94-95.)  During the course of Jeter's tenure at Queens Outreach, Embriano allegedly commented to Jeter "Oh, you are the lawyer," which Jeter construed as a signal that Embriano was aware of his pending claim. (D. Ex. F at 91.)

On December 18, 1995, Jeter began working at Walter Reed School, P9 ("P9") a special education school with grades K through nine, in District 75.  Jeter's position was full-time substitute guidance counselor.  Jeter worked at P9 from December 1995 through August 1997. During the 1995-96 school year Ms. Bloomberg was the principal of P9.  In September 1996, Jeanette Fricault became principal of P9. (D. Ex. B, D Ex. F at 91-92, 96-98, D. Ex. S at 4-6.) The P9 building has four floors and does not have an elevator. (D. Ex. F at 99-100, D. Ex. S at 42-45.)  Jeter did not request any accommodation for his injury from Bloomberg or Fricault. (D. Ex. F at 100-01.)

On November 16, 1996, Jeter was told by Fricault to lower certain percentage levels regarding goals he set for students.  In her opinion they were unattainable. (D. Ex. T.)  On August 27, 1997, Jeter was notified that he was to be excessed from P9, which is in Queens, to the Manhattan Center for Career Development, P751M ("P751M") in Manhattan, also in District 75.  According to DOE the excess was necessary because a guidance counselor was coming into P9 under the UFT transfer plan on September 5, 1997.  The UFT transfer plan is a contractual

provision allowing senior employees to transfer from one school to another. (D. Ex. U.) In addition to Jeter, the other guidance counselors at P9 at the time of the transfer were Talia Intrator, Mary Digman, Doris Braunstein, and Rochelle Lebovic. Intrator, who is white, started working for the DOE on September 18, 1990. (D. Ex. V, D. Ex. H at 68-70, Pl. Ex. DD.) Digman, who is white, started working for the DOE on April 3, 1995. (D. Ex. W, D. Ex. H at 74-75, Pl. Ex. DD.) Lebovic, who is white, started working for the DOE on September 7, 1977. (D. Ex. X, D. Ex. H at 75-76, Pl. Ex. DD.) Braunstein, who is black, started working for the DOE on October 14, 1985. (Pl. Ex. DD, Pl. Ex. YY, D. Ex. Y, D. Ex. H at 73-74.) Jeter did not file a grievance regarding this excessing. (D. Ex. U., D. Ex. F at 149-49.) Lewis Eisenberg, who is white, was transferred into P9 on September 2, 1997. He had been appointed a secondary guidance counselor on March 5, 1984. (D. Ex. Z, D. Ex. H at 70-72, D. Ex. S at 35, Pl. Ex. DD.)

On the day Eisenberg was transferred to P9 Jeter was excessed to P751M. There he remained a full-time substitute guidance counselor. Jeter was supervised by Carlyne Turner, the Supervisor for Guidance Counselors for District 75 for Manhattan and the Bronx. (D. Ex. B, D. Ex. F at 114, 139-41, D. Ex. AA at 83-92.) Jeter continued to walk with a cane at P751M. (D. Ex. F. at 142-43.) Manhattan Transition Center ("MTC") is an off-site location for P751M. (D. Ex. F at 139-41.) Jeter worked at several placement centers through MTC, including Columbia University, VA Hospital, Baruch College, the Restaurant School, Metropolitan Hospital, Fashion Institute of Technology, State University and Central Park. Jeter often worked at two different sites each day, five days a week. (D. Ex. F at 139-41.) On October 17, 1997, after a month of being a full-time substitute at P751M, Jeter was regularly appointed as a secondary guidance counselor in P751M and received tenure one year later, on October 18, 1998. (D. Ex. B, D. Ex. F

at 196-201.) While at P751M Jeter did not request any accommodation for his disability. (D. Ex. F at 142-43.) The buildings in which Jeter worked at Columbia University, State University, the Restaurant School, Metropolitan Hospital and Central Park had elevators. (D. Ex. F at 142-43, D. Ex AA at 83-92.)

While Jeter was assigned to the Restaurant School the school moved into another facility, formerly an elementary school, with stairs and no elevator. Turner arranged for Jeter to be relocated to Metropolitan Hospital. Turner stated that she believed it would be easier for Jeter if he could avoid the stairs at the new Restaurant School location. (D. Ex. AA at 95-98.) Jeter did not request any accommodation during the 1998-99 school year. (D. Ex. AA 66-68, 83-92.)

While at several of the P751M off-site locations, including Metropolitan Hospital, VA Hospital and Columbia University, Jeter did not have private offices or a telephone. DOE claims it did not have resources to provide such amenities at every off-site location. Each off-site location was responsible for providing space for the DOE employee to work. (D. Ex. AA at 58-61.)

In 1998, Jeter again attempted to grieve the denial of ILOD status for the two week period from June 13 through June 28, 1995. (D. Ex. F at 168-71.) The UFT informed Jeter that because he was a full-time substitute guidance counselor at the time of his injury, he was not entitled under the UFT contract to appeal the Medical Bureau's decision to a medical arbitrator. However, the UFT advised Jeter that he would have been entitled to file a regular contract grievance had he done so at the time. (D. Ex. BB, D. Ex. F at 135, 168-71.)

On February 9, 1999 Jeter was injured while breaking up a fight between two students at Metropolitan Hospital. The DOE's Medical Bureau approved Jeter's ILOD status from February

-8-

9 through March 18, 1999. (D. Ex. DD.) Jeter's case was referred to Dr. Jean Jeudy on February

24, 1999. Jeudy cleared Jeter to return to work immediately, but scheduled another appointment

for March 18, 1999 and requested that Jeter bring additional documentation, including

psychiatric and orthopedic reports from the Brooklyn VA Hospital, where Jeter was being

treated. (Pl. Ex. P.) On March 18, 1999 Jeter was examined by Dr. Anne Garner, a DOE

psychiatrist, who reported that Jeter's complaints of back pain "were not born out objectively"

and that Jeter became "very angry, defensive and hostile." (Pl. Ex. V at 27.) Jeter then filed for

medical arbitration. Pending arbitration, Jeter borrowed days from his Cumulative Absence

Reserve. Thereafter, Jeter sought leave without pay. The Medical Arbitrator found Jeter fit to

return to work. (D. Ex. GG, D. Ex. FF.) The Arbitrator also found that Jeter suffered from Post

Traumatic Stress Disorder and that he feared being attacked by students. Jeter's ILOD status was

extended through June 30, 1999, pursuant to the Medical Arbitrator's decision. (D. Ex. FF.)

Jeter filed a Notice of Claim in May 1999 based on the injuries he had sustained in February. (D.

Ex. IIII.) On October 28, 1999 Jeter was examined by Dr. Jeudy who noted that Jeter was fit for

service, but added "how competent he'll be remains to be seen." (Pl. Ex. U.)

     On October 26, 1999, Jeter returned from leave without pay, motivated by financial

difficulties and fear of being evicted. (D. Ex. F 185-86.) Upon return he was initially assigned to

P811K in Brooklyn, a special education school in District 75. (D. Ex. B, D. Ex. AA at 123-24,

D. Ex. F at 185-87.) According to Turner, Jeter was transferred out of P751M, Metropolitan

Hospital, because she did not want him to return to work in the environment where he was

assaulted. (D. Ex. Aa at 123-24.) Jeter's position was filled by Ed Mainzer, who is white. (Pl.

Ex. JJ. At 13-14.)

During 2002 and early 2003 Jeter attended physical therapy sessions at the Brooklyn VA

Hospital every Tuesday and Thursday, and only worked three days per week. (Pl. Opp. at 32.)

Dr. Susan Erber, superintendent of District 75, and Jeter's superior, met with Jeter on February

24, 2003 to discuss his attendance record and possible disciplinary action against him. (Pl. Ex.

SS, Letter from Dr. Susan Erber dated Feb. 11, 2003.) After the meeting, at which Jeter was

represented by Mr. Mancuso from the UFT, Dr. Erber required Jeter to come to work at P811K

on Tuesdays and Thursdays. (Pl. Ex. SS, Letter from Dr. Susan Erber dated Feb. 24, 2003.)

Jeter continues to be an appointed secondary guidance counselor at P811K. (D. Ex. B.)

### Discussion

Summary judgment may not be granted unless "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed.R.Civ.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548

(1986); Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).

In determining whether summary judgment is appropriate, a court must resolve all

ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986) (citing United

States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994 (1962)); see also Gallo, 22 F.3d at

1223. If the moving party meets its burden, the burden shifts to the nonmoving party to come

forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

The nonmoving party must produce evidence in the record and "may not rely simply on

-10-

conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993). In employment discrimination actions summary judgment must be granted with caution, but "remains available to reject discrimination in cases lacking genuine issues of material fact." Alston v. New York City Transit Auth., No. 02 Civ. 2400, 2003 WL 22871917, at *2 (S.D.N.Y. Dec. 3, 2003) (quoting Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 40 (2d Cir. 1994)).

Although the same standards for summary judgment apply when a pro se litigant is involved, the pro se litigant should be given "special latitude" in responding to a summary judgment motion. See McPherson v. Coombe, 174 F.3d 276, 279 (2d Cir. 1999) (courts "read the pleadings of a pro se plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest'") (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)); see also Alston, 2003 WL 22871917, at *2.

### (1)

### Timeliness

DOE argues that Jeter's claims under Title VII and the ADA for events which occurred prior to April 26, 1997 are time barred, and that Jeter's §§ 1981 or 1983 claim is barred for acts occurring prior to May 4, 1996. Claims arising under Title VII and the ADA must be commenced within 300 days.[4] Claims arising under §§ 1981 or 1983 must be commenced within

---

[4]Title VII, 42 U.S.C. § 2000e-5(e)(1)(1994) states in relevant part: "A charge ... in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice ... shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred."

The ADA, 42 U.S.C. § 12117(a)(1994) states in relevant part: "The powers, remedies, and procedures set forth in section[ ] ... 2000e-5 ... of this title shall be the powers, remedies and procedures this subchapter provides to

-11-

three years. Owens v. Okure, 488 U.S. 235, 250, 109 S.Ct. 573, 582 (1998). Jeter apparently

concedes this point with regard to the §§ 1981 or 1983 claim as he completely failed to respond

to it in any of his motion papers. See Hawana v. City of New York, 230 F. Supp. 2d 518, 525

(S.D.N.Y. 2002).

    With regard to the timeliness of his Title VII and ADA claims, Jeter invokes the doctrines

of equitable "tolling, estoppel and waiver." (Pl. Opp. at 9, ¶ 2.) Jeter claims that he lacked

sufficient knowledge of the circumstances surrounding his excessings and the denials of ILOD

status extensions to bring his claims until depositions were taken. This lack of information was

allegedly due to misrepresentations made by various DOE personnel. (Pl. Opp. 27-28.) Jeter,

however, has failed to present facts to support his invocation of the doctrines. See Zerri-

Edelglass v. New York City Transit Auth., 333 F.3d 74 (2d Cir. 2003) ("Equitable tolling is an

extraordinary remedy and requires showing that plaintiff acted with reasonable diligence to

uncover facts."). DOE points out the incongruity that Jeter did in fact file his claim prior to

taking depositions, which belies any assertion that he was unaware of the circumstances that

formed the basis of the claim. Accordingly, Jeter's claims based on his 1995 excessing from

EBC, East New York, and the denial of 1995 ILOD status extension are time barred.

---

... any person alleging discrimination on the basis of disability in violation of any provision of this chapter ...
concerning employment."

    If the alleged discrimination took place in a state or locality that has its own antidiscrimination laws and an
agency to enforce those laws, then the time period for filing claims with the EEOC is extended to 300 days. 42
U.S.C. § 2000e-5(e)(1). In this case, the discrimination alleged took place in New York, which has both
antidiscrimination laws and an antidiscrimination agency. The 300-day limit therefore applies. Ford v. Bernard
Fineson Dev. Ctr., 81 F.3d 304 (2d Cir. 1996).

**(2)**

**Title VII**

**a. Excessing**

    Jeter claims that his excessings from Queens Outreach to P9, from P9 to P751M, and from P751M to 811K were unlawful employment practices prohibited under Title VII because they were based on his race.  Title VII makes it unlawful "for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. §§ 2000(e)-2(a)(1), (2).  In order to establish a prima facie case of race discrimination Jeter must establish: (1) that he is a member of a protected class; (2) he satisfactorily performed his job duties; (3) adverse employment action was taken against him; and (4) the adverse employment action gives rise to an inference of unlawful discrimination.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973); Kerzer v. Kingly Mfg., 156 F.3d 396, 401 (2d Cir. 1998); see also Hudson v. IBM Corp., 620 F.2d 351, 354 (2d Cir. 1980) (same framework applies to § 1981 claims); Surlocco v. New York Police Dep't, 888 F.2d 4, 7 (2d Cir. 1989) (same framework applies to § 1983 claims).  The parties agree that the first two requirements are met.

**1. Adverse Employment Actions**

    Jeter claims that his excessing from P9 to P751M was improper because he had seniority over two of the other guidance counselors, Intrator and Digman, both of whom were white.  It appears that he is correct that this excessing did not conform with DOE guidelines because both Intrator and Digman were less senior that him.  Jeter also claims that his excessings from Queens

-13-

Outreach to P9, and from P751M to P811K were improper, without specifying the grounds for this belief. Moreover, Jeter does not point to any career detriment suffered due to any of the excessings. Rather, his pleadings can be construed to assert that the frequency[5] and alleged impropriety of the excessings were detrimental per se, and amounted to adverse employment actions. DOE contends that Jeter's excessings, without more, are not adverse employment actions.

In order for Jeter to show that he suffered an adverse employment action he must have "endure[d] a 'materially adverse change' in the terms and conditions of employment." Pimentel v. City of New York, No. 00 Civ. 326, 2002 WL 977535, at *3 (S.D.N.Y. May 14, 2002) (quoting Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 446 (2d Cir. 1999)). In order for an action to be "materially adverse," there must be a change in working conditions that is "more disruptive than a mere inconvenience or an alteration of job responsibilities." Galabaya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2001) (quoting Crady v. Liberty Nat'l Bank and Trust Co. of Indiana, 993 F.2d 132, 136 (7th Cir. 1993)). A materially adverse change is one that "has an attendant negative result, a deprivation of a position or an opportunity." Pimentel, 2002 WL 977535, at *3; Campbell v. Grayline Air Shuttle, Inc., 930 F. Supp. 794, 802 (E.D.N.Y. 1996). Adverse employment actions are not limited to "readily quantifiable losses," but an employee's unhappiness does not engender an actionable adverse action. Pimentel, 2002 WL 977535, at *3 (quoting Phillips v. Bowen, 278 F.3d 103, 117 (2d Cir. 2002)); see also Bennett v. Watson Wyatt & Co., 136 F. Supp. 2d 236 (S.D.N.Y. 2001).

---

[5]The "continuing violation" doctrine does not apply. It was not included in Jeter's original or amended complaint, which could be fatal to its application. Miller v. ITT, 755 F.2d 20, 25 (2d Cir. 1985). Even under the more liberal reading of a pro se plaintiff's motion papers, Jeter would have to raise a hostile work environment claim, which it cannot be inferred he is attempting to do. AMTRAK v. Morgan, 536 U.S. 101 (2002).

-14-

Determination of which employment actions are "adverse" must be made on a case-by-case basis. Lumhoo v. Home Depot USA, Inc., 229 F. Supp. 2d 121, 138 (E.D.N.Y. 2002) (citing Richardson, 180 F.3d at 446). Examples of adverse employment actions are "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." Pimentel, 2002 WL 977535, at *3 (quoting Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999)). If an employee "earns the same salary, has the same benefits, works the same hours ... and has the same opportunities for promotion" following a transfer then there is no adverse employment action, even if the employee is "extremely unhappy about it." Pimentel, 2002 WL 977535, at *3; see also Galabaya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (plaintiff's transfer from one special education school to another was not an adverse employment action); Garber v. New York City Police Dep't, No. 95 Civ. 2516, 1997 WL 525396, at *4 (S.D.N.Y. Aug. 22, 1997) (holding that "purely subjective feelings about a transfer which, by objective standards, did not negatively alter the terms and conditions of his employment in any respect" have no bearing on the adverse employment action inquiry). Jeter does not allege, nor is there any evidence in the record, that the excessings negatively altered the terms and conditions of his employment beyond mere inconvenience. It cannot be inferred that his excessings were anything more pernicious than lateral transfers. A "pure lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action." Pimentel, 2002 WL 977535, at *4; Adeniji v. Admin. for Children Servs., NYC, 43 F. Supp. 2d 407, 426 (S.D.N.Y. 1999); Cooper v. New York State Dep't of Human Rights, 986 F. Supp. 825, 828 (S.D.N.Y. 1997) (mere fact of transfer insufficient to show a materially adverse change in working condition). Jeter's allegations that there were more

-15-

convenient schools where he could have worked do not transform his excessings into adverse employment actions.

Jeter's working conditions while at P751M, however, including not having an office or telephone at off-site locations, may have negatively altered the terms and conditions of his employment. Nevertheless, these conditions are not shown to have affected Jeter's salary, benefits, hours or opportunities for promotion.

While Jeter was at P9, the principal, Fricault, requested that he lower his student performance goals. Jeter alleges this was one of the adverse employment actions taken against him. Being advised and counseled, however, does not, as a matter of law, constitute an adverse employment action. See Weeks v. New York State, 273 F.3d 76, 86 (2d Cir. 2001) ("criticism of an employee... is not an adverse employment action"). Even if Fricault's request is considered a negative evaluation, such an evaluation is not actionable under Title VII unless followed by an adverse employment action. See Valentine v. Standard & Poor's, 50 F. Supp. 2d 262, 284 (S.D.N.Y. 1999), aff'd, 205 F.3d 1327 (2d Cir. 2000) ("Given that plaintiff's negative reviews did not lead to any immediate tangible harm or consequences, they do not constitute adverse actions materially altering the conditions of his employment."); see also Pellei v. Int'l Planned Parenthood Fed'n, Inc., No. 96 Civ. 7014, 1999 WL 787753, at *12 (S.D.N.Y. Sept. 30, 1999) (evaluations must cause "a materially adverse change" in conditions of employment, such as "demotion, suspension, or loss of wages"); Castro v. New York City Bd. of Educ. Personnel, No. 96 Civ. 6314, 1998 WL 108004, at *7 (S.D.N.Y. Mar. 12, 1998) (negative evaluations "unattended by a demotion, diminution of wages, or other tangible loss do not materially alter employment conditions"). It can be inferred that Jeter considered his excessing from P9 a

-16-

negative consequence of his negative evaluation. However, the excessing was a lateral transfer, not a materially adverse change in the conditions of employment, and therefore cannot be considered an adverse employment action caused by the negative evaluation for purposes of Title VII analysis.

Jeter does not allege, nor does the record indicate, that the negative evaluation adversely affected his opportunity for promotion. See Manessis v. New York City Dep't of Transp., No. 02 Civ. 359, 2003 WL 289969, at *13 (S.D.N.Y. Feb. 10, 2003) ("no evidence indicating that this evaluation in any way affected plaintiff's promotional opportunities"). In fact, Jeter was appointed as a secondary guidance counselor in 1997 and received tenure on October 18, 1998.

**b. ILOD**

Jeter claims that the denial of his application to extend his 1999 ILOD status was unlawfully racially motivated. DOE concedes that a denial of an ILOD extension constitutes an adverse employment action, but they argue that Jeter fails to present evidence to support an inference that the reason for the denial was his race, and thus fails to make out a prima facie discrimination case. The burden of alleging a prima facie case "is a minimal one." Booker v. Fed. Reserve Bank of New York, Nos. 01 Civ. 2290, 01 Civ. 2291, 2003 WL 1213148, at *8 (S.D.N.Y. Mar. 17, 2003) (quoting Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000)). A victim of discrimination is "seldom able" to prove his claim by direct evidence and is usually "constrained to rely on the cumulative weight of circumstantial evidence." Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991); see also Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 464-65 (2d Cir. 1989). In raising an inference of discrimination, Jeter must show that race "had a

determinative influence" on the decision to deny the extension of ILOD status.  Johnson v.

Eastchester Union Free School Dist., 211 F. Supp. 2d 514, 519 (S.D.N.Y. 2002) (quoting Reeves

v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141, 120 S.Ct. 2097, 2105 (2000)).  An

inference of discrimination may be drawn from evidence tending to show preferential treatment

given to employees outside the protected class, or upon the timing or sequence of events leading

to the adverse employment action.  Tout v. County of Erie, 2 F. Supp. 2d 320, 326 (W.D.N.Y.

1998); see also Stratton v. Dep't for the Aging, 132 F.3d 869, 878-79 (2d Cir. 1997); Chertkova

v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir. 1996).  One "common and especially

effective method" for a plaintiff to discharge his burden of showing circumstances giving rise to

an inference of discrimination is to show "that the employer treated a similarly situated employee

differently." Arqueta v. N. Shore Long Island Jewish Med. Health Sys., Inc., No. 01 Civ. 4031,

2003 WL 22670915, at *6 (E.D.N.Y. Nov. 6, 2003) (quoting McGuinness v. Lincoln Hall, 263

F.3d 49, 53 (2d Cir. 2001)).  Jeter has not alleged that he was subjected to racially derogatory

comments, nor has he presented any direct evidence of racial animus.  Gordon v. New York City

Bd. of Educ., No. 01 Civ. 9265, 2003 WL 169800, at *6 (S.D.N.Y. Jan. 23, 2003) (granting

summary judgment where plaintiff failed to produce any evidence of racial motivation for

transfer).  Although Jeter asserts that the determinations made by DOE Medical Bureau staff

were medically unfounded, he has not produced evidence or alleged that other similarly situated

employees were granted ILOD extensions; nor does the record reveal any other evidence that

might give rise to an inference of discrimination.  Without such an inference Jeter fails to make

out a prima facie case for discrimination based on the denial of the ILOD status extension.

### (3)

### ADA

Jeter claims that his injury in 1995 rendered him disabled under the ADA because he was unable to walk and climb stairs. Subsequent to his 1999 injury Jeter was unable "to sleep and to lift," suffered back pain and was diagnosed with Post Traumatic Stress Disorder. He further claims that he was denied reasonable accommodations for these injuries, in violation of the ADA. It can be inferred that the accommodation Jeter sought was extension of ILOD status.

To establish a prima facie case of discrimination for failure to provide reasonable accommodation under the ADA, Jeter must demonstrate that: (1) he has a disability within the meaning of the statute; (2) DOE had notice of the disability; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) DOE refused to make such reasonable accommodations. Felix v. New York City Transit Auth., 154 F. Supp. 2d 640, 653 (S.D.N.Y. 2001), aff'd, 324 F.3d 102 (2nd Cir. 2003).

DOE argues that Jeter fails to make a prima facie case because he does not have a "disability" as defined by the statute. Although he has an impairment that affects major life activities, DOE argues the impairment does not substantially limit those activities. They also claim that Jeter is not "otherwise qualified" because the accommodation he sought was to not work. They argue in the alternative that Jeter fails to establish that he was denied reasonable accommodation.

### a. Disability under the ADA

An individual is considered disabled within the meaning of the ADA if he: (1) has a physical or mental impairment that substantially limits one or more of the major life activities; (2) has a record of such an impairment; or (3) has been regarded as having such an impairment. 42 U.S.C. § 12102(2)(A)-(C). The first factor has three discrete elements, such that the plaintiff must (1) have a mental or physical impairment that (2) substantially limits (3) a major life activity. Bragdon v. Abbott, 524 U.S. 624, 631, 118 S.Ct. 2196, 2202 (1998); Burgos v. City of Rochester, No. 99 Civ. 6480, 2003 WL 22956907, at *2 (W.D.N.Y. Mar. 31, 2003). DOE concedes that Jeter has an impairment, however, a physical impairment, standing alone, does not necessarily constitute a disability under the ADA. Hazeldine v. Beverage Media, Ltd., 954 F. Supp. 697 (S.D.N.Y. 1997).

To be "substantially limited" under the ADA, an individual must be "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity" as compared to the average person in the general population. 29 C.F.R. § 1630.2(j)(1)(i)-(ii). The three factors to be considered when determining whether an impairment substantially limits a major life activity are: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2)(i)-(iii). This list is "illustrative and not exhaustive." Bragdon, 524 U.S. at 625. If the major life activity is employment "the impairment

-20-

must substantially limit employment generally." Byrne v. Bd. of Educ., 979 F.2d 560, 565 (7th Cir. 1992); Castro v. Local 1199, 964 F. Supp. 719 (S.D.N.Y. 1997).

Several courts have held that an inability to walk or climb stairs is insufficient to meet the substantial limitation requirement. See Brower v. Continental Airlines, Inc., 62 F. Supp. 2d 896 (E.D.N.Y. 1999); Zuppardo v. Suffolk County Vanderbuilt Museum, 19 F. Supp. 2d 52 (E.D.N.Y. 1998) (holding plaintiff was not substantially limited where unable to walk more than one eighth of a mile without suffering severe pain and needing to rest); see also Kelly v. Drexel Univ., 94 F.3d 102, 106-08 (3d Cir. 1996) (plaintiff who did not require crutches or cane not "disabled" as a matter of law); Banks v. Hit or Miss, Inc., 996 F. Supp. 802, 807 (N.D.Ill. 1998) (plaintiff not "disabled" as a matter of law where she could only walk short distances and could not stand for extended periods); Horth v. Gen. Dynamics Land Sys., Inc., 960 F. Supp. 873, 878 (M.D.Pa. 1997) (plaintiff who could not sit or stand for more than two hours without difficulty and had trouble walking could not show limitations were more than moderate restrictions and thus, was not disabled). Although Jeter walked with a cane while at several schools he was clearly able to continue his work as a guidance counselor, even where he was required to travel between schools. There is no evidence to support a finding that Jeter was substantially limited in his working, walking, or any other major life activity. Accordingly, Jeter fails to establish that he was disabled within the meaning of the ADA.

**b. Reasonable Accommodation**

Even if Jeter is substantially limited in his ability to work, or in another major life activity, it is his burden to identify a reasonable accommodation that would have allowed him to

-21-

continue to work. <u>Mitchell v. Washingtonville Cent. School Dist.</u>, 992 F. Supp. 395 (S.D.N.Y.

1998), <u>aff'd</u>, 190 F.3d 1 (2d Cir. 1999); <u>see</u> <u>Borkowski v. Valley Cent. School Dist.</u>, 63 F.3d 131,

138 (2d Cir. 1995). This burden is a minimal one. Jeter need only "suggest the existence of a

plausible accommodation," which passes a facial cost/benefit analysis. <u>Borkowski</u>, 63 F.3d at

138; <u>see also</u> <u>Gilbert v. Frank</u>, 949 F.2d 637, 642 (2d Cir.1991). Under the ADA, "reasonable

accommodation" may include "job restructuring, part-time or modified work schedules,

reassignment to a vacant position." 42 U.S.C. § 12111(9)(B).

The accommodation Jeter sought was extension of ILOD status. A reasonable

accommodation, however, does not require the employer to eliminate any of a job's essential

functions. <u>Mitchell v. Washingtonville Cent. School Dist.</u>,190 F.3d 1, 5 (2d Cir. 1999)

(employer has no obligation to provide employee with an indefinite leave of absence).

Attendance is an essential job function. <u>Mescall v. Marra</u>, 49 F. Supp. 2d 365, 374 (S.D.N.Y.

1999). Jeter's only requested accommodation, therefore, would have required DOE to eliminate

an essential job function.

Jeter also claims that he was denied a reasonable accommodation when he was not

allowed to schedule his physical therapy on Tuesdays and Thursdays in 2003. This issue,

however, is not properly before the court as it was raised for the first time in Plaintiff's

Memorandum of Law in Support of Plaintiff's Opposition to Defendant's Motion for Summary

Judgment. <u>See</u> <u>Beckman v. United States Postal Serv.</u>, 79 F. Supp. 2d 394, 407-08 (S.D.N.Y.

2000) (Plaintiff cannot raise a new cause of action for the first time in a motion for summary

judgment or motion in opposition to an opponent's summary judgment motion).

-22-

Even if the claim was properly before this court, requesting two days off each week does not allow Jeter to perform the essential functions of his job. See Adams v. Rochester Gen. Hosp., 977 F.Supp. 226, 235 (W.D.N.Y. 1997) (holding that employer did not fail to provide reasonable accommodation where plaintiff failed to show how time off would allow him to perform an essential job function). Jeter claims that taking Tuesdays and Thursdays off to go to physical therapy is a reasonable "restructuring" of his work schedule. (Pl. Opp. at 32.) However, his superintendent found that his frequent absences created a "hardship" for students who needed counseling, and for teachers and parents who needed to speak to him. (Pl. Ex. SS, letter from Dr. Erber dated Feb. 26, 2003.) Accessibility to students, teachers, and parents is unquestionably an essential aspect of a guidance counselor's job, and Jeter's request was, therefore, unreasonable. Cf. Franklin v. Consol. Edison Co. of New York, Inc., No. 98 Civ. 2286, 1999 WL 796170, at *13 (S.D.N.Y. Sept. 30, 1999) (finding request for accommodation reasonable where plaintiff sought to arrive at work one hour later).

### (4)

### §§ 1981 or 1983 Claims

Jeter claims that his civil rights were violated as a result of a municipal policy or custom, in violation of 18 U.S.C. §§ 1981 or 1983. He bases this claim on the above violations of his civil rights, alleging that the individual acts of discrimination were endorsed by the lack of a coherent employment policy throughout the DOE. DOE argues that Jeter failed to establish a claim under §§ 1981 or 1983 because he cannot prove that his civil rights were violated, and that

even if Jeter proves that his civil rights were violated, he cannot point to any evidence showing that the DOE had a policy or custom of discriminating against African-Americans.

Municipal liability under §§ 1981 and 1983 requires a plaintiff to show either that he suffered the alleged harm (1) as a result of an officially promulgated policy, formally adopted by the municipal agency's governing board, or (2) because of an act undertaken by an employee who, as a matter of state law, has final policymaking authority in that area. Davis v. City of New York, 228 F. Supp. 2d 327, 337 (S.D.N.Y. 2002), aff'd, 75 Fed. Appx. 827 (2nd Cir. 2003) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690, 98 S.Ct. 2018, 2035-36 (1978) and Pembar v. City of Cincinnati, 475 U.S. 469, 480-81, 106 S.Ct. 1292, 1298-99 (1986)). To support municipal liability on the basis of an alleged custom, a plaintiff must show that the alleged custom that led to his constitutional deprivation is permanent in the agency and is so widespread as to have force of law. Davis, 288 F. Supp. at 336-37. From 1995 to 1999 final policymaking authority at the DOE was vested in the Chancellor or the seven member Board. See N.Y. EDUC. LAW § 2590-g (McKinney 2003). Jeter has presented no evidence that there was an official policy of discrimination with regard to guidance counselor excessing or ILOD extensions, or that any of the acts alleged were undertaken by the Board or the Chancellor.


**(5)**

**Retaliation**

Jeter claims that his excessings and the denial of the 1999 ILOD extension were retaliations for his filing of a Notice of Claim for the first denial of ILOD extension. To establish a prima facie case of retaliation a plaintiff must demonstrate that: (1) the employee was engaged in protected activity; ... (3) the employee suffered an adverse employment action; and (4) there

was a causal connection between the protected activity and the adverse employment action.
Booker, 2003 WL 1213148, at *9 (quoting Distasio v. Perkin Elmer Corp., 157 F.3d 55, 66 (2d
Cir. 1998)). "[P]rotected activity" refers to action taken to protest or oppose statutorily
prohibited discrimination. See 42 U.S.C. § 2000e; see also Reed v. A.W. Lawrence & Co., Inc.,
95 F.3d 1170, 1178 (2d Cir. 1996) (stating that plaintiff must act in "opposition to an unlawful
employment practice" to engage in protected activity). Here, Jeter has not alleged that he
engaged in any protected activity. Jeter's Notice of Claim does not allege that the denial of his
ILOD status was racially motivated, or evidence that he was in any way protesting statutorily
prohibited discrimination. Even if Jeter had believed at the time of the 1995 denial of ILOD
status extension that the denial was racially motivated, and his filing the Notice of Claim is
considered a protected activity, he has not suffered any adverse employment action as a result.
See Section III(A)(1), supra. Accordingly, Jeter fails to make out a prima facie retaliation case.

### (6)

### Request for Additional Discovery

Jeter's request for additional discovery, raised in Plaintiff's Memorandum of Law in
Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, is denied. A
party opposing summary judgment on the ground that it needs more discovery under Rule 56(f)
must present his contention by affidavit. United States v. Evseroff, No. 00 Civ. 6029, 2001 WL
1571881, at *5 (E.D.N.Y. Nov. 6, 2001); see also Paddington Partners v. Bouchard, 34 F.3d
1132, 1137 (2d Cir. 1994). "A reference to Rule 56(f) and to the need for additional discovery in
a memorandum of law in opposition to a motion for summary judgment is not an adequate

substitute for a Rule 56(f) affidavit." Evseroff, 2001 WL 1571881, at *5. Jeter does not reference rule 56(f) in his Memorandum.[6]

Even if Jeter's Memorandum is liberally construed to allow it to be treated as a Rule 56(f) affidavit, the Second Circuit requires such an affidavit to include: "(1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." Meloff v. New York Life Ins. Co., 51 F.3d 372, 375 (2d Cir. 1995). Jeter request is a bare assertion that he needs additional discovery time "to offer the court more details to support" his 1981 and 1893 claims. Jeter does not mention what details will be obtained or how they will be obtained. Further, Jeter essentially admits that he has made no efforts to discover the information.

As the party opposing the motion for summary judgment, Jeter is usually entitled to "the opportunity to discover information that is essential to his opposition." Berger v. United States, 87 F.3d 60, 65 (2d Cir. 1996). "But the trial court may properly deny further discovery if the non-moving party has had a fully adequate opportunity for discovery." Trebor Sportswear Co. v. The Limited Stores, Inc., 865 F.2d 506, 511 (2d Cir. 1989). Discovery in this case was extensive. Moreover, a court may deny a request for further discovery "if it deems the request to be based on speculation as to what potentially could be discovered." Paddington Partners, 34 F.3d at 1138. Jeter's lack of specificity suggests that his request is probably speculative. The

---

[6] The rule states:

> Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f).

"bare assertion" that the evidence supporting a party's allegation is in the hands of his opponent is "insufficient to justify a denial of a motion for summary judgment under Rule 56(f)." Id. (quoting Contemporary Mission, Inc. v. United States Postal Serv., 648 F.2d 97, 107 (2d Cir. 1981)).


## Conclusion

Jeter's claims based on his 1995 excessing from EBC, East New York, and the denial of 1995 ILOD status extension are time barred. The remaining excessings are not adverse employment actions and, therefore, preclude Jeter from establishing a prima facie case of employment discrimination. Jeter fails to establish a prima facie case based on the denial of the 1999 ILOD status extension because he has not produced any evidence to support an inference of discriminatory motive. Similarly, Jeter failed to establish prima facie cases as to the §§ 1981 and 1983 and retaliation claims.

Accordingly, DOE's motion for summary judgment is granted, and Jeter's cross-motion for summary judgment is denied. The Clerk of the Court is directed to close the case.


Dated: Brooklyn, NY
        March 25 2004

                                        SO ORDERED:


                                        _____
                                        David G. Trager
                                        United States District Judge